# EXHIBIT A

# EXHIBIT A

03/12/2021, 9:02:04 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1  Gregory P. Brock (State Bar No. 181903)
   BROCK LAW OFFICE
2  2039 Shattuck Avenue, Suite 303
   Berkeley, CA 94704
3  Telephone: (510) 841-1171
   Facsimile: (510) 841-1666
4  Email: brocklawoffice@gmail.com

5  Attorney for Plaintiff,
   MARK GRIFFIN
6

7

8                    SUPERIOR COURT OF CALIFORNIA

9                         COUNTY OF MARIN

10                      [Unlimited Jurisdiction]

11

12  MARK GRIFFIN,                          Case No.

13          Plaintiff,                     COMPLAINT FOR DAMAGES:
                                            1.  Negligence;
14      vs.                                 2.  Breach of Contract;
                                            3.  Breach of the Implied Covenant of Good
15  JED D'ABRAVANEL, YANYI                      Faith and Fair Dealing;
    D'ABRAVANEL, CHRISTOPHER PIRO,         4.  Violation of Civil Code §§1941 and 1941.1;
16  CLAIRE PIRO, and DOES 1 to 10,         5.  Violation of Civil Code §1942.4;
                                            6.  Violation of Civil Code §1942.5;
17          Defendants.                     7.  Violation of Civil Code §1950.5; and
                                            8.  Unfair Business Practices in Violation of
18                                              Bus. & Prof. Code §§17200, 17203.
19

20      Plaintiff alleges:

21      1.      Plaintiff MARK GRIFFIN ("Plaintiff") is a competent adult.

22      2.      Defendant JED D'ABRAVANEL is and at all times herein mentioned was a

23  competent adult who resides in the County of Marin, State of California.

24      3.      Defendant YANYI D'ABRAVANEL is and at all times herein mentioned was a

25  competent adult who resides in the County of Marin, State of California.

26      4.      Defendants JED D'ABRAVANEL and YANYI D'ABRAVANEL are referred

27  herein as "Defendants D'Abravanel" or "the D'Abravanels".

28      5.      Defendant CHRISTOPHER PIRO is and at all times herein mentioned was a

                                    1

Complaint

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1   competent adult who resides in the County of Marin, State of California.

2       6.   Defendant CLAIRE PIRO is and at all times herein mentioned was a competent

3   adult who resides in the County of Marin, State of California.

4       7.   Defendants CHRISTOPHER PIRO and CLAIRE PIRO are referred herein as

5   "Defendants Piro" or "the Piros".

6       8.   Defendants D'Abravanel, Defendants Piro, and DOES 1 to 10 (collectively

7   "Defendants") at all relevant times alleged herein owned, controlled, managed, supervised, and/or

8   operated a business establishment engaged in the business of leasing residential housing known as

9   27 Acacia Road, Fairfax, California (the "Property").  The Property is a three-bedroom single

10  family home.

11      9.   Defendants Does 1 through 10 are sued herein under fictitious names.  Their true

12  names and capacities are unknown to each Plaintiff.  When their true names and capacities are

13  ascertained, each Plaintiff will amend this complaint by inserting their true names and capacities

14  herein.  Each Plaintiff is informed and believes and thereon alleges that each of the fictitiously

15  named Defendants is responsible in some manner for the occurrences herein alleged, and that each

16  Plaintiff's damages as herein alleged were proximately caused by those Defendants.

17      10.   Plaintiff alleges on information and belief that Defendants, and each of them, are

18  and at all times herein mentioned were the agents and servants of each other and in doing the

19  things hereinafter alleged were acting within the scope of such agency and service.

20      11.   Plaintiff alleges on information and belief that each and every wrongful act and

21  omission by Defendants, and each of them, complained of herein was done with the express

22  approval and/or implied approval of each other Defendant, and that each Defendant has adopted

23  and/or approved and/or ratified the acts and omissions of the other Defendants.

24      12.   Plaintiff Mark Griffin is the father of two boys – aged 10 and 12.  Plaintiff and his

25  sons moved into the Property in January 2019 under a written lease with Defendant Christopher

26  Piro which specified monthly rent of $4,250, and a security deposit of $6,375.  Plaintiff paid the

27  security deposit of $6,375 to the Piros in January 2019.

28      13.   Plaintiff at all times made timely payment of rent unless such payments were

Complaint

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1    waived or excused.

2        14.    After living at the Property for some months, Plaintiff and his sons noticed some

3    defective conditions.  Chief among these defects were an extensive rat infestation and a defective

4    furnace.  There was also a problem with rotting exterior stairs and railings.

5        15.    On or about September 3, 2019, Plaintiff sent an email to Defendant Christopher

6    Piro regarding his concerns about the defective furnace, rodents in the walls, and other

7    substandard conditions at the Property.  Defendant Christopher Piro noted these concerns but took

8    no immediate corrective action.

9        16.    On or about November 18, 2019, Plaintiff sent Defendant Christopher Piro a follow

10   up email, letting him know that rodent activity was ongoing.  Defendant Christopher Piro again

11   failed to take effective action.

12       17.    On or about December 6, 2019, Defendant Christopher Piro finally scheduled an

13   extermination company to come to the Property on December 23, 2019.  This effort did not abate

14   the rat infestation.

15       18.    In April 2020, Plaintiff and Defendant Christopher Piro entered into a renewal

16   written Rental Agreement.  The Rental Agreement ("Rental Agreement") had a one-year term

17   beginning July 1, 2020 and ending June 30, 2021.  Rent remained at $4,250.  The Rental

18   Agreement acknowledged that Plaintiff had paid a security deposit of $6,375.  The Rental

19   Agreement provided that the prevailing party in any dispute arising out of the agreement was

20   entitled to reasonable attorney's fees and costs.  A true and correct copy of the Rental Agreement

21   is attached hereto and incorporated herein as **Exhibit A**.

22       19.    On or about April 13, 2020, Plaintiff again emailed Defendant Christopher Piro to

23   notify him of ongoing rodent activity.  Rats were in the walls and inside the house. Defendants

24   Piro sent an exterminator who placed traps, but the rodent problem persisted.

25       20.    On or about April 19, 2020, Plaintiff notified Defendants Piro by email that rodents

26   were leaving excrement in the kitchen.  The rodent infestation remained unabated.

27       21.    On or about July 4, 2020, Defendant Christopher Piro informed Plaintiff that he

28   planned to sell the Property.  Plaintiff told Defendant that he wanted to stay on as a tenant during

3

Complaint

03/12/2021, 9:02:12 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1   the lease term and beyond.

2       22.     On or about July 21, 2020, Plaintiff notified Defendants Piro by email that there

3   were large areas under the house where the exterminators had failed to place rodent traps.

4       23.     On or about August 11, 2020, the Piros' realtor asked Plaintiff to sign a Covid

5   waiver acknowledging the risk of having people come into the residence.  Plaintiff complied but

6   asked that Defendants Piro take appropriate Covid precautions to avoid endangering his children

7   and himself.  The Piros agreed to take Covid precautions but failed to do so; some of the people

8   they allowed to enter the Property refused to follow Covid safety protocols.  On one occasion,

9   inspectors sent by Defendants D'Abravanel entered the Property without advance notice and

10  without wearing personal protective equipment while Plaintiff and his children were sheltering in

11  the home.

12      24.     During the week of August 18, 2020, Plaintiff was stung repeatedly over a period

13  of several days by yellow jackets which emerged from an in-ground nest located in a rotting

14  terrace off the main path to the house.  Plaintiff had a severe allergic reaction to these stings,

15  which left him with swelling and pain for days.

16      25.     On or about August 18, 2020, Plaintiff emailed Defendant Christopher Piro to

17  schedule an appointment with a service provider to take out the yellow jacket nest.

18      26.     On or about August 20, 2020, Defendants Piro agreed to sell the Property to

19  Defendants D'Abravanel.  At that time, Defendant Jed D'Abravanel personally assured Plaintiff

20  that he could stay in the Property until the end of the Rental Agreement term on June 30, 2021.

21  Defendant Jed D'Abravanel also told Plaintiff that he and Defendant Yanyi D'Abravanel planned

22  to move into the Property, and that they would be happy to terminate the Rental Agreement early

23  and without penalty if Plaintiff wanted to move out sooner.  Plaintiff told Defendant Jed

24  D'Abravanel that he did not want to move out early.

25      27.     On or about August 21, 2020, the pest exterminators were scheduled to come to the

26  Property.  However, the pest company apparently confused the date, and did not appear.  Plaintiff

27  contacted Marin Vector Control and was able to arrange for an appointment.

28      28.     On or about August 24, 2020, Marin Vector came to the Property and treated the

4

Complaint

03/12/2021 9:02:15 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1  yellow jacket nest. Marin Vector informed Plaintiff that this was a large and extremely dangerous

2  nest, and that the rotten terrace wood and excessive ground cover were the perfect breeding

3  ground for these pests. At the beginning of Plaintiff's tenancy, Defendants Piro had a yard service

4  that cleared weeds, fallen branches, and debris from redwood trees from the Property; the Piros

5  later discontinued this service, allowing debris to accumulate on the Property.

6    29.    In late August 2020, Defendants D'Abravanel performed housing inspections at the

7  Property. One of their inspectors informed Plaintiff that the furnace was cracked and leaking

8  carbon monoxide. This condition had no doubt been in existence throughout the tenancy,

9  exposing Plaintiff and his boys to carbon monoxide gas poisoning. The inspector shut off the

10  HVAC and instructed Plaintiff not to turn it on because it posed a health hazard.

11    30.    On or about August 24, 2020, Defendant Jed D'Abravanel came to the Property.

12  Plaintiff told him about the rodent infestation, lack of heat, and rotting stairs and railings that he'd

13  been trying to get the Piros to fix since September 2019. Defendant Jed D'Abravanel told Plaintiff

14  that he planned to do a lot of repairs before he moved in himself with his own family. He

15  specified that this included foundation work because the home was at risk of sliding down the hill

16  in the event of heavy rains. He also told Plaintiff that he'd be repairing the defective and

17  dangerous exterior stairs and railings. Plaintiff agreed that all of this needed to be done but stated

18  that major work on the foundation and stairs would be disruptive given that Plaintiff and his two

19  boys were sheltering at home during the Covid crisis. Plaintiff was working from home all of the

20  time, and his two sons were schooling remotely from home. Plaintiff reiterated his request for

21  immediate abatement of the rodent infestation and repair of the furnace. Defendant Jed

22  D'Abravanel replied that he did not intend to pay for repairs now that would have to be redone

23  later when he and family took up residence at the Property.

24    31.    On or about August 28, 2020, Plaintiff followed up with an email to Defendant Jed

25  D'Abravanel urging him to resolve the lack of heat and rodent infestation problems right away.

26  He also repeated his concerns about the D'Abravanels performing extensive structural work while

27  Plaintiff and his children had to be home because of the Covid epidemic.

28    32.    On or about September 7, 2020, the sale of the Property closed and Defendants

5

Complaint

03/12/2021 9:02:18 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1  D'Abravanel became the new owners of the Property.  They were bound as successors-in-interest

2  by the terms of the rental agreement between Defendant Christopher Piro and Plaintiff.

3      33.    On or about September 13, 2020, Defendant Jed D'Abravanel sent Plaintiff an

4  email stating that he was "looking into" the rodent infestation and furnace repair issues.  No

5  appreciable action took place to repair the defects.

6      34.    On or about September 19, 2020, Defendant Jed D'Abravanel sent Plaintiff an

7  email about having the Property evaluated for fire hazards.  There was no mention about repairing

8  the heater or abating the rodent infestation.  Defendants D'Abravanel' fire hazard evaluation

9  determined that trees needed to be trimmed and debris needed to be removed to eliminate fire

10  hazards at the Property, but they failed to take these actions during Plaintiff's tenancy.

11      35.    On or about September 21, 2020, Defendant Jed D'Abravanel emailed Plaintiff to

12  state that there would be inspections by contractors on September 22, 30, and October 19.

13  Defendant Jed D'Abravanel stated that he would be taking no corrective action until after the last

14  of these inspections had taken place.  Plaintiff responded with an objection to this timing,

15  repeating his request that the rat infestation be abated as soon as possible.  Defendant Jed

16  D'Abravanel responded in effect that nothing could be done sooner.  This was not accurate.

17      36.    On or about September 28, 2020, Plaintiff asked for an update.  Defendant Jed

18  D'Abravanel emailed to state that they had ordered a replacement furnace and were waiting for the

19  company to schedule an installation date.

20      37.    On or about October 2, 2020, Defendant Jed D'Abravanel told Plaintiff by email

21  that he'd ordered rodent traps and would bring them to the Property "soon".  Plaintiff replied that

22  traps had been tried in the past without eradicating the rodent infestation.  Frustrated with

23  Defendants D'Abravanel' lack of prompt responsiveness, Plaintiff took action to abate the rat

24  infestation himself.  He phoned three local extermination companies and was able to arrange

25  same-day inspections from all three.  Each company came out and reported in essence the same

26  thing: that the infestation was extensive and one of the worst they had seen.  One company

27  estimated that the rodent count was "in the hundreds".  The rats were nesting in the insulation

28  material in the walls and had also gotten into the HVAC ducts.  Rat excrement was found in the

6

Complaint

03/12/2021 9:02:19 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1    air ducts, which needed to be sanitized for safety before the furnace could be turned back on.  All

2    three companies were willing to start within a few days, and they all estimated that the extensive

3    remediation job would cost in the $10,000 range.  All three companies emphasized that this rat

4    infestation constituted a major health hazard that should be remediated right away.

5         38.    Plaintiff communicated all of this information to Defendant Jed D'Abravanel

6    immediately.  Defendant Jed D'Abravanel did not act immediately.  Instead, he told Plaintiff he

7    still wanted to wait until he heard from the contractor who was coming on October 19th.

8         39.    Also, on October 2, 2020, the new furnace was installed.  Plaintiff had been

9    instructed by the extermination companies he'd contacted not to turn on the heat until the old duct

10   work has been sterilized.  When he communicated this information to the company that installed

11   the new furnace, they elected not to turn on the new furnace.  Plaintiff was later informed by the

12   health inspector from the Town of Fairfax that it was important that the heater was not turned on

13   until the old ducts had been sterilized.  So, although there was a new furnace, Plaintiff and his

14   family were still without heat.  They were also continuing to be exposed to the health dangers of

15   the active rodent infestation.

16        40.    On or about October 4, 2020, Defendant Jed D'Abravanel came to the Property.

17   He told Plaintiff he was not satisfied with the expertise of the three pest control companies that

18   Plaintiff had called out to inspect the rat infestation.  Defendant Jed D'Abravanel said he wanted

19   to see for himself whether there was rat excrement in the heater ducts.  He looked in the ducts

20   using his phone for light, then told Plaintiff that did not see any.  Plaintiff provided a photograph

21   showing the excrement in the ducts, but Defendant Jed D'Abravanel chose to disregard this

22   evidence.  Defendant Jed D'Abravanel stated that he would rely on an inspection of the ducts by

23   his own HVAC contractor later on.

24        41.    On or about October 5, 2020, Plaintiff contacted a company named Bragg HVAC

25   and asked them to inspect the ducts and provide a repair estimate.  Bragg HVAC came out the

26   following day and confirmed that there was evidence of rat activity in the ducts and that the ducts

27   needed to be sanitized before use.  Plaintiff provided this additional information to Defendant Jed

28   D'Abravanel who responded that Bragg HVAC was expensive, and he still wanted to have his

7

Complaint

03/12/2021, 9:02:22 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1 | own HVAC inspection done before taking any action.

2 | 42.    On or about October 7, 2020, Defendant Jed D'Abravanel scheduled an HVAC
3 | inspection, apparently with a less expensive contractor.  Mr. Griffith learned that this contractor
4 | was an HVAC installer who had never performed any cleaning or sanitization work on heating
5 | ducts and was not certified to do so.

6 | 43.    Also, on October 7, 2020, Defendant Jed D'Abravanel phoned Plaintiff and stated
7 | that he would not pay for sanitization of the heating ducts because his HVAC inspection had
8 | found no proof of excrement.  Plaintiff responded that he felt it was dangerous to use the furnace
9 | without sanitizing the ducts when several inspectors had confirmed that this was necessary.
10 | Plaintiff sent him a photo of rat excrement in a heater duct.  Defendant Jed D'Abravanel did not
11 | reply.

12 | 44.    On or about October 11, 2020, Plaintiff emailed Defendant Jed D'Abravanel again
13 | emphasizing the need to sanitize ducts used by rodents, including some information from the
14 | Centers for Disease Control and Prevention on the subject.  He asked Defendant Jed D'Abravanel
15 | for an update on the rodent abatement.  Defendant Jed D'Abravanel replied that he was waiting for
16 | the estimate on October 19 before moving forward with any pest abatement.

17 | 45.    On or about October 13, 2020, Plaintiff phoned the Marin County Health
18 | Department regarding the rodent infestation and his concerns about rat excrement in the heating
19 | ducts.  The Health Department acknowledged the seriousness of the situation and recommended
20 | that Plaintiff contact the health inspector at the Town of Fairfax to schedule an inspection.

21 | 46.    October 13, 2020 was the date Defendants D'Abravanel had scheduled for an
22 | HVAC company to clean and repair the heating ducts.  Plaintiff phoned the company to confirm
23 | they had the ability to sanitize ducts that had been penetrated by rodents.  The company
24 | representative told Plaintiff that they didn't know rats had breached the ducts, and that they were
25 | not able to do a standard cleaning and repair in such cases.  They recommended a duct
26 | replacement instead.  Defendant Jed D'Abravanel later claimed that Plaintiff had cancelled the
27 | cleaning.  This was not accurate, however, as the company told Plaintiff that they would not have
28 | performed this work given the fact that rodents had been in the ducts

8

Complaint

03/12/2021 9:02:25 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

47.    On or about October 14, 2020, Plaintiff contacted two companies with the plan to pay out of his own pocket for the duct sterilization or abatement.  The companies refused to contract with Plaintiff for this work because he was a tenant not the owner of the Property.

48.    On or about October 15, 2020, Plaintiff emailed the health inspector for the Town of Fairfax to report the rodent infestation and request an inspection.

49.    Also, on October 15, 2020, Defendant Jed D'Abravanel emailed Plaintiff to state that a company equipped to clean ducts infested with rodents would be at the Property the following day at 2 pm.  Plaintiff asked for the name of the company, but Defendant Jed D'Abravanel refused to give him the name or contact information.

50.    On or about October 16, 2020, Plaintiff was at home waiting for the contractors to come and clean the heating ducts at 2 pm.  No one showed up.  The company had notified Defendant Jed D'Abravanel that they were going to be late, but Defendants didn't bother to notify Plaintiff.  The workers arrived unexpectedly at 7:30 pm, when Plaintiff and his children were in the middle of dinner and about to prepare for bedtime.  The company asked Plaintiff and his sons to be away from the Property while the work was performed, and because it was late in the evening, Plaintiff agreed to reschedule for the following day, a Saturday.

51.    On October 18, 2020, Plaintiff noticed that rodents had caused damage to the hot tub.  Rats had pulled out the insulation in the hot tub, causing damage to the internal control area.  Plaintiff notified Defendants D'Abravanel that the rodent infestation was getting worse.

52.    On October 19, 2020, the Fairfax health inspector came to the Property for an inspection.  The inspector said he found health and safety violations and would be issuing a Notice of Violation to Defendants D'Abravanel.  He also suggested that Plaintiff phone Marin County Vector Control for advice on how to protect himself and his family in the short term.  Plaintiff phoned Vector Control the next day and scheduled a County rodent inspection for October 26.

53.    By October 21, 2020, Plaintiff still had not received word from Defendants D'Abravanel as to when the rodent infestation would be abated or when the furnace would be made functional.  Plaintiff sent an email to Defendant Jed D'Abravanel that day again asking for abatement of his rent because substandard conditions at the Property posed a significant health

9

Complaint

03/12/2021, 9:02:28 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1  risk.  In the email, Plaintiff also notified Defendant Jed D'Abravanel of his intent to vacate the

2  Property as soon as possible for health and safety reasons.

3      54.    On or about October 22, 2020, Defendant Jed D'Abravanel emailed Plaintiff to say

4  he was not entitled to any rent abatement.

5      55.    On or about October 23, 2020, the Town of Fairfax issued a Notice of Violation

6  ("NOV") to Defendants D'Abravanel.  The NOV stated that the presence of rodents at the

7  Property constituted a violation of the 2013 International Property Maintenance Code § 309.1, and

8  the Fairfax Municipal Code § 1.12.045.  The Notice advised Defendants D'Abravanel that the

9  defective conditions "must be addressed immediately, and we must receive a letter from the

10  extermination company stating that the infestation has been eliminated."

11      56.    Also, on October 23, 2020, Plaintiff sent an email to Defendants D'Abravanel

12  insisting they take immediate action to abate the rodent infestation.  Defendants D'Abravanel

13  failed to take immediate action.

14      57.    On or about October 26, 2020, Defendant Jed D'Abravanel emailed Plaintiff stating

15  that "in depth work" would begin the following day.  It did not.

16      58.    On or about October 27, 2020, Plaintiff emailed Defendant Jed D'Abravanel,

17  stating that the new HVAC system was not operating property, and that rodents had rendered the

18  hot tub unusable.

19      59.    On or about October 30, 2020, Defendants D'Abravanel began the rat cleanup work

20  at last.  An exterminator started the cleaning work and said they would be back on November 2,

21  2020 for more cleanup and fogging.  Plaintiff and his family would need to leave the house for

22  that day.  The exterminator confirmed that the infestation was major and that they would have

23  trouble sealing the affected areas for fogging due to the overall dilapidated condition of the

24  Property.

25      60.    That same day, October 30, 2020, Plaintiff was able to secure a lease for himself

26  and his boys at another residence.  Because of the tightness of the rental market, and the need to

27  stay within the school district for his children, Plaintiff was only able to find a smaller residence at

28  higher rent.  The Property at 27 Acacia Road comprised 3 Bedrooms, with 2.5 Baths, in 1,615

10

Complaint

03/12/2021 9:02:31 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1   square feet at a rent of $4,250.  The new residence was a 2-Bedroom, 1 Bath place with only 1,225

2   square feet at a rent of $4,500.  Plaintiff sent a letter to the D'Abravanels and their attorney

3   regarding his need to move his family from the Property.

4        61.    On or about November 9, 2020, Plaintiff moved out of the Property, leaving it in

5   broom-clean condition.  Plaintiff provided written notice to Defendants D'Abravanel that he was

6   leaving the premises due to uninhabitable conditions they had failed to correct.

7        62.    On or about November 30, 2020, Plaintiff received an email from the

8   D'Abravanels' attorney regarding the security deposit.  Of the $6,375 deposit, Defendants

9   D'Abravanel withheld $4,250 which they allocated as rent for one month for alleged insufficient

10  notice of termination of tenancy; they deducted another $1,275 as rent for the first week of

11  November.  Defendants D'Abravanel withheld a total of $5,525 from the deposit and refunded

12  only $850 to Plaintiff.

13       63.    As of December 1, 2020, the health and safety violations at the Property had not

14  been abated, and the Town of Fairfax had not yet cleared the NOV.

15       64.    Plaintiff alleges on information and belief that Defendants failed to make repairs at

16  the Property with the malicious intent to retaliate against Plaintiff for requesting repairs and for

17  reporting defective conditions to the Town of Fairfax.  Plaintiff further alleges that Defendants

18  were motivated to cause harm to Plaintiff, with the goal of forcing Plaintiff to abandon his tenancy

19  prior to the termination of the term of his Rental Agreement, so that Defendants D'Abravanel

20  might gain possession of the Property for themselves without having to undertake the expense and

21  difficulty of complying with applicable owner move-in laws and regulations.

22       65.    All of the above caused extreme emotional distress to Plaintiff.

23                          **FIRST CAUSE OF ACTION**

24                          **(Negligence – All Defendants)**

25       66.    Plaintiff incorporates herein each of the allegations set forth in paragraphs 1

26  through 65 above.

27       67.    Defendants owned, operated, supervised, managed, and/or controlled the Property

28  at the relevant times stated herein.

                                    11

Complaint

03/12/2021, 9:02:33 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

68.     Each Defendant owed a duty to Plaintiff under California Civil Code Section 1714 to avoid causing harm to Plaintiff through lack of care or skill in management of his or her property or person.

69.     Each Defendant also owed a duty to Plaintiff to provide habitable residential premises, and to avoid taking actions that caused bodily injury to Plaintiff.

70.     Each Defendant further owed a duty of care to Plaintiff to hire and retain workers who were competent to maintain and repair the Property in a manner that would avoid causing harm, including property damage and physical injury, to Plaintiff.

71.     The defective, unsafe, and dilapidated conditions at the premises, as alleged herein, constituted a breach of legal duties by Defendants.

72.     As a proximate result of the conduct of Defendants, as described herein, Plaintiff has suffered actual, special and general damages, including property damage and bodily injuries, in an amount to be established according to proof at trial, but including at least $60,775 for rent paid, $1,000 for property damage, $20,000 for bodily injury, $2,000 for moving costs, and $75,000 for emotional distress.

## SECOND CAUSE OF ACTION

### (Breach of Contract – All Defendants)

73.     Plaintiff incorporates herein each of the allegations set forth in paragraphs 1 through 65 above.

74.     Plaintiff entered into the alleged written Rental Agreement with Defendants Piro in April 2020 under which Plaintiff obtained a leasehold interest in the Property in exchange for payment of rent.

75.     In or about September 2020, Defendants D'Abravanel became owners of the Property, and became successors in interest to the Rental Agreement, subject to its terms and conditions just as if they had been the original landlord signatories.

76.     Plaintiff performed all material conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the Rental Agreement, except where performance was excused.

12

Complaint

03/12/2021 9:02:37 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1    77.    By the acts and omissions alleged herein, Defendants have breached the Rental

2  Agreements between the parties, including by failing to maintain the Property in compliance with

3  applicable health and safety regulations, causing damage to Plaintiff in amounts to be established

4  according to proof at trial, but including at least $60,775 for rent paid, $1,000 for property

5  damage, $20,000 for bodily injury, and $2,000 for moving costs.

6    78.    Plaintiff is entitled to an award of attorney's fees and costs under the Rental

7  Agreement.

8                              **THIRD CAUSE OF ACTION**

9        **(Breach of the Implied Covenant of Good Faith and Fair Dealing - All Defendants)**

10    79.    Plaintiff incorporates herein each of the allegations set forth in paragraphs 1

11  through 65 above.

12    80.    Plaintiffs entered into a written lease agreement with Defendants to rent the

13  Property.

14    81.    That agreement, like all contracts in the State of California, contained an implied

15  covenant of good faith and fair dealing. That covenant requires, broadly, that neither party do

16  anything that will deprive the other of the benefits of their agreement.

17    82.    Defendants breached the covenant of good faith and fair dealing by failing to

18  maintain the Property in a safe and habitable condition as above described.

19    83.    As a direct and proximate result of Defendants' wrongful acts and/or omissions

20  alleged herein, Plaintiff suffered general and special damages, including discomfort,

21  inconvenience, annoyance, humiliation, fear, anxiety, and emotional distress, all to his general

22  detriment.

23                             **FOURTH CAUSE OF ACTION**

24          **(Violation of Civil Code Sections 1941 and 1941.1 - All Defendants)**

25    84.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth

26  in paragraphs 1 through 65 above.

27    85.    The defective and dilapidated conditions at the subject premises constituted

28  violations of Civil Code Sections 1941 and 1941.1 by Defendants and each of them.

13

Complaint

03/12/2021, 9:02:40 AM Batch: 93252065
DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

86.     As a proximate result of Defendants, as described herein, Plaintiff has suffered actual, special and general damages in an amount to be established according to proof at trial.

### FIFTH CAUSE OF ACTION

**(Violation of Civil Code §1942.4 –Defendants D'Abravanel and Does 1 to 10)**

87.     Plaintiff incorporates herein each of the allegations set forth in paragraphs 1 through 65 above.

88.     Code of Civil Procedure § 1942.4(a) provides:

A landlord of a dwelling may not demand rent, collect rent, issue a notice of a rent increase, or issue a three-day notice to pay rent or quit pursuant to subdivision (2) of Section 1161 of the Code of Civil Procedure, if all of the following conditions exist prior to the landlord's demand or notice:

(1) The dwelling substantially lacks any of the affirmative standard characteristics listed in Section 1941.1 or violates Section 17920.10 of the Health and Safety Code, or is deemed and declared substandard as set forth in Section 17920.3 of the Health and Safety Code because conditions listed in that section exist to an extent that endangers the life, limb, health, property, safety, or welfare of the public or the occupants of the dwelling.

(2) A public officer or employee who is responsible for the enforcement of any housing law, after inspecting the premises, has notified the landlord or the landlord's agent in writing of his or her obligations to abate the nuisance or repair the substandard conditions.

(3) The conditions have existed and have not been abated 35 days beyond the date of service of the notice specified in paragraph (2) and the delay is without good cause. For purposes of this subdivision, service shall be complete at the time of deposit in the United States mail.

(4) The conditions were not caused by an act or omission of the tenant or lessee in violation of Section 1929 or 1941.2.

89.     Code of Civil Procedure § 1942.4(b) provides:

14

Complaint

03/12/2021, 9:02:41 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1    (1) A landlord who violates this section is liable to the tenant or lessee for

2    the actual damages sustained by the tenant or lessee and special damages of not

3    less than one hundred dollars ($100) and not more than five thousand dollars

4    ($5,000).

5        (2) The prevailing party shall be entitled to recovery of reasonable

6    attorney's fees and costs of the suit in an amount fixed by the court.

7    90.    During the period from September 2020 through December 2020, as alleged herein,

8    Defendants failed to maintain the subject premises in a tenantable condition in violation of their

9    statutory duty as set forth in Civil Code Sections 1941 and 1941.1.

10    91.    Beginning in or about September 2019, Plaintiff began reporting defective

11    conditions at the Property to Defendants Piro and asking for repair of such conditions.  Plaintiff

12    continued to make such reports to Defendants Piro at regular intervals thereafter.  Beginning in or

13    about August 2020, Plaintiff began reported defective conditions at the Property to Defendants

14    D'Abravanel and asking for repair of such conditions.  Plaintiff continued to make such reports to

15    Defendants D'Abravanel at regular intervals thereafter.  In October 2020, Plaintiff reported

16    defective conditions at the Property to the health inspector of the Town of Fairfax ("Fairfax").

17    92.    Fairfax performed an inspection of the Property on or about October 19, 2020, and

18    on October 23, 2020 sent a Notice of Violation to Defendants D'Abravanel regarding the defective

19    and hazardous conditions at the Property, including rodent infestations.

20    93.    The conditions Fairfax ordered Defendants D'Abravanel to correct constituted

21    public health nuisances, which were required to be repaired promptly.

22    94.    Despite receipt of these reports and requests from Plaintiff and Fairfax, Defendants

23    D'Abravanel failed adequately to correct the defective conditions at the Property and allowed

24    these conditions to persist for more than 35 days after receipt of written notice from SFHA and

25    DBI.

26    95.    The above-alleged violations were not caused by any act or omission of Plaintiff or

27    by any tenants at the subject premises.

28    96.    The above-alleged conditions continued to exist and were not abated for more than

15

Complaint

03/12/2021, 9:02:44 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1   35 days after written notification of a requirement to abate such conditions was served by a

2   governmental entity upon Defendants. The delay in abatement of these conditions was without

3   good cause.

4       97.    Defendants continued to demand and/or collect rent from the Plaintiff during

5   periods of time in which said substandard conditions continued to exist.

6       98.    On or about November 30, 2020, Defendants withheld rent from Plaintiff's security

7   deposit. Defendants withheld $4,250 allocated as rent for one month for alleged insufficient

8   notice of termination of tenancy; Defendants further deducted $1,275 as rent for the first week of

9   November 2020. Defendants collected this rent more than 35 days after Defendants had received

10  the violation notice alleged herein, and before Defendants caused those defective conditions to be

11  abated.

12      99.    As a proximate result of Defendants' conduct, as described herein, Plaintiff suffered

13  actual, special and general damages, including property damage, physical injuries, and/or

14  emotional distress, in amounts to be established according to proof at trial.

15      100.    As a proximate result of the acts or omissions of Defendants, and each of them, as

16  set forth above, Plaintiff is entitled to actual damages to be proven at trial as set forth herein in

17  amounts of at least $150,000, and to statutory damages of $10,000, calculated as $5,000 per

18  violation pursuant to Civil Code Section 1942.4, one violation for withholding $4,250 allocated as

19  rent for one month for alleged insufficient notice of termination of tenancy, and a second violation

20  for withholding $1,275 as rent for the first week of November 2020.

21      101.    Plaintiff is further entitled to an award of reasonable attorney's fees under Civil

22  Code Section 1942.4.

23                      **SIXTH CAUSE OF ACTION**

24      **(Violation of Civil Code Section 1942.5 – Defendants D'Abravanel and Does 1 to 10)**

25      102.    Plaintiff incorporates herein each of the allegations set forth in paragraphs 1

26  through 65 above.

27      103.    Civil Code § 1942.5 (a) provides:

28      If the lessor retaliates against the lessee because of the exercise by the lessee of his

16

Complaint

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1   rights under this chapter or because of his complaint to an appropriate agency as to

2   tenantability of a dwelling, and if the lessee of a dwelling is not in default as to the

3   payment of his rent, the lessor may not recover possession of a dwelling in any

4   action or proceeding, cause the lessee to quit involuntarily, increase the rent, or

5   decrease any services within 180 days of any of the following:

6          (1) After the date upon which the lessee, in good faith, has given notice

7   pursuant to Section 1942, or has made an oral complaint to the lessor regarding

8   tenantability.

9          (2) After the date upon which the lessee, in good faith, has filed a written

10  complaint, or an oral complaint which is registered or otherwise recorded in

11  writing, with an appropriate agency, of which the lessor has notice, for the purpose

12  of obtaining correction of a condition relating to tenantability.

13         (3) After the date of an inspection or issuance of a citation, resulting from a

14  complaint described in paragraph (2) of which the lessor did not have notice.

15         (4) After the filing of appropriate documents commencing a judicial or

16  arbitration proceeding involving the issue of tenantability.

17         (5) After entry of judgment or the signing of an arbitration award, if any,

18  when in the judicial proceeding or arbitration the issue of tenantability is

19  determined adversely to the lessor.

20  104.    Civil Code § 1942.5 (b) provides in relevant part:

21  It is unlawful for a lessor to increase rent, decrease services, cause a lessee to quit

22  involuntarily, bring an action to recover possession, or threaten to do any of those

23  acts, for the purpose of retaliating against the lessee because he or she has lawfully

24  organized or participated in a lessees' association or an organization advocating

25  lessees' rights or has lawfully and peaceably exercised any rights under the law.

26  105.    Civil Code § 1942.5 (f) provides:

27         Any lessor or agent of a lessor who violates this section shall be liable to

28  the lessee in a civil action for all of the following:

17

Complaint

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1    (1) The actual damages sustained by the lessee.

2    (2) Punitive damages in an amount of not more than two thousand

3 dollars ($2,000) for each retaliatory act where the lessor or agent has been guilty

4 of fraud, oppression, or malice with respect to that act.

5    106.    Civil Code § 1942.5 (g) provides: "In any action brought for damages for

6 retaliatory eviction, the court shall award reasonable attorney's fees to the prevailing party if either

7 party requests attorney's fees upon the initiation of the action."

8    107.    Numerous defective conditions existed and continue to exist at the subject premises

9 during the time that Plaintiff resided at the premises, as alleged herein.

10    108.    Plaintiff gave Defendants notice of these defective conditions on an ongoing basis

11 beginning in August 2020.  Despite such notice, Defendants failed make adequate corrections of

12 the defective conditions.

13    109.    Plaintiff alleges on information and belief that Defendants have failed to make

14 repairs at the Property with the malicious intent to retaliate against Plaintiff for requesting repairs,

15 and for reporting defective conditions to the Town of Fairfax.  Plaintiff further alleges that

16 Defendants were motivated to cause harm to Plaintiff, with the goal of forcing Plaintiff to abandon

17 his tenancy prior to the termination of the term of his Rental Agreement, so that Defendants might

18 gain possession of the Property for themselves without having to undertake the expense and

19 difficulty of complying with applicable owner move-in laws and regulations.

20    110.    By these means, Defendants have engaged in acts of retaliation against Plaintiff

21 because of Plaintiff's exercise of rights under California law in violation of Civil Code Section

22 1942.5.

23    111.    As a direct and proximate result of such Defendants' conduct, Plaintiff has suffered

24 and continues to suffer economic losses in amounts to be proven at trial.

25    112.    The conduct of Defendants, as alleged herein, was oppressive, fraudulent, and done

26 with conscious disregard for Plaintiff's legal rights as a tenant.  Plaintiff is therefore entitled to

27 recover penalties of $2,000 for each retaliatory act of such Defendants under Civil Code Section

28 1942.5.

18

Complaint

03/12/2021 9:02:52 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1    113.    Plaintiff hereby requests an award of costs, including reasonable attorney's fees,

2    under Civil Code Section 1942.5.

3                            **SEVENTH CAUSE OF ACTION**

4        **(Violation of Civil Code § 1950.5 – Defendants D'Abravanel and Does 1 to 10)**

5    114.    Plaintiff incorporates herein each of the allegations set forth in paragraphs 1

6    through 65 above.

7    115.    Civil Code Section 1950.5(l) provides that a tenant may recover the full amount of

8    a security deposit, together with statutory damages of up to twice the amount of the deposit in an

9    action for bad faith failure to refund the deposit.

10   116.    Plaintiff provided Defendants Piro with security deposits totaling $6,375 in or

11   about January 2019.

12   117.    Plaintiff alleges on information and belief that Defendants Piro transferred

13   Plaintiff's security deposit to Defendants D'Abravanel in or about September 2020 when

14   Defendants D'Abravanel became the owners of the Property.

15   118.    After Plaintiff moved out on or about November 1, 2020, Defendants D'Abravanel

16   and Does 1 to 10 withheld a total of $5,525 from Plaintiff's $6,375 deposit and refunded only

17   $850 to Plaintiff.

18   119.    On November 30, 2020, Defendants D'Abravanel and Does 1 to 10 notified

19   Plaintiff that they were withholding $4,250 as rent for one month, and that Defendants were also

20   withholding $1,275 as rent for the first week of November 2020.  Plaintiff alleges on information

21   and belief that Defendants D'Abravanel were both aware at this time that the Town of Fairfax had

22   issued a Notice of Violation on October 23, 2020, requiring them to abate health hazards at the

23   Property; Defendants also knew that they had not abated such hazards.  Plaintiff alleges on

24   information and belief that Defendant Jed D'Abravanel is an attorney licensed in the State of

25   California with knowledge and experience in real estate law, and that Jed D'Abravanel knew that

26   he was not entitled to apply Plaintiff's security deposit towards rent given the NOV from the

27   Town of Fairfax and the unabated health hazards at the Property.

28   120.    This conduct by Defendants constitutes a willful violation of Civil Code Section

                                    19

Complaint

03/12/2021, 9:02:54 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1    1950.5.

2    121.    As a direct and proximate result of such Defendants' conduct, Plaintiff has had

3    $5,525 of his security deposit wrongfully withheld by Defendants.

4    122.    Plaintiff is entitled to recover $5,525 of his security deposit, together with double

5    that amount ($11,050) in an action for bad faith failure to refund the deposit.

6                              **EIGHTH CAUSE OF ACTION**

7    **(Unlawful Business Practices in Violation of Business & Professions Code §§ 17200, 17203 –**

8                                    **All Defendants)**

9    123.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth

10   above.

11   124.    Section 17200 *et seq.* of the California Business & Professions Code prohibits any

12   unlawful, unfair, or fraudulent business act or practices.

13   125.    Through their actions alleged herein, Defendants have engaged in unfair

14   competition within the meaning of Cal. Bus. & Prof. Code §§17200, 17203, because Defendants'

15   conduct has violated state laws, and the California common law, as herein described.

16   126.    Beginning at a date unknown to Plaintiff, but at least as early as January 2019,

17   Defendants committed, and continue to commit, acts of unfair competition, as defined by

18   §§17200, 17203 of the California Business and Professions Code, by and among other things,

19   engaging in the acts and practices described herein.

20   127.    Defendants engaged in unfair competition in violation of Cal. Bus. & Prof. Code

21   §§17200, 17203 by violating, *inter alia*, each of the following: Causes of action One through

22   Seven, stated above; violation of Civil Code §§ 1941, 1941.1, 1942.4, 1942.5, and 1950.5.

23   128.    Defendants' course of conduct, acts, and practice in violation of the California laws

24   mentioned in each paragraph above constitute separate and independent violations of §§17200,

25   17203 of the California Business and Professions Code.

26   129.    Defendants' acts and omissions alleged herein are part of a pattern and practice by

27   defendants to violate laws to provide economic benefits to themselves, all to the detriment of

28   Plaintiff.

                                          20

Complaint

03/12/2021, 9:02:57 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

130.   Defendants' violations of these laws have caused harm to each plaintiff in amounts to be proven at trial. Defendants have further been unjustly enriched and have wrongfully profited from their violations of law at the expense of each Plaintiff.

118.   Plaintiff seeks restitution of all rents paid to Defendants from September 2019 to December 2020 in an amount of at least $60,775.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

**On the Cause of Action for Violation of Civil Code Section 1942.4:**

1.   For compensatory damages according to proof.

2.   For statutory damages of $5,000.00 for each violation of Civil Code Section 1942.4; and

3.   For attorney's fees by statute, including pursuant to Civil Code Section 1942.4.

**On the Cause of Action for Violation of Civil Code §1942.5:**

1.   For actual and compensatory damages according to proof;

2.   For statutory damages of $2,000 per violation of Civil Code Section 1942.5;

3.   For punitive and exemplary damages according to proof under Civil Code Section 3294; and

4.   For attorney's fees by statute, including pursuant to Civil Code Section 1942.5.

**On the CAUSE OF ACTION for Violation of Civil Code §1950.5:**

1.   Refund of the security deposit of $5,525;

2.   Double the amount of the security deposit ($11,050) for bad faith failure to refund the deposit; and

3.   Pre-judgment interest on these amounts under Civil Code §§ 3287 and/or 3291.

**On all Causes of Action:**

1.   For compensatory damages according to proof;

2.   For costs of suit herein incurred;

3.   For reasonable attorney's fees as allowed by contract or by statute;

4.   For pre-judgment interest under Civil Code Sections 3287 and/or 3291; and

21

Complaint

03/12/2021, 9:03:00 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

1         5.     For such other and further relief as the court may deem proper.

2

3    Dated: March 3, 2021                  By: _____

4                                         GREGORY P. BROCK
                                        Attorney for Plaintiff

5                                       MARK GRIFFIN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22

Complaint

03/12/2021 9:03:03 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

# EXHIBIT A

# 03/12/2021 9:03:04 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

## RESIDENTIAL LEASE/RENTAL AGREEMENT
### (For use in the State of California)

PARTIES: LANDLORD___Christopher Piro _____

TENANT(S)____Mark L Griffin

PROPERTY ADDRESS: _____27 Acacia Road, Fairfax, CA 94930__

1. RENTAL AMOUNT: Commencing __July 1st 2020____ TENANT agrees to pay LANDLORD the sum of $_4250_ per month in advance on the __2nd___day of each calendar month. Said rental payment shall be delivered by TENANT to LANDLORD or his designated agent to the following location:
**First Republic Account: Acct #:** 80007233770, Routing: 321081669

Rent must be actually received by LANDLORD, or designated agent, in order to be considered in compliance with the terms of this agreement.

2. TERM: The premises are leased on the following lease term: (please check one item only) _12 month term___ with 60 day notice necessary for cancellation of terms and lease

3. SECURITY DEPOSITS:TENANT ***FUNDS ALREADY IN HAND. NO ADDITIONAL DEPOSIT NEEDED!*** shall deposit with landlord the sum of $___4250_ (1 month) + $4250 (last month) + security deposit $2125=$10625 total ___ as a security deposit to secure TENANT'S faithful performance of the terms of this lease. The security deposit shall not exceed two times the monthly rent. After all the TENANTS have vacated, leaving the premises vacant, the LANDLORD may use the security deposit for the cleaning of the premises, any unusual wear and tear to the premises or common areas, and any rent or other amounts owed pursuant to the lease agreement or pursuant to Civil Code Section 1950.5.

TENANT may not use said deposit for rent owed during the term of the lease. Within 21 days of the TENANT vacating the premises, LANDLORD shall furnish TENANT a written statement indicating any amounts deducted from the security deposit and returning the balance to the TENANT. If TENANT fails to furnish a forwarding address to LANDLORD, then LANDLORD shall send said statement and any security deposit refund to the leased premises.

4. INITIAL PAYMENT: N/A

5. OCCUPANTS: The premises shall not be occupied by any person other than those designated above as TENANT with the exception of the following named persons: _Mark Griffin, Atom Griffin, Quinn Griffin_____

**03/12/2021 9:03:06 AM Batch: 93252065**

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

If LANDLORD, with written consent, allows for additional persons to occupy the premises, the rent shall be increased by $500 for each such person. Any person staying 14 days cumulative or longer, without the LANDLORD'S written consent, shall be considered as occupying the premises in violation of this agreement.

6. SUBLETTING OR ASSIGNING: TENANT agrees not to assign or sublet the premises, or any part thereof, without first obtaining written permission from LANDLORD.

7. UTILITIES: TENANT shall pay for all utilities and/or services supplied to the premises with the following exception:
_____N/A_____.

8. PARKING: TENANT _X_is (check one) assigned a parking space. If assigned a parking space it shall be designated as space #__ONE OFF STREET/THREE DRIVEWAY_____. TENANT may only park a vehicle that is registered in the TENANT'S name. TENANT may not assign, sublet, or allow any other person to use this space. This space is exclusively used for the parking of passenger automobiles by the TENANT. No other type of vehicle or item may be stored in this space without prior written consent of LANDLORD. TENANT may not wash, repair, or paint in this space or at any other common area on the premises.

Only vehicles that are operational and currently registered in the State of California may park in this space. Any vehicle that is leaking any substance must not be parked anywhere on the premises.

9. CONDITION OF PREMISES: TENANT acknowledges that the premises have been inspected. Tenant acknowledges that said premises have been cleaned and all items, fixtures, appliances, and appurtenances are in complete working order. TENANT promises to keep the premises in a neat and sanitary condition and to immediately reimburse landlord for any sums necessary to repair any item, fixture or appurtenance that needed service due to TENANT'S, or TENANT'S invitee, misuse or negligence.

TENANT shall be responsible for the cleaning or repair to any plumbing fixture where a stoppage has occurred. TENANT shall also be responsible for repair or replacement of the garbage disposal where the cause has been a result of bones, grease, pits, or any other item which normally causes blockage of the mechanism.
PLEASE NOTE: light fixtures and the wall in the bathroom need to be fixed

10. ALTERATIONS: TENANT shall not make any alterations to the premises, including but not limited to installing aerials, lighting fixtures, dishwashers, washing machines, dryers or other items without first obtaining written permission from LANDLORD. TENANT shall not change or install locks, paint, or wallpaper said premises without LANDLORD'S prior written consent, TENANT shall not place placards, signs, or other exhibits in a window or any other place where they can be viewed by other residents or by the general public.

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

11. LATE CHARGE/BAD CHECKS: A late charge of **5% ($212.50)** of the current rental amount shall be incurred if rent is not paid when due. **Late payment penalty will be charged if payment is received later than 15ᵗʰ of month**

If rent is not paid when due and landlord issues a 'Notice To Pay Rent Or Quit', TENANT must tender cash or cashier's check only. If TENANT tenders a check, which is dishonored by a banking institution, than TENANT shall only tender cash or cashier's check for all future payments. This shall continue until such time as written consent is obtained from LANDLORD. In addition, TENANT shall be liable in the sum of $30 for each check that is returned to LANDLORD because the check has been dishonored.

12. NOISE AND DISRUPTIVE ACTIVITIES: TENANT or his/her guests and invitees shall not disturb, annoy, endanger or inconvenience other tenants of the building, neighbors, the LANDLORD or his agents, or workmen nor violate any law, nor commit or permit waste or nuisance in or about the premises.

Further, TENANT shall not do or keep anything in or about the premises that will obstruct the public spaces available to other residents. Lounging or unnecessary loitering on the front steps, public balconies or the common hallways that interferes with the convenience of other residents is prohibited.

13. LANDLORD'S RIGHT OF ENTRY: LANDLORD may enter and inspect the premises during normal business hours and upon reasonable advance notice of at least 24 hours to TENANT. LANDLORD is permitted to make all alterations, repairs and maintenance that in LANDLORD'S judgment is necessary to perform. In addition LANDLORD has all right to enter pursuant to Civil Code Section 1954. If the work performed requires that TENANT temporarily vacate the unit, then TENANT shall vacate for this temporary period upon being served a 7 days notice by LANDLORD. TENANT agrees that in such event that TENANT will be solely compensated by a corresponding reduction in rent for those many days that TENANT was temporarily displaced.

If the work to be performed requires the cooperation of TENANT to perform certain tasks, then those tasks shall be performed upon serving 24 hours written notice by LANDLORD. (EXAMPLE -removing food items from cabinets so that the unit may be sprayed for pests)

14. REPAIRS BY LANDLORD: Where a repair is the responsibility of the LANDLORD, TENANT must notify LANDLORD with a written notice stating what item needs servicing or repair. TENANT must give LANDLORD a reasonable opportunity to service or repair said item. TENANT acknowledges that rent will not be withheld unless a written notice has been served on LANDLORD giving LANDLORD a reasonable time to fix said item within the meaning of Civil Code Section 1942. Under no circumstances may TENANT withhold rent unless said item constitutes a substantial breach of the warrantee of habitability as stated in Code of Civil Procedure Section 1174.2.

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

15. PETS: No dog, bird, fish or other domestic pet or animal of any kind may be kept on or about the premises without LANDLORD"S written consent

16. FURNISHINGS: No liquid filled furniture of any kind may be kept on the premises. If the structure was built in 1973 or later TENANT may possess a waterbed if he maintains waterbed insurance valued at $100,000 or more. TENANT must furnish LANDLORD with proof of said insurance. TENANT must use bedding that complies with the load capacity of the manufacturer. In addition, TENANT must also be in full compliance with Civil Code Section 1940.5. TENANT shall not install or use any washer, dryer, or dishwasher that was not already furnished with the unit.

17. INSURANCE: TENANT may maintain a personal property insurance policy to cover any losses sustained to TENANT'S personal property or vehicle. It is acknowledged that LANDLORD does not maintain this insurance to cover personal property damage or loss caused by fire, theft, rain, water overflow/leakage, acts of GOD, and/or any other causes.

It is acknowledged that LANDLORD is not liable for these occurrences. It is acknowledged that TENANT'S insurance policy shall solely indemnify TENANT for any losses sustained. TENANT'S failure to maintain said policy shall be a complete waiver of TENANT'S right to seek damages against LANDLORD for the above stated losses. The parties acknowledge that the premises are not to be considered a security building which would hold LANDLORD to a higher degree of care.

18. TERMINATION OF LEASE/RENTAL AGREEMENT: If this lease is based on a fixed term, pursuant to paragraph 2, then at the expiration of said fixed term this lease shall become a month to month tenancy upon the approval of LANDLORD.

Where said term is a month to month tenancy, either party may terminate this tenancy by the serving of a 30 day written notice.

19. POSSESSION: If premises cannot be delivered to TENANT on the agreed date due to loss, total or partial destruction of the premises, or fail ure of previous TENANT to vacate, either party may terminate this agreement upon written notice to the other party at their last known address. It is acknowledged that either party shall have no liability to each other except that all sums paid to LANDLORD will be immediately refunded to TENANT.

20. ABANDONMENT: It shall be deemed a reasonable belief by the LANDLORD that an abandonment of the premises has occurred where the, within the meaning of Civil Code Section 1951.2, where rent has been unpaid for 14 consecutive days and the TENANT has been absent from unit for 14 consecutive days. In that event, LANDLORD may serve written notice pursuant to Civil Code Section 1951.2. If TENANT does not comply with the requirements of said notice in 18 days, the premises shall be deemed abandoned.

03/12/2021 9:03:15 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

21. WAIVER: <u>LANDLORD'S</u> failure to require compliance with the conditions of this agreement, or to exercise any right provided herein, shall not be deemed a waiver by LANDLORD of such condition or right. LANDLORD'S acceptance of rent with knowledge of any default under agreement by TENANT shall not be deemed a waiver of such default, nor shall it limit LANDLORD'S rights with respect to that or any subsequent right. If is further agreed between the parties that the payment of rent at any time shall not be a waiver to any UNLAWFUL DETAINER action unless LANDLORD in writing speci ically acknowledges that this constitutes a waiver to the UNLAWFUL DETAINER action.

22. VALIDITY/SEVERABILITY: If any provision of this agreement is held to be invalid, such invalidity shall not affect the validity or enforceability of any other provision of this agreement.

23. ATTORNEY FEES: In the event action is brought by any party to enforce any terms of this agreement or to recover possession of the premises, the prevailing party shall recover from the other party reasonable attorney fees.

It is acknowledged, between the parties, that jury trials significantly increase the costs of any litigation between the parties. It is also acknowledged that jury trials require a longer length of time to adjudicate the controversy. On this basis, all parties waive their rights to have any matter settled by jury trial.

24. NOTICES: All notices to the tenant shall be deemed served upon mailing by first class mail, addressed to the tenant, at the subject premises or upon personal delivery to the premises whether or not TENANT is actually present at the time of said delivery. All notices to the landlord shall be se rved by mailing first class mail or by personal delivery to the manager's <u>apartment</u> or to:__1300 4th st, San Rafael CA 94901 OR piro.chris@gmail.com_____.

25. PERSONAL PROPERTY OF TENANT: Once TENANT vacates the premises, all personal property left in the unit shall be stored by the LANDLORD for 18 days. If within that time period, TENANT does not claim said property, LANDLORD may dispose of said items in any manner LANDLORD chooses.

26. ADDITIONAL RENT: All items owed under this lease shall be deemed additional rent.

27. APPLICATION: All statements in TENANT'S application must be true or this will constitute a material breach of this lease.

**28. ADDITIONAL TERMS: N/A**

29. ENTIRE AGREEMENT: The foregoing agreement, including any attachments incorporated by reference, constitutes the entire agreement between the parties and supersedes any oral or written representations or agreements that may have been made by either party. Further, TENANT represe nts that TENANT has relied solely on TENANT'S judgment in entering into this agreement.

## 03/12/2021 9:03:17 AM Batch: 93252065

DocuSign Envelope ID: E9F63F0A-378D-48D2-92AF-A83C2E42D248

TENANT acknowledges having been advised to consult with independent legal counsel before entering into this Agreement and has decided to waive such representation and advice. TENANT acknowledges that TENANT has read and understood this agreement and has been furnished a duplicate original.

DocuSigned by:

*Chris piro*

Christopher Piro

_____LANDLORD/AGENT 4/22/2020 DATE

DocuSigned by:

*Mark Griffin*

Mark Griffin

_____TENANT 4/27/2020 DATE

_____TENANT _____DATE

# EXHIBIT B

# EXHIBIT B

| DATE | TIME | EVENT | DETAILS | VENDOR/WITNESS NAME |
|---|---|---|---|---|
| **INITIAL OFFER ON HOUSE** | | | | |
| 8/4/2020 | | Learned of 27 Acacia property on Aalto.com | Could not see the house because of tenant and COVID rules. | |
| 8/7/2020 | | Contacted a Landlord/Tenant Attorney | We were informed that property was tenant occupied until June 2021 and we would assume the remainder of the lease upon closing. We had never been landlords and we wanted to make sure we were doing things by the book. | Laura Campbell via Ashley Klein |
| 8/8/2020 | | Made offer on property | | |
| 8/9/2020 | 8:30 AM | Visited the outside of the property for less than 30 minutes. Met tenant face-to-face briefly, by chance. | Given the hillside elements of the property, we asked for inspections (general, structural, soil, HVAC, arborist). Structural and HVAC required entering the home, so we scheduled those on the same day so that tenant would not have to leave multiple times.

Home was financed as an investment property since tenant's lease was valid until June 2021. We were well aware of this and totally fine with him staying until end of his lease. We took on a slightly higher rate as well as higher down payment with the understanding that he would stay in the home until lease end. We had never been to the property prior to this visit. Tenant was notified we would stop by. We came with our baby and did not enter the house, just walked around the outside. Ran into tenant as he was taking out the trash—he was amenable and invited us to walk behind the house. Other than this chance interaction, we did have planned communications with tenant until after closing (we were not allowed to contact tenant or seller without agent reps anyway). | |
| **HOME INSPECTION PERIOD - BEFORE CLOSING** | | | | |
| 8/10/2020 | 6:30 PM | Arborist inspection | No need for entry into the home. Inspectors went outside. Tenant and seller (vis a vis seller's agent) was notified prior to visit. (All consequent visits in and outside of the house followed this process). | Small World Tree Company |
| 8/11/2020 | | Was informed by our agent that tenant was pushing back on inspection times at the last minute. | Was told by agent that tenant refused to leave the property during the general inspection appointment time, so we canceled general inspection all together to accommodate the tenant. All other inspections (structural, HVAC, soil) were rescheduled more than a week into the future to accommodate tenant as well. This was our first indication that tenant might be difficult to work with. | April Lepito Smith (realtor) |
| 8/14/2020 | | Soil inspection | Soils inspector knocked on front door and thought he heard tenant tell him to come in. Instead, tenant insists he said, "don't come in." Inspector did not ultimately enter the house. Prior to the inspection, inspector was told by us to NOT enter the home. Inspector was alone when he visited. | Bob Settgast |
| 8/20/2020 | 10:30AM - 3PM | Structural and HVAC inspections. | We met our realtor, structural architect, and HVAC inspector at the house. This was the first and only time there was entry into the house during the inspection period. Tenant was home. We wore all required protective gear, including booties, masks, gloves, etc and refrained from touching any part of the house. Proper sanitization was used before and after entering the house, and the house was professionally cleaned immediately after our visit.

HVAC inspector found a crack in the heater that he suggested could potentially cause carbon monoxide leak. Consequently, by law, he was required to turn off the furnace. Inspector informed seller's agent of the crack and that he had turned off the furnace and would not turn it back on in its current state. | Paul Pieri Reyes Heating & Air |
| 8/23/2020 | | General Contractor inspection (original appointment) | GC was a no-show. Jed and realtor waited outside of property for GC. Tenant went to his car in the driveway during this period and, in passing, mentioned to Jed and realtor that he had notified seller (his landlord at the time) about hearing rodents, but did not express greater concern. When pushed to provide more details, tenant was reticent and refused to comment further. As we were in contingency, Jed tried to ask about any other problems tenant faced with the home, including the stairs and hot tub. Tenant expressed no concerns. Jed shared that we were considering repairing the stairs and possible foundation work upon purchase. Tenant expressed resistence to any construction while he remained the tenant. Given COVID, we said that we understood and would respect his wishes. | Tony Street |
| 8/24/2020 | 10:00 AM | General Contractor inspection (makeup appointment) | Home disclosure mentioned termite damage and some rodent activity, which are common in home reports, but no red flags. No indication from seller or tenant, or history of disagreement over, serious issues prior to closing. Home report mentions: "Conditions were observed in the underbuilding crawl space indicating evidence of rodent activity. The first step in eliminating rodents from the house is to seal all possible openings [...]". During the inspection period, we observed that work had been done to seal all of the openings from the exterior and saw evidence a previous owner had addressed the rodent issue per the report's recommendations.

Meanwhile, in item F-4 of the Seller Property Questionnaire, seller answered "No" to the following: "Past or present treatment or eradication of pests or odors, or repair of damage due to any of the above [including pests]."

No need for entry into the home. GC met with realtor only outside of home. | Tony Street |
| 8/28/2020 | | Email from tenant to Seller, et al (Received 3rd hand email from tenant to seller regarding tenant's maintenance items) | Email was sent from tenant to seller (his landlord at the time) and seller's agent. The email was then forwarded to our agent, who then forwarded it to us. In the email, tenant asked seller to address two maintenance items: (1) fix the furnace; (2) rodent issue. In addition, he referenced the conversation he had with Jed and our realtor on 8/23/2020 about possible construction work on the house, and reiterated his desire that no work be done on the property while he remained a tenant. He also indicated that he would be looking for new housing, but had not found a place. Given that the lease does not allow for early termination, we understood that he would therefore communicate with us prior to ending the lease early. We had kept our own month-to-month lease at our apartment with the understanding that tenant would stay through their lease period, which thus, relied on proper and timely notice from the tenant about any plans of departure so that we could notify our own landlord and promptly move into the property without assuming both mortgage and rent payments simultaneously. | |
| 8/28/2020 | | Hired Landlord/Tenant attorney on retainer | There was no followup on this email from either the tenant nor the seller/landlord. Tenant's behavior thus far caused us concern about future dealings with him once we assumed the lease. In an abundance of caution, we retained a lawyer during the period of his tenancy because we wanted to understand our rights and obligations. | |
| 9/2/2020 | | Tenant's response to our insurance broker | In response to our insurance broker's request from the tenant for some information needed in order for us to procure renter's insurance, tenant writes to our broker:

"[...] FYI, there is nothing in my lease that even requires me to have this, so me providing this for everyone's review is going above and beyond."

Section 17 of his lease does state that it is not required for him to have insurance. However, Section 17 explicitly states that the landlord is not liable for any damages that would be covered by personal property insurance and recommends the tenant obtain such coverage. | Jim Sciaroni |
| **INTERACTIONS AFTER CLOSING** | | | | |
| 9/11/2020 | | Closed escrow | | |
| 9/12/2020 | | Called tenant to introduce ourselves | Left voicemail | |
| 9/13/2020 | | Spoke with tenant by phone for the first time | Yanyi and Jed introduced themselves and shared contact info in case tenant needed to reach out. We expressed our intention to respond to his concern in a timely manner and that we were fine with him staying through the terms of his lease (June 2021). On this call, tenant mentioned the following and we addressed each item:
(1) structural stability of the bike shed - Jed responded that he would reinforce it promptly
(2) structural stability of entrance arbor - Jed responded that he would inspect and handle
(3) rodent sounds - Yanyi responded that we would connect with pest vendors and schedule visits for abatement
(4) furnace had been turned off during HVAC inspection due to the crack in heater - Yanyi informed tenant that we were already in conversation with HVAC vendor to replace the furnace (we had to wait until after close of escrow)

Given delayed COVID timelines and safety requirements and supply chain issues, scheduling vendors was more challenging than normal as in any were fully booked, but we began reaching out to vendors immediately after speaking with the tenant and remained fastidious about following up with vendors who were not responsive. | |

| Date | Event | Description | Vendor |
|---|---|---|---|
| 9/13/2020 | Sent followup email to tenant to confirm our earlier conversation | We emailed tenant after our initial call to confirm what we spoke of. This included rent payment information and maintenance issues. We confirmed that we were working on scheduling HVAC and pest work, but that pest work would take longer to complete given the inspections that pest control vendors would first need to complete to even understand the scope of work. | |
| 9/19/2020 | Followup email to tenant about maintenance work | We informed tenant that we had reached out to several pest vendors but had yet to hear back, and that we would continue to update him. | |
| 9/17-10/19/2020 | Various pest control vendor inspections | We informed tenant about all of our efforts and any appointments that would be scheduled ahead of time. Tenant wanted to speak with all vendors that we scheduled, and in retrospect, we suspect this may have been so tenant could control the narrative. Of the pest vendors we called, the following came to inspect the home:<br>-WeCare Pest Solutions - Rodent inspection scheduled for 9/22 @2pm; termite scheduled for 9/30 @11AM<br>-New West Pest Control - Rodent inspection 10/19 @11am<br>-North Bay Rat & Rodent - Rodent inspection 10/4 @10AM<br>-Additional vendor - inspection (need to look it up in our calendar)<br><br>Pest vendors returned with inconclusive solutions, generally suggesting that nothing more could be done unless perimeter foundation was constructed (which tenant did not want). In the interim, they suggested regularly setting traps. We promptly ordered and installed rodent traps and ultrasonic rodent repellers, and continued to search for other vendors hoping to find a solution that was amenable to the tenant, given his expressed concerns about construction work during his tenancy. | WeCare Pest Solutions<br>New West Pest Control<br>North Bay Rat & Rodent |
| 9/20/2020 | Maintenance on house - drainage | Jed fixed the drainage along the hillside and back of the house | |
| 9/22/2020 | Requested quote from HVAC vendor for furnace replacement and installation | Replace existing furnace. Install new 80% two-stage gas furnace. Reconnect power and gas back to new furnace.<br><br>We received a quote on 9/28 and signed immediately. We asked to schedule installation ASAP. | Reyes Heating & Air |
| 9/28/2020 | Followup email to tenant with updates | We informed tenant that we had signed the contract to replace the HVAC and were waiting for vendor to schedule installation. We also provided followup on pest vendor scheduling-- we were in various stages of initial assessments with multiple vendors. Again, scheduling was delayed on vendors' side due to challenges of COVID. | |
| 10/1/2020 | Called tenant to provide updates on rodent abatement and HVAC replacement | Tenant then added a new item to the list of issues: He expressed concerns about the cleanliness of the air ducts, given possible rodent activity. We responded that we would ask the HVAC installer to also inspect the duct activity and would follow up accordingly. | |
| 10/1/2020 | Followed up with tenant via email to summarize our earlier call | Tenant emphasized that he wanted the rodent issue resolved quickly, however, the solution offered by vendors thus far would require some time for construction work, a suggestion which he had consistently rejected in past conversations. We said we would continue to search for vendors who could offer a solution that was amenable to him. Tenant also shared that he had sourced his own pest vendors, and (without our knowledge or approval) had made appointments for estimates. We asked that he connect those vendors with us. Only one of the vendors he provided got back to us. | |
| 10/2/2020 | Tenant asked for a copy of the buyer's inspection report | In a followup email, tenant asked us to show him the buyer's inspection report. This was a red flag to us that tenant may want to find other issues with the property to exploit. We did not respond to his request. | |
| 10/2/2020 | 9:00 AM Furnace replacement/installation | HVAC vendor entered the home (with prior notice to tenant) to replace the furnace and check the ducts/vents. No issues with vents was found, despite tenant's insistence. Upon completion of installation, tenant refused to allow HVAC vendor to turn on the new system to test air flow because tenant said he was concerned about rodent intrusion in the duct work. Consequently, vendor could not properly test the new system. | Reyes Heating & Air |
| 10/4/2020 | 10:00 AM Jed met with a rodent vendor at the house | North Bay Rat & Rodent offered a solution that was less intrusive to the tenant but still allowed for some additional sealing of the foundation and cleanup/sanitizing. In addition, this was a vendor that the tenant sourced and directed to us, so in an effort to work with the tenant, we signed with this vendor. Work was scheduled to begin mid October--we asked vendor to schedule directly with tenant to avoid scheduling disagreements with the tenant. Due to COVID delays on supply shipments, vendor scheduled start date of 10/27 | North Bay Rat and Rodent |
| 10/4/2020 | Maintenance on house - bike shed, front arch, rodent traps | Jed reinforced the bike shed and removed the arbor lattice at the front of the house. He installed multiple rodent traps in the underbuilding, as well as ultrasonic repellers.<br><br>In addition, Jed gave the tenant several traps to set inside the house as he did not want to enter during COVID. | |
| 10/5/2020 | Jed returned to the house to check the traps and check air ducts | Tenant allowed Jed to enter the house to take videos of the air ducts in search of damage or rodent activity, per tenant's claims. No such evidence was found. | |
| 10/5/2020 | Jed met with foundation specialist (Chris Baumsteiger) outside of property | Understanding the tenant's resistance to construction work, we still wanted to ensure the safety of the house and all inhabitants, so we asked a foundation contractor to assess the conditions and determine if helical screws were necessary. Jed met with Chris outside of the house, upon which, Chris indicated that he had installed helical screws and reinforced the foundation of this house in the 1990s. Jed later pulled the permit records from the Town of Fairfax and followed up with a structural engineer (Paul Pieri) to confirm that no further foundation work was needed. In the engineer's opinion, no additional work was needed at that time. | Chris Baumsteiger |
| 10/7/2020 | 10:00 AM HVAC vendor returned to reinspect ducts | Tenant was not satisfied with Jed's inspection of the air ducts, so we scheduled original HVAC installer to return to the house and inspect the ducts with a camera/probe. Vendor did not find rodent activity or damage and shared photos of his findings. Despite the vendor's findings, tenant insisted in an email response that HVAC vendor was wrong. | Reyes Heating & Air |
| 10/13/2020 | Followup on HVAC cleaning | Tenant again asked for HVAC duct cleaning and suggested a particular cleaning company at $500 for the service. In an effort to again work with the tenant, we agreed to use the vendor he suggested and asked vendor to connect with us about cost. Tenant then sends us the actual esimate from the vendor--at $1,800 (not $500). We replied that we would look into other vendors and get back to tenant. | Bragg Plumbing & Heating |
| 10/13/2020 | Scheduling HVAC cleaner | We informed tenant that we had scheduled a duct cleaner for 10/16 at 9am. We also added their sanitizing service so ducts would be sanitized in addition to standard cleaning. Tenant asked for the name and contact number for the vendor that we booked, and we provided that information to him. Tenant then called the vendor directly, without notifying us, and claimed without evidence that there was rodent activity in the ducts. Tenant also insisted that particular certifications and experience was needed, in his opinion. Upon speaking to the vendor again, they informed us that they could not clean the ducts given the supposed rodent activity as claimed by the tenant, which could damage their equipment. | Pristine Air Duct Cleaning |
| 10/15/2020 | Scheduling a second HVAC cleaner | We arranged for a different duct cleaner (one who would sanitize, clean and inspect using probe) to clean the HVAC system on 10/16 between 2-4pm. We notified the tenant, who replied that this was very short notice, but that he would "see what he could do", and asked for the new vendor's contact info. We did not respond to his request for their contact information given his previous interaction with the first air duct cleaner. | Cyclone Air Systems Inc. |
| 10/16/2020 | Tenant berates Jed and leaves angry voicemail with Yanyi after new HVAC cleaner arrives late for appointment | Tenant leaves an angry voicemail with Yanyi. Jed calls him back and is on the receiving end of several minutes of verbal abuse from tenant. We then contact the HVAC cleaner who had been scheduled for that afternoon.<br><br>The vendor shared that he was late arriving at the property due to COVID restrictions slowing down his prior appointments, and that when he arrived, tenant would not let him in and berated him, and called Jed a, "bad guy." (In all, we have only spoken with tenant a handful of times, and always very professionally, and do not know him personally.) HVAC cleaning was completed. | Cyclone Air Systems Inc. |
| 10/17/2020 | Rescheduled HVAC cleaning appointment | | Cyclone Air Systems Inc. |
| 10/21/2020 | Tenant asks for rent abatement | In an email, tenant claims that he is eligible for rent abatement, "both retroactively and moving forward" under California Civil Code 1942. "due to the habitability issues I've been facing." Tenant also suggests that he would like to vacate his lease, and would keep us updated on his search for new housing. | |

| 10/22/2020 | Response to tenant's rent abatement request | Upon advice of counsel, we responded that the dwelling was not untenable and that tenant was not entitled to rent abatement. At this point, we had received 1 full month's rent from tenant. We reminded him that we have responded to his repair requests in a timely manner and disputed his claims of "rapid deterioration". We also acknowledged that we are open to permitting an early termination of his lease and asked him to keep us posted about his plans. | |
| | | Tenant responded that he disagreed and that he has spoken with Marin Legal Aid, Marin County Health Department and the Town of Fairfax Building Inspector. He informed us that he had the Building Inspector visit the house earlier in the week and that we should expect a letter from the Town of Fairfax. His email suggested, "we can resolve this ourselves and not have to pursue it further." | |
| 10/23/2020 | Increasingly antagonistic and intimidating emails from tenant | | |
| 10/26/2020 | Notice from Town of Fairfax Building Inspector | We received a boilerplate notice from the Building Inspector (Mark Lockaby) to address the rodent problem. We contacted the inspector immediately and provided the following information:<br>1. We just purchased the home a month prior<br>2. We have had multiple rodent exterminators come to the property since close of escrow, and their general recommendation has been that nothing more can be done except setting traps (which we have also done), and to close up the foundation (which tenant initially rejected)<br>3. We have booked a rodent contractor to close remaining entry points, with tenants approval.<br>4. We provided written evidence from vendors--including inspection findings from New West Pest Control:  "[...] In our opinion our rodent service would not be any different than what the homeowners were already doing in regards to having traps out."<br>5. We forwarded a written proposed work plan for exclusion work from North Bay Rat & Rodent | Mark Lockaby |
| | | The inspector was satisfied with our updates. | |
| 10/27/2020 | Rodent abatement/exclusion work postponed | Rodent abatement and cleaning/sanitizing work to begin this week but upon informing the vendor that tenant had contacted the Building Inspector, vendor became nervous and asked to postpone start date until after he could get confirmation from Building Inspector that his work plan was permitted. | North Bay Rat and Rodent |
| 10/27/2020 | Tenant denies knowing that rodent abatement was planned | Despite vendor's repeated presence at the property (to prepare for the exclusion work, measure the property for replacement insulation, etc) and our instruction for vendor to schedule timing of work directly with tenant, tenant claims in 10/27 email that he is not aware of the rodent work that is planned. | |
| 10/27/2020 | Tenant sends list of new alleged issues with the property | In this new email, tenant provides a laundry list of additional problems that were never previously disclosed, including: | North Bay Rat and Rodent |
| | | (1) Heat isn't working, despite the newly installed heating system and multiple visits by HVAC vendor.<br>(2) Lumped in with the HVAC issue, he suspects rodents may have pulled down wires under the house, but admits he's "not sure how to know if that has happened at all."<br>(3) He claims the stairs in front of the house are "unsafe". He acknowledges that he previously said he did not want work to be done on the stairs, but has now changed his mind.<br>(4) He claims there is "black mold" on a window sill. We subsequently found no black mold upon our move-in. | |
| | | At this point, wary of the back and forth that we had been having with tenant, we asked that our attorney assume communications on our behalf, as it was apparent to us that tenant was attempting to exploit us and escalate the situation any way he could. Our attorney responded to tenant in email that we would work on a few items in tandem with the rodent remediation and would look into the stair repair, as well as asked for clarification on the "black mold". Tenant never responded. | |
| 10/30/2020 | Rodent abatement/exclusion work begins | After receiving the go-ahead from Building Inspector, vendor begins rodent exclusion and cleaning. | North Bay Rat and Rodent |

**TENANT BREAKS LEASE**

| 11/9/2020 | November rent check not received | Our attorney sends tenant an informal email reminder to submit November rent. | Laura Campbell |
| 11/9/2020 | Tenant sends email to us and CCs our attorney informing he has vacated the premises (without prior notice) | Tenant claims in email that he provided us notice of a number of "serious conditions" on August 24th and that they have not been resolved. We did not close on the house until September 11th. | |
| | | Tenant also claims that we agreed to release him from his lease without penalty. What we had actually said in a previous email, ghostwritten by our legal counsel in response to his threat of rent abatement, was, "[...] we are open to permitting an early termination of your lease without penalty. Please keep us posted on your plans." | |
| | | Through our attorney, we acknowledged receipt of his email while disputing several of his statements. | |
| 11/30/2020 | Check for $850 was mailed to tenant's forwarding address. | Per the lease, last month's rent and pro-rated rent for November were deducted from his total security deposit since tenant failed to give prior notice. The remainder of $850 was mailed to him. Our attorney provided an email confirmation to tenant. An itemized breakdown was included with the returned check. | |
| | | Tenant's initial deposit = $2125 (Security Deposit) + $4250 (Last Month's Rent)<br>Deductions = $1275 (Pro-rated rent for November 1-9) + $4250 (Last Month's Rent) | |
| 12/28/2020 | $850 check was cashed, per our bank records | | |

# EXHIBIT C

# EXHIBIT C

DocuSign Envelope ID: 02CE682C-C2CE-4DD8-980C-EB38F7E3CFC8

# Application for Dwelling Fire Insurance

JED D'ABRAVANEL / YANYI MAO
1132 PACIFIC AVE
SAN FRANCISCO, CA 94133-7250

**Grange** Insurance
ASSOCIATION

**Agent:**
CALIFORNIA MERIDIAN INSURANCE SERVICES INC
9700 EL CAMINO REAL
ATASCADERO, CA 93422
(805)466-3400
Producer Code: 000080400
Quoted By: Teri Price
www.californiameridian.com

200 Cedar Street
Seattle, WA 98121-1223
800-247-2643 / Fax 888-332-9253
www.grange.com

| | |
|---|---|
| **Quote Number:** | D17795 |
| **Policy Period:** | 9/2/2020 - 9/2/2021 |
| **Effective Date and Time** | 9/2/2020 at 12:01 AM at the mailing address shown above |

**Total Annual Premium**

Please review, sign where indicated, and return to your agent.

## Location Information

| Address: | 27 ACACIA RD |
|---|---|
| | FAIRFAX, CA 94930-1502 |
| | |
| Structure/Dwelling Type | Residential Dwelling |
| Number of Families | 1 |
| Territory | 34 |
| Feet to Hydrant | 1,000+ Feet |
| # of Miles to Fire Department | 1 |
| Responding Fire Station | ROSS VALLEY FS 21 |
| Protection Class | 2 |
| Protection Class Source | ISO |
| CoreLogic Wildfire | 10 |
| Spatial Key Wildfire | Low |
| Area Rating Factor (Concentration Risk) | 0.00 |
| Usage | Non-Seasonal |
| Occupancy | Tenant |
| Year Built | 1920 |
| Number of Stories | 2 |
| Roof Type | Asphalt Shingle |
| Roof Update Year | 2018 |
| Construction Type | Frame or Stucco |
| Primary Heat Source | Natural gas or propane |
| Supplemental Heat - Woodstove | Yes |
| Professionally Installed | Yes |
| UL/CSA Listed | Yes |
| Chimney Cleaned Annually | Yes |
| Supplemental Heat - Pellet Stove | No |
| Program Type | Residential Structure |
| Form Type | DP 00 03-Special |

Grange Insurance Association                DF 9099G CA 0713                Page 1 of 7

Exhibit C - page 1

DocuSign Envelope ID: 02CE682C-C2CE-4DD8-980C-EB38F7E3CFC8

JED D'ABRAVANEL / YANYI MAO, Residential Structure, D17795

## Customer Information

| | |
|---|---|
| Insured | JED D'ABRAVANEL |
| Email Address | jedandyanyi@gmail.com |
| Phone Number | (415)529-8212 |
| Date of Birth | 2/27/1985 |
| Applicant's Occupation | Employed; Legal/Law Enforcement/Security; Attorney |
| | |
| Insured | YANYI MAO |
| Date of Birth | 4/9/1984 |
| Applicant's Occupation | Employed; Banking/Finance/Real Estate; Financial Advisor |

Exhibit C - page 2

DocuSign Envelope ID: 02CE682C-C2CE-4DD8-980C-EB38F7E3CFC8

JED D'ABRAVANEL / YANYI MAO, Residential Structure, D17795

## Coverage Information

| | | |
|---|---|---|
| Earthquake Deductible | No Coverage | |
| All Perils Deductible | $2,500 | |
| **COVERAGES** | **LIMIT OF LIABILITY** | ▉ |
| Coverage A - Dwelling | $790,000 | |
| Coverage B - Other Structures | $79,000 | |
| Coverage C - Personal Property | $20,000 | |
| Coverage D/E – Fair Rental Value/Additional Living Expense | $158,000 | |
| Coverage L - Liability | $500,000 | |
| Coverage M - Medical Payments | $5,000 | |
| **INCLUDED COVERAGES** | **TOTAL LIMIT** | ▉ |
| Workers Compensation Residence Employees | | |
| **ADDITIONAL OPTIONS AND COVERAGES** | **TOTAL LIMIT** | ▉ |
| **Optional Property Coverages** | | |
| Ordinance or Law | 25% | |
| Water Back-Up and Sump Overflow | $5,000 | |
| **Optional Liability Coverages** | | |
| Personal Injury | | |
| **POLICY DISCOUNTS** | | |
| Fire Protection | | |
| **TOTAL PREMIUM** | | |

## Pay Plan Options

| | |
|---|---|
| Down Payment | |
| # of Installments | |
| Installment | |
| Service Fee per Installment | |
| Total | |

Grange Insurance Association                 DF 9099G CA 0713                 Page 3 of 7

Exhibit C - page 3

DocuSign Envelope ID: 02CE682C-C2CE-4DD8-980C-EB38F7E3CFC8

JED D'ABRAVANEL / YANYI MAO, Residential Structure, D17795

## Additional Information

| | |
|---|---|
| Is the dwelling under construction, significant renovation, vacant or for sale? | No |
| Has the property ever been converted FROM its originally constructed purpose? | No |
| Number of units at property to be insured: | 1 |
| Has any property insurance been declined, canceled or nonrenewed for any reason in the last 5 years? | No |
| Number of rental units owned by the applicant, including this location: | 1 |
| Is there an inground swimming pool on the premises? | No |
| Is the home bolted to the foundation and/or have sheer plates been installed? | Yes |
| Is the dwelling on a solid and continuous foundation? | Yes |
| Is it built on or within 20' of a slope exceeding 20 degrees? | No |
| Has the hot water heater been strapped or braced? | Yes |
| Does the dwelling have any of the following characteristics: cantilevered design, post or pillar construction, unrepaired damage, structural defects or built on fill or silt? | No |
| Are annual or semi-annual leases required? | Yes |
| Are the tenants required to carry an HO4? | Yes |

## Losses At This Location In The Last 5 Years

| | |
|---|---|
| Losses at this location in the last 5 years | None |

## Losses At Other Properties In The Last 5 Years

| | |
|---|---|
| Losses at any other properties in the last 5 years | None |

## Prior Carrier Information

| | |
|---|---|
| Prior Carrier | No Insurance - Other Explanation |
| Expiration Date | |

## Additional Interest

| Type | Additional Interest - Property & Liability |
|---|---|
| Name 1 | BING CAI |
| Name 2 | |
| Address | 1132 PACIFIC AVENUE |
| | SAN FRANCISCO, CA 94133 |
| Loan Number | |

| Type | First Mortgagee |
|---|---|
| Name 1 | GUARANTEED RATE, INC. ISAOA ATIMA |
| Name 2 | |
| Address | 3940 N. RAVENSWOOD AVE. |
| | CHICAGO, IL 60613 |
| Loan Number | 202964778 |

DocuSign Envelope ID: 02CE682C-C2CE-4DD8-980C-EB38F7E3CFC8

JED D'ABRAVANEL / YANYI MAO, Residential Structure, D17795

## Insurance Binder

Effective Date: 09/02/2020 at 12:01 AM at the mailing address shown above
Expiration Date: 09/02/2021 at 12:01 AM at the mailing address shown above

The following conditions apply:

This company binds the kind(s) of insurance stipulated on this application. This insurance is subject to the terms, conditions, and limitations of the policy(ies) in current use by the company.

This binder may be cancelled by the Insured by surrender of this binder or by written notice to the Company stating when cancellation will be effective. This binder may be cancelled by the Company by notice to the Insured in accordance with the policy conditions. This binder will remain in force for 60 days from the listed effective date or when replaced by a policy. If this binder is not replaced by a policy, the Company is entitled to charge a premium for the binder according to the rules and rates in use by the Company. The quoted premium is subject to verification and adjustment, when necessary, by the company.

## Applicable in California

When this form is used to provide insurance in the amount of one million dollars ($1,000,000) or more, the title of this form is changed from "Insurance Binder" to "Cover Note".

## Information Disclosure

GIA will confirm the claims history for the property listed on this application by using the Comprehensive Loss Underwriting Exchange (CLUE) report. Results from this report may impact the final premium charged.

## Privacy Notice

Any information that we obtain about you or other individuals listed as policyholders on your policy will be treated confidentially. However, this information, as well as other personal or privileged information subsequently collected, may, under certain circumstances, and where permitted by law, be disclosed without prior authorization to non-affiliated third parties. Generally this information will be disclosed only to persons or organizations having a business interest in insurance transactions involving you, having a contract to perform insurance services for us or that have some other business relationship with us.

You have the right to review the recorded personal information about you contained in our files and to get a copy. You have the further right to request that we correct, amend or delete any incorrect information. Please contact your agent or write us at the address listed on your policy to obtain this information.

## Fraud Warning

**For your protection California law requires the following to appear on this form. Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.**

Grange Insurance Association                DF 9099G CA 0713                Page 5 of 7

Exhibit C - page 5

DocuSign Envelope ID: 02CE682C-C2CE-4DD8-980C-EB38F7E3CFC8

JED D'ABRAVANEL / YANYI MAO, Residential Structure, D17795

## Verification of Content

For your protection California law requires the following to appear on this form

Any person who knowingly and with intent to defraud any insurance company or another person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects the person to criminal and civil penalties.

Applicant's statement: I have read the above application and any attachments. I declare that the information provided in them is true, complete and correct to the best of my knowledge and belief. This information is being offered to the company as an inducement to issue the policy for which I am applying.

I understand that the coverage selection and limit choices indicated here will apply to all future policy renewals, continuations, and changes unless I notify you otherwise in writing.

Date: _____9/2/2020_____     Signature of Applicant: _____*Jed D'Abravanel*_____
                                                      80391028D83243E...

Signature of the party above is binding on all parties.


Producer's statement: I certify to the best of my knowledge and belief that the signature of the applicant is the personal signature of the applicant.

Date: _____9/2/2020_____     Signature of Producer: _____*Jim Sciaroni*_____
                                                     073FC23583FD4DF...


Grange Insurance Association                    DF 9099G CA 0713                    Page 6 of 7

Exhibit C - page 6

DocuSign Envelope ID: 02CE682C-C2CE-4DD8-980C-EB38F7E3CFC8

JED D'ABRAVANEL / YANYI MAO, Residential Structure, D17795

## Overview of Payment Plan Options

We offer several convenient payment plans including:

- Payment in full with the application
- Four installments, with 25% of the full premium due at the time of application
- Twelve installments, with one-twelfth of the full premium due at the time of application

Our service charge for payment plans is $5.00 per payment. We do not charge on the initial installment.

Our Insufficient Funds Fee is $25.00.

Exhibit C - page 7

# EXHIBIT D

# EXHIBIT D



March 17, 2021


**To Whom It May Concern:**

It is hereby certified that the attached is a true and complete copy of the insurance policy issued

to **Jed D'Abravanel and Yanyi Mao** by Grange Insurance Association bearing policy number

**5302220006342** in effect September 2, 2020.



*Steven Trop*
_____

**Grange Insurance Association | 200 Cedar Street | Seattle, Washington 98121**
**Claims 800 826 3197 |Fax 888 769 7602| www.grange.com**

Exhibit D - page 1



Your Insurer:
**Grange Insurance Association**
200 Cedar Street
Seattle, WA 98121-1223
800-247-2643 / Fax 888-332-9253
www.grange.com

Agent # 80400
California Meridian Insurance Services Inc
9700 El Camino Real
Atascadero, CA 93422
805-466-3400
www.californiameridian.com

## NEW DECLARATIONS
## DWELLING POLICY
## SPECIAL FORM

**Insured:**

JED D'ABRAVANEL
YANYI MAO
1132 PACIFIC AVE
SAN FRANCISCO, CA 94133-7250

**Policy Number:** 5302220006342
**Client ID:** 317565
**Policy Term:**   Effective Date:  09-02-2020
   Expiration Date: 09-02-2021
   12:01 a.m. at your mailing address shown on these declarations.

**Printed Date:**  03-17-2021

| PREMIUMS | |
|---|---|
| Total Policy Premium | ▬▬▬ |

**LIABILITY COVERAGES**

| | Limit of Liability | Premium |
|---|---|---|
| Coverage L - Personal Liability: each occurrence | $   500,000 | $ ▬ |
| Personal Injury: aggregate limit | 500,000 | |
| Coverage M - Medical Payments: each person | 5,000 | |

**PROPERTY COVERAGES**

**DEDUCTIBLE**

In case of a loss under Property coverage, we will pay only that part of the total of all loss payable that exceeds the following deductible. The deductible applies separately to each loss occurrence: $2,500.00

**Property Location #**1   27 ACACIA RD   FAIRFAX, CA 94930-1502
**Description:** 1 Family Dwelling, Built in 1920, Frame or Stucco Construction, Tenant Occupied, Non-Seasonal Usage

| Coverages | Limit of Liability | Premium |
|---|---|---|
| A. Dwelling | $   790,000 | $▬ |
| B. Other Structures (included as part of the Coverage A Limit) | 10% of Cov A | |
| C. Personal Property | 20,000 | |
| D. & E. Fair Rental Value/Additional Living Expense | 158,000 | |
| (Limited to 12 months from date of loss) | | |

**Total Property Premium This Location  $**      853.00

| ADDITIONAL COVERAGES | Total Limit | Premium |
|---|---|---|
| Loc 1   Ordinance or Law Increased Amount of Coverage -Total Percentage Amt: 25% | $ | $▬ |
| Loc 1   Water Back Up and Sump Overflow | 5,000 | |

DF 9001 06 20

Exhibit D - page 2

**DWELLING POLICY**                                  **Grange Insurance Asssociation**

**Insured:** JED D'ABRAVANEL

**Policy Number:** 5302220006342              **Effective Date:**  09-02-2020
**Agent:** California Meridian Insurance Services Inc     **Printed Date:**    03-17-2021

---

**ADDITIONAL LIABILITY COVERAGE**                                          Premium
Workers Compensation for Residence Employees                         

---

**ADDITIONAL POLICY INFORMATION**

Your policy does not cover loss by flood. For information on obtaining flood insurance please contact the National Flood Insurance Program (NFIP) at 800-611-6122 or at www.fema.gov/business/NFIP. Your agent is a good resource for all your insurance needs and may be able to help you obtain this coverage.

Loc  1    Does not cover loss by earthquake.

The limit of liability for this structure (Coverage A) is based on an estimate of the cost to rebuild your home, including an approximate cost for the labor and materials in your area, and specific information that you have provided about your home.

---

**COVERAGE FORMS**

| Form | Edition | Title |
|------|---------|-------|
| DF 9001 | 06 20 | Policy Declaration |
| | | Policy Form |
| DL 0104 | 10 11 | Special Provisions - California |
| | | Policy Form |
| DL 2401G | 07 13 | Personal Liability |
| | | Policy Form |
| DL 2402 | 12 02 | Personal Liability Additional Policy Conditions |
| | | Policy Form |
| DL 2416 | 12 02 | NO Coverage For Home Day Care Business |
| | | Policy Form |
| DL 2433 | 05 04 | Workers Compensation Residence Employees - California |
| | | Policy Form |
| DL 2504 | 07 05 | Special Provisions - California |
| | | Policy Form |
| DL 2482G | 07 13 | Personal Injury Coverage |
| | | Policy Form |
| DL 9063G | 07 13 | Personal Liability Exclusion - Fungi, Wet Or Dry Rot, Or Bacteria Endorsement |
| | | Policy Form |
| DP 0003G | 07 13 | Dwelling Property 3 - Special Form |
| | | Policy Form |
| DP 0104G CA | 07 19 | Special Provisions - California |
| | | Policy Form |
| DP 0422G | 05 15 | Limited Fungi, Wet Or Dry Rot, Or Bacteria Coverage |
| | | Policy Form |
| DL 2411G | 07 13 | Premises Liability |
| | | For Location:  Loc 1 |
| DP 0471G | 07 13 | Ordinance Or Law Coverage Increased Amount Of Coverage |
| | | For Location:  Loc 1 |
| DP 0495G | 07 13 | Water Back-Up and Sump Discharge Or Overflow |
| | | For Location:  Loc 1 |
| DL 2410 | 12 02 | Additional Insured |
| | | For Location:  Loc 1 |
| DP 0441 | 12 02 | Additional Insured |
| | | For Location:  Loc 1 |
| HO 9003G | 05 09 | Mortgage Clause |
| | | For Location:  Loc 1 |

Exhibit D - page 3

**DWELLING POLICY**

**Insured:** JED D'ABRAVANEL

**Policy Number:** 5302220006342

**Agent:** California Meridian Insurance Services Inc

**Grange Insurance Asssociation**

**Effective Date:** 09-02-2020

**Printed Date:**   03-17-2021

**ADVISORY NOTICES**

| Form | Edition | Title |
|---|---|---|
| 10189 | 06 20 | Privacy Notice |
| MC 001 | 06 20 | Notice to Members |
| S 127 GIA | 06 19 | Welcome Letter |
| S 64 | 04 20 | Notice for California Policyholders |
| S 103 | 06 20 | California Residential Property Insurance Disclosure |
| S 244 | 06 20 | California Residential Property Insurance Bill of Rights |
| S 245 | 06 11 | Important Information Concerning Your Residential Property Insurance Policy |
| 10113 | 10 15 | Designated Additional Person To Receive Notice Of Cancellation Or Nonrenewal |
| S 231 | 01 20 | California Department of Insurance Survey |
| S 136 | 06 11 | California Offer/Rejection of Earthquake Coverage |

**ADDITIONAL INTEREST INFORMATION**

**First Mortgagee for Location #1**    Loan Number:  202964778
GUARANTEED RATE, INC. ISAOA ATIMA
3940 N. RAVENSWOOD AVE.
CHICAGO, IL 60613

**Additional Insured for  Location #1**
BING CAI
1132 PACIFIC AVENUE
SAN FRANCISCO, CA 94133

DF 9001 06 20

Exhibit D - page 4

PERSONAL LIABILITY
DL 0104 1011

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SPECIAL PROVISIONS – CALIFORNIA

**PERSONAL LIABILITY ADDITIONAL POLICY CONDITIONS**

**E. Cancellation**

Paragraphs **2.b., 2.c., 2.d., 3.** and **4.** are replaced by the following:

    **b.** When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 20 days before the date cancellation takes effect.

    **c.** When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel if there has been:

        **(1)** Conviction of a crime having as one of its necessary elements an act increasing the hazard insured against; or

        **(2)** Discovery of fraud or material misrepresentation by:

            **(a)** The named insured or a representative of the named insured in obtaining this policy; or

            **(b)** The named insured in pursuing a claim under this policy; or

        **(3)** Discovery of grossly negligent acts or omissions substantially increasing any of the hazards insured against; or

        **(4)** Physical changes in the property insured against which result in the property becoming uninsurable.

        This can be done by notifying you at least 30 days before the date cancellation takes effect.

    **d.** When this policy is written for a period longer than one year, we may cancel for any reason at anniversary by letting you know at least 45 days before the date cancellation takes effect.

  **3.** When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata. However, the refund may be less than pro rata if we made a loan to you for the purpose of payment of premiums for this policy.

  **4.** If we cancel this policy, the return premium will be refunded within 25 days after we send the cancellation notice to you. When you request cancellation, the return premium will be refunded within 25 days of the date when we receive your notice of cancellation.

The following condition is added:

**F. Nonrenewal**

  **1.** We may elect not to renew this policy, subject to the provisions of **2.** below. We may do so by delivering to you, at your mailing address shown in the Declarations, written notice at least 45 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

  **2.** We will not refuse to renew this policy:

    **a.** Solely on the grounds that a claim is pending under the policy; or

    **b.** Solely on the basis of the age of a person insured under this policy.

  **3.** If this policy is written for a period of less than one year, we agree not to refuse to renew except at the end of an annual period commencing with the original or renewal effective date.

All other provisions of this policy apply.

# PERSONAL LIABILITY

**AGREEMENT**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

**DEFINITIONS**

**A.** In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance.

**B.** In addition, certain words and phrases are defined as follows:

   **1.** "Aircraft Liability", "Hovercraft Liability", "Motor Vehicle Liability" and "Watercraft Liability", subject to the provisions in **b.** below, mean the following:

   **a.** Liability for "bodily injury" or "property damage" arising out of the:

   **(1)** Ownership of such vehicle or craft by an "insured";

   **(2)** Maintenance, occupancy, operation, use, loading or unloading of such vehicle or craft by any person;

   **(3)** Entrustment of such vehicle or craft by an "insured" to any person;

   **(4)** Failure to supervise or negligent supervision of any person involving such vehicle or craft by an "insured"; or

   **(5)** Vicarious liability, whether or not imposed by law, for the actions of a child or minor involving such vehicle or craft.

   **b.** For the purpose of this definition:

   **(1)** Aircraft means any contrivance used or designed for flight except model or hobby aircraft not used or designed to carry people or cargo;

   **(2)** Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles;

   **(3)** Watercraft means a craft principally designed to be propelled on or in water by wind, engine power or electric motor; and

   **(4)** Motor vehicle means a "motor vehicle" as defined in **7.** below.

   **2.** "Bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.

   **3.** "Business" means:

   **a.** A trade, profession or occupation engaged in on a full-time, part-time or occasional basis; or

   **b.** Any other activity engaged in for money or other compensation, except the following:

   **(1)** One or more activities, not described in **(2)** through **(4)** below, for which no "insured" receives more than $2,000 in total compensation for the 12 months before the beginning of the policy period;

   **(2)** Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

   **(3)** Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or

   **(4)** The rendering of home day care services to a relative of an "insured".

   **4.** "Employee" means an employee of an "insured", or an employee leased to an "insured" by a labor leasing firm under an agreement between an "insured" and the labor leasing firm, whose duties are other than those performed by a "residence employee".

   Includes copyrighted material from
Insurance Services Office, Inc., 2002, used with permission

5. "Insured" means:

   **a.** You and residents of your household who are:

   **(1)** Your relatives; or

   **(2)** Other persons under the age of 21 and in the care of any person named above;

   **b.** A student enrolled in school full time, as defined by the school, who was a resident of your household before moving out to attend school, provided the student is under the age of:

   **(1)** 24 and your relative; or

   **(2)** 21 and in your care or the care of a person described in **a.(1)** above;

   **c.** With respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in **a.** or **b.** above. "Insured" does not mean a person or organization using or having custody of these animals or watercraft in the course of any "business" or without consent of the owner; or

   **d.** With respect to a "motor vehicle" to which this policy applies:

   **(1)** Persons while engaged in your employ or that of any person included in **a.** or **b.** above; or

   **(2)** Other persons using the vehicle on an "insured location" with your consent.

   Throughout this policy, when the word an immediately precedes the word "insured", the words an "insured" together mean one or more "insureds".

6. "Insured location" means:

   **a.** The "residence premises";

   **b.** The part of other premises, other structures and grounds used by you as a residence; and

   **(1)** Which is shown in the Declarations; or

   **(2)** Which is acquired by you during the policy period for your use as a residence;

   **c.** Any premises used by you in connection with a premises described in **a.** and **b.** above;

   **d.** Any part of a premises:

   **(1)** Not owned by an "insured"; and

   **(2)** Where an "insured" is temporarily residing;

   **e.** Vacant land, other than farm land, owned by or rented to an "insured";

   **f.** Land owned by or rented to an "insured" on which a one, two, three or four family dwelling is being built as a residence for an "insured";

   **g.** Individual or family cemetery plots or burial vaults of an "insured"; or

   **h.** Any part of a premises occasionally rented to an "insured" for other than "business" use.

7. "Motor vehicle" means:

   **a.** A self-propelled land or amphibious vehicle; or

   **b.** Any trailer or semitrailer which is being carried on, towed by or hitched for towing by a vehicle described in **a.** above.

8. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

   **a.** "Bodily injury"; or

   **b.** "Property damage".

9. "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

10. "Residence employee" means:

    **a.** An employee of an "insured", or an employee leased to an "insured" by a labor leasing firm, under an agreement between an "insured" and the labor leasing firm, whose duties are related to the maintenance or use of the "residence premises", including household or domestic services; or

DL 2401G 0713                    Includes copyrighted material from                    Page 2 of 9
Insurance Services Office, Inc., 2002, used with permission

Exhibit D - page 7

    **b.** One who performs similar duties elsewhere not related to the "business" of an "insured".

A "residence employee" does not include a temporary employee who is furnished to an "insured" to substitute for a permanent "residence employee" on leave or to meet seasonal or short-term workload conditions.

**11.** "Residence premises" means:

    **a.** The one family dwelling where you reside;

    **b.** The two, three or four family dwelling where you reside in at least one of the family units; or

    **c.** That part of any other building where you reside;

and which is shown as the "residence premises" in the Declarations.

"Residence premises" also includes other structures and grounds at that location.

## LIABILITY COVERAGES

### A. Coverage L – Personal Liability

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

**1.** Pay up to our limit of liability for the damages for which an "insured" is legally liable. Damages include pre-judgment interest awarded against an "insured"; and

**2.** Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of liability for the "occurrence" has been exhausted by payment of a judgment or settlement.

### B. Coverage M – Medical Payments To Others

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing "bodily injury". Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except "residence employees". As to others, this coverage applies only:

**1.** To a person on the "insured location" with the permission of an "insured"; or

**2.** To a person off the "insured location", if the "bodily injury":

    **a.** Arises out of a condition on the "insured location" or the ways immediately adjoining;

    **b.** Is caused by the activities of an "insured";

    **c.** Is caused by a "residence employee" in the course of the "residence employee's" employment by an "insured"; or

    **d.** Is caused by an animal owned by or in the care of an "insured".

## EXCLUSIONS

### A. "Motor Vehicle Liability"

**1.** Coverages **L** and **M** do not apply to any "motor vehicle liability" if, at the time and place of an "occurrence", the involved "motor vehicle":

    **a.** Is registered for use on public roads or property;

    **b.** Is not registered for use on public roads or property, but such registration is required by a law, or regulation issued by a government agency, for it to be used at the place of the "occurrence"; or

    **c.** Is being:

        **(1)** Operated in, or practicing for, any prearranged or organized race, speed contest or other competition;

        **(2)** Rented to others;

        **(3)** Used to carry persons or cargo for a charge; or

**DL 2401G 0713**        Includes copyrighted material from        **Page 3 of 9**
Insurance Services Office, Inc., 2002, used with permission

Exhibit D - page 8

    **(4)** Used for any "business" purpose except for a motorized golf cart while on a golfing facility.

**2.** If Exclusion **A.1.** does not apply, there is still no coverage for "motor vehicle liability" unless the "motor vehicle" is:

  **a.** In dead storage on an "insured location";

  **b.** Used solely to service an "insured's" residence;

  **c.** Designed to assist the handicapped and, at the time of an "occurrence", it is:

    **(1)** Being used to assist a handicapped person; or

    **(2)** Parked on an "insured location";

  **d.** Designed for recreational use off public roads and:

    **(1)** Not owned by an "insured"; or

    **(2)** Owned by an "insured" provided the "occurrence" takes place on an "insured location" as defined in Definitions **B. 6.a., b., d., e.** or **h.;** or

  **e.** A motorized golf cart that is owned by an "insured", designed to carry up to 4 persons, not built or modified after manufacture to exceed a speed of 25 miles per hour on level ground and, at the time of an "occurrence", is within the legal boundaries of:

    **(1)** A golfing facility and is parked or stored there, or being used by an "insured" to:

      **(a)** Play the game of golf or for other recreational or leisure activity allowed by the facility;

      **(b)** Travel to or from an area where "motor vehicles" or golf carts are parked or stored; or

      **(c)** Cross public roads at designated points to access other parts of the golfing facility; or

    **(2)** A private residential community, including its public roads upon which a motorized golf cart can legally travel, which is subject to the authority of a property owners association and contains an "insured's" residence.

**B. "Watercraft Liability"**

**1.** Coverages **L** and **M** do not apply to any "watercraft liability" if, at the time of an "occurrence", the involved watercraft is being:

  **a.** Operated in, or practicing for, any prearranged or organized race, speed contest or other competition. This exclusion does not apply to a sailing vessel or a predicted log cruise;

  **b.** Rented to others;

  **c.** Used to carry persons or cargo for a charge; or

  **d.** Used for any "business" purpose.

**2.** If Exclusion **B.1.** does not apply, there is still no coverage for "watercraft liability" unless, at the time of the "occurrence", the watercraft:

  **a.** Is stored;

  **b.** Is a sailing vessel, with or without auxiliary power, that is:

    **(1)** Less than 26 feet in overall length; or

    **(2)** 26 feet or more in overall length and not owned by or rented to an "insured"; or

  **c.** Is not a sailing vessel and is powered by:

    **(1)** An inboard or inboard-outdrive engine or motor, including those that power a water jet pump, of:

      **(a)** 50 horsepower or less and not owned by an "insured"; or

      **(b)** More than 50 horsepower and not owned by or rented to an "insured"; or

    **(2)** One or more outboard engines or motors with:

      **(a)** 25 total horsepower or less;

      **(b)** More than 25 horsepower if the outboard engine or motor is not owned by an "insured";

**DL 2401G 0713**        Includes copyrighted material from        **Page 4 of 9**
Insurance Services Office, Inc., 2002, used with permission

Exhibit D - page 9

    **(c)** More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it during the policy period; or

    **(d)** More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it before the policy period, but only if:

        **(i)** You declare them at policy inception; or

        **(ii)** Your intent to insure them is reported to us in writing within 45 days after you acquire them.

    The coverages in **(c)** and **(d)** above apply for the policy period.

    Horsepower means the maximum power rating assigned to the engine or motor by the manufacturer.

**C. "Aircraft Liability"**

    This policy does not cover "aircraft liability".

**D. "Hovercraft Liability"**

    This policy does not cover "hovercraft liability".

**E. Coverage L – Personal Liability And Coverage M – Medical Payments To Others**

    Coverages **L** and **M** do not apply to the following:

    **1. Expected Or Intended Injury**

    "Bodily injury" or "property damage" which is expected or intended or resulting from a criminal act by an "insured" even if the resulting "bodily injury" or "property damage":

    **a.** Is of a different kind, quality or degree than initially expected or intended; or

    **b.** Is sustained by a different person, entity, real or personal property, than initially expected or intended.

    However, this Exclusion **E.1.** does not apply to "bodily injury" resulting from the use of reasonable force by an "insured" to protect persons or property;

    **2. "Business"**

    **a.** "Bodily injury" or "property damage" arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured".

    This Exclusion **E.2.** applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

    **b.** This Exclusion **E.2.** does not apply to:

    **(1)** The rental or holding for rental of an "insured location":

        **(a)** On an occasional basis if used only as a residence;

        **(b)** In part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

        **(c)** In part, as an office, school, studio or private garage; and

    **(2)** An "insured" under the age of 21 years involved in a part-time or occasional, self-employed "business" with no employees;

    **3. Professional Services**

    "Bodily injury" or "property damage" arising out of the rendering of or failure to render professional services;

    **4. "Insured's" Premises Not An "Insured Location"**

    "Bodily injury" or "property damage" arising out of a premises:

    **a.** Owned by an "insured";

    **b.** Rented to an "insured"; or

    **c.** Rented to others by an "insured";

    that is not an "insured location";

**DL 2401G 0713**      Includes copyrighted material from      Page 5 of 9
Insurance Services Office, Inc., 2002, used with permission

Exhibit D - page 10

**5. War**

"Bodily injury" or "property damage" caused directly or indirectly by war, including the following and any consequence of any of the following:

    **a.** Undeclared war, civil war, insurrection, rebellion or revolution;

    **b.** Warlike act by a military force or military personnel; or

    **c.** Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental;

**6. Communicable Disease**

"Bodily injury" or "property damage" which arises out of the transmission of a communicable disease by an "insured";

**7. Sexual Molestation, Corporal Punishment Or Physical Or Mental Abuse**

"Bodily injury" or "property damage" arising out of sexual molestation, corporal punishment or physical or mental abuse; or

**8. Controlled Substance**

"Bodily injury" or "property damage" arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed physician.

Exclusions **A.** "Motor Vehicle Liability", **B.** "Watercraft Liability", **C.** "Aircraft Liability", **D.** "Hovercraft Liability" and **E.4.** "Insured's" Premises Not An "Insured Location" do not apply to "bodily injury" to a "residence employee" arising out of and in the course of the "residence employee's" employment by an "insured".

**F. Coverage L – Personal Liability**

Coverage **L** does not apply to:

**1. Liability:**

    **a.** For any loss assessment charged against you as a member of an association, corporation or community of property owners;

    **b.** Under any contract or agreement entered into by an "insured". However, this exclusion does not apply to written contracts:

        **(1)** That directly relate to the ownership, maintenance or use of an "insured location"; or

        **(2)** Where the liability of others is assumed by you prior to an "occurrence";

        unless excluded in **a.** above or elsewhere in this policy;

**2.** "Property damage" to property owned by an "insured". This includes costs or expenses incurred by an "insured" or others to repair, replace, enhance, restore or maintain such property to prevent injury to a person or damage to property of others, whether on or away from an "insured location";

**3.** "Property damage" to property rented to, occupied or used by or in the care of an "insured". This exclusion does not apply to "property damage" caused by fire, smoke or explosion;

**4.** "Bodily injury" to any person eligible to receive any benefits voluntarily provided or required to be provided by an "insured" under any:

    **a.** Workers' compensation law;

    **b.** Non-occupational disability law; or

    **c.** Occupational disease law;

**5.** "Bodily injury" or "property damage" for which an "insured" under this policy:

    **a.** Is also an insured under a nuclear energy liability policy issued by the:

        **(1)** Nuclear Energy Liability Insurance Association;

    **(2)** Mutual Atomic Energy Liability Underwriters;

    **(3)** Nuclear Insurance Association of Canada;

    or any of their successors; or

  **b.** Would be an insured under such a policy but for the exhaustion of its limit of liability; or

**6.** "Bodily injury" to you or an "insured" as defined under Definitions **5.a.** or **b.**

This exclusion also applies to any claim made or suit brought against you or an "insured":

  **a.** To repay; or

  **b.** Share damages with;

another person who may be obligated to pay damages because of "bodily injury" to an "insured".

**G. Coverage M – Medical Payments To Others**

Coverage **M** does not apply to "bodily injury":

**1.** To a "residence employee" if the "bodily injury":

  **a.** Occurs off the "insured location"; and

  **b.** Does not arise out of or in the course of the "residence employee's" employment by an "insured";

**2.** To any person eligible to receive benefits voluntarily provided or required to be provided under any:

  **a.** Workers' compensation law;

  **b.** Non-occupational disability law; or

  **c.** Occupational disease law;

**3.** From any:

  **a.** Nuclear reaction;

  **b.** Nuclear radiation; or

  **c.** Radioactive contamination;

all whether controlled or uncontrolled or however caused; or

  **d.** Any consequence of any of these; or

**4.** To any person, other than a "residence employee" of an "insured", regularly residing on any part of the "insured location".

## ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

**A. Claim Expenses**

We pay:

**1.** Expenses we incur and costs taxed against an "insured" in any suit we defend;

**2.** Premiums on bonds required in a suit we defend, but not for bond amounts more than the Coverage **L** limit of liability. We need not apply for or furnish any bond;

**3.** Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) up to $250 per day, for assisting us in the investigation or defense of a claim or suit; and

**4.** Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

**B. First Aid Expenses**

We will pay expenses for first aid to others incurred by an "insured" for "bodily injury" covered under this policy. We will not pay for first aid to an "insured".

**C. Damage To Property Of Others**

**1.** We will pay, at replacement cost, up to $1,000 per "occurrence" for "property damage" to property of others caused by an "insured".

**DL 2401G 0713**      Includes copyrighted material from      **Page 7 of 9**
Insurance Services Office, Inc., 2002, used with permission

Exhibit D - page 12

   **2.** We will not pay for "property damage":

      **a.** Caused intentionally by an "insured" who is 13 years of age or older;

      **b.** To property owned by an "insured";

      **c.** To property owned by or rented to a tenant of an "insured" or a resident in your household; or

      **d.** Arising out of:

        **(1)** A "business" engaged in by an "insured";

        **(2)** Any act or omission in connection with a premises owned, rented or controlled by an "insured", other than the "insured location"; or

        **(3)** The ownership, maintenance, occupancy, operation, use, loading or unloading of aircraft, hovercraft, watercraft or "motor vehicles".

          This Exclusion **d.(3)** does not apply to a "motor vehicle" that:

          **(a)** Is designed for recreational use off public roads;

          **(b)** Is not owned by an "insured"; and

          **(c)** At the time of the "occurrence", is not required by law, or regulation issued by a government agency, to have been registered for it to be used on public roads or property.

## CONDITIONS

### A. Limit Of Liability

The Coverage **L** limit is shown in the Declarations. This is the limit for all damages from each "occurrence" in the policy period in which the "bodily injury" or "property damage" first occurs, regardless of the number of insureds, claims made or persons injured. No additional limits or coverage will be available for the "occurrence" under any additional policies or policy periods.

Our total liability under Coverage **M** for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the Coverage **M** limit of liability shown in the Declarations.

### B. Severability Of Insurance

This insurance applies separately to each "insured". This condition will not increase our limit of liability for any one "occurrence".

### C. Duties After "Occurrence"

In case of an "occurrence", you or another "insured" will perform the following duties that apply. We have no duty to provide coverage under this policy if your failure to comply with the following duties is prejudicial to us. You will help us by seeing that these duties are performed:

   **1.** Give written notice to us or our agent as soon as is practical, which sets forth:

      **a.** The identity of the policy and the "named insured" shown in the Declarations;

      **b.** Reasonably available information on the time, place and circumstances of the "occurrence"; and

      **c.** Names and addresses of any claimants and witnesses;

   **2.** Cooperate with us in the investigation, settlement or defense of any claim or suit;

   **3.** Promptly forward to us every notice, demand, summons or other process relating to the "occurrence";

   **4.** At our request, help us:

      **a.** To make settlement;

      **b.** To enforce any right of contribution or indemnity against any person or organization who may be liable to an "insured";

      **c.** With the conduct of suits and attend hearings and trials; and

      **d.** To secure and give evidence and obtain the attendance of witnesses;

   **5.** With respect to **C.** Damage To Property Of Others under Additional Coverages, submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in an "insured's" control;

**DL 2401G 0713**          Includes copyrighted material from          **Page 8 of 9**
Insurance Services Office, Inc., 2002, used with permission

Exhibit D - page 13

**6.** No "insured" shall, except at such "insured's" own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the "bodily injury".

**D. Duties Of An Injured Person – Coverage M – Medical Payments To Others**

**1.** The injured person or someone acting for the injured person will:

    **a.** Give us written proof of claim, under oath if required, as soon as is practical; and

    **b.** Authorize us to obtain copies of medical reports and records.

**2.** The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

**E. Payment Of Claim – Coverage M – Medical Payments To Others**

Payment under this coverage is not an admission of liability by an "insured" or us.

**F. Suit Against Us**

**1.** No action can be brought against us unless there has been full compliance with all of the terms under this policy.

**2.** No one will have the right to join us as a party to any action against an "insured".

**3.** Also, no action with respect to Coverage **L** can be brought against us until the obligation of such "insured" has been determined by final judgment or agreement signed by us.

**G. Bankruptcy Of An "Insured"**

Bankruptcy or insolvency of an "insured" will not relieve us of our obligations under this policy.

**H. Other Insurance**

This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

**I. Policy Period**

This policy applies only to "bodily injury" or "property damage" which occurs during the policy period.

**J. Subrogation**

An "insured" may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an "insured" must sign and deliver all related papers and cooperate with us.

Subrogation does not apply to Coverage **M** or Paragraph **C.** Damage To Property Of Others under Additional Coverages.

**K. Concealment Or Fraud**

We do not provide coverage to an "insured" who, whether before or after a loss, has:

**1.** Intentionally concealed or misrepresented any material fact or circumstance;

**2.** Engaged in fraudulent conduct; or

**3.** Made false statements;

relating to this insurance.

DL 2401G 0713        Includes copyrighted material from        Page 9 of 9
Insurance Services Office, Inc., 2002, used with permission

Exhibit D - page 14

PERSONAL LIABILITY
DL 2402 1202

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PERSONAL LIABILITY
# ADDITIONAL POLICY CONDITIONS

The following conditions are added to this policy:

**A. Liberalization Clause**

If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

This Liberalization Clause does not apply to changes implemented with a general program revision that includes both broadenings and restrictions in coverage, whether that general program revision is implemented through introduction of:

**1.** A subsequent edition of this policy; or

**2.** An amendatory endorsement.

**B. Waiver Or Change Of Policy Provisions**

A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

**C. Assignment**

Assignment of this policy will not be valid unless we give our written consent.

**D. Death**

If any person named in the Declarations or the spouse, if a resident of the same household, dies:

**1.** We insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

**2.** "Insured" includes:

**a.** An "insured" who is a member of your household at the time of your death, but only while a resident of the "residence premises;" and

**b.** With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

**E. Cancellation**

**1.** You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

**2.** We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations. Proof of mailing will be sufficient proof of notice.

**a.** When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

**b.** When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

Exhibit D - page 15

  **c.** When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

    **(1)** if there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

    **(2)** if the risk has changed substantially since the policy was issued.

    This can be done by letting you know at least 30 days before the date cancellation takes effect.

  **d.** When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 30 days before the date cancellation takes effect.

**3.** When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

**4.** If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

**PERSONAL LIABILITY**
**DL 2416 1202**

**THIS ENDORSEMENT DOES NOT CONSTITUTE A REDUCTION OF COVERAGE.**

# NO COVERAGE FOR
# HOME DAY CARE BUSINESS

**A.** "Business", as defined in the policy, means:

    **1.** A trade, profession or occupation engaged in on a full time, part-time or occasional basis; or

    **2.** Any other activity engaged in for money or other compensation, except the following:

        **a.** One or more activities:

            **(1)** Not described in **b.** through **d.** below,

            **(2)** For which no "insured" receives more than $2,000 in total compensation for the 12 months before the beginning of the policy period;

        **b.** Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

        **c.** Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or

        **d.** The rendering of home day care services to a relative of an "insured".

**B.** If an "insured" regularly provides home day care services to a person or persons other than "insureds" as their trade, profession or occupation, that service is a "business".

**C.** If home day care service is not a given "insured's" trade, profession or occupation but is an activity:

    **1.** That an "insured" engages in for money or other compensation; and

    **2.** From which an "insured" receives more than $2,000 in total/combined compensation from it for the 12 months before the beginning of the policy period,

the home day care service and other activity will be considered a "business".

**D.** With respect to **C.** above home day care service is only an example of an activity engaged in for money that may be a "business". Any single activity or combination of activities:

    **1.** Described in **A.2.** above, and

    **2.** Engaged in for money by a single "insured";

may be considered a "business" if the $2000 threshold is exceeded.

**E.** With respect to **A.** through **D.** above, coverage does not apply with respect to home day care service which is a "business". This policy does not provide coverage because a "business" of an "insured" is excluded under Exclusion **E.2.**

© ISO Properties, Inc.,  2002

Exhibit D - page 17

**DWELLING**
**DL 2433 0504**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WORKERS COMPENSATION RESIDENCE EMPLOYEES – CALIFORNIA

**A. Agreement**

We agree, with respect to "residence employees":

**Under Coverage I**

To pay when due all benefits required of an "insured" by the California Workers' Compensation Law; and

**Under Coverage II**

To pay on behalf of an "insured" all damages for which the "insured" is legally liable because of "bodily injury" sustained by a "residence employee". The "bodily injury" must be caused by accident or disease and arise out of and in the course of employment by the "insured" while:

**1.** In the United States of America, its territories or possessions, or Canada, or

**2.** Temporarily elsewhere if the "residence employee" is a citizen or resident of the United States or Canada.

Coverage **II** does not apply to any suit brought in or judgment rendered by any court outside the United States of America, its territories and possessions, or Canada, or to any action on such judgment.

**B. Who Is Covered**

A "residence employee" is covered if during the 90 calendar days immediately before the date of injury the employee has:

**1.** Actually been engaged in such employment by the "insured" for no less than 52 hours, and

**2.** Earned no less than one hundred dollars ($100) in wages.

**C. Application Of Coverage**

This insurance applies only to "bodily injury" which occurs during the policy period. If the "bodily injury" is a disease, it must be caused or aggravated by the conditions of the "residence employee's" employment by the "insured".

**D. Policy Provisions**

This insurance is subject to all the provisions of this endorsement and the following provisions of this policy:

**1.** Under Conditions:

**C.** Duties After "Occurrence".

**F.** Suit Against Us.

**J.** Subrogation.

**2.** Under Additional Policy Conditions:

**B.** Waiver or Change of Policy Provisions.

**C.** Assignment.

**E.** Cancellation.

**3.** Our agreement to defend an "insured" as provided under **Coverage L – Personal Liability.**

**4.** Under Additional Coverages:

**A.** Claim Expenses.

    **B.** First Aid Expenses.

   **5.** The definitions of "bodily injury", "business", "insured" and "residence employee".

**E. Additional Provisions Applicable To Coverage I**

The following provisions are applicable to Coverage **I:**

   **1.** We shall be directly and primarily liable to any "residence employee" of an "insured" entitled to the benefits of the California Workers' Compensation Law.

   **2.** As between the "residence employee" and us, notice to or knowledge of the occurrence of the injury on the part of an "insured" will be deemed notice or knowledge on our part.

   **3.** The jurisdiction of an "insured" will, for the purpose of the law imposing liability for compensation, be our jurisdiction.

   **4.** We will be subject to the orders, findings, decisions or awards rendered against an "insured", under the provisions of the law imposing liability for compensation, subject to the provisions, conditions and limitations of this policy.

      This policy shall govern as between an "insured" and us as to payments by either in discharge of an "insured's" liability for compensation.

   **5.** The "residence employee" has a first lien upon any amount which we owe you on account of this insurance. In case of your legal incapacity or inability to receive the money and pay it to the "residence employee", we will pay it directly to the "residence employee". Your obligation to the "residence employee" will be discharged to the extent of such payment.

**F. Limits Of Liability Coverage II**

Our total limit of liability will not exceed $100,000 for all damages because of "bodily injury":

   **1.** Sustained by one or more "residence employees" in any one accident; or

   **2.** Caused by disease and sustained by a "residence employee".

Our total limit of liability will not exceed $500,000 for all damages arising out of "bodily injury" by disease regardless of the number of "residence employees" who sustain "bodily injury" by disease.

**G. Other Insurance**

This insurance does not apply to any loss to which other valid and collectible Workers' Compensation or Employers' Liability Insurance applies

**H. Conformity To Statute**

Terms of this insurance which are in conflict with the California Workers' Compensation Law are amended to conform to that law.

**I. Exclusions**

This policy does not apply:

   **1.** To liability for additional compensation imposed on an "insured" under Sections 4553 and 4557, Division IV, Labor Code of the State of California, because of the serious and willful misconduct of an "insured", or because of "bodily injury" to an employee under 16 years of age and illegally employed at the time of injury;

   **2.** To liability for "bodily injury" arising out of or in connection with a "business" engaged in by an "insured".

   **3.** Under Coverage **II:**

      **a.** To liability assumed by the "insured" under any contract or agreement.

      **b.** To "bodily injury" by disease unless a written claim is made or suit brought against the "insured" within 36 months after the end of the policy period.

      **c.** To any obligation under a workers' compensation, unemployment or disability benefits law or any similar law.

All other provisions of this policy apply.

**DWELLING**
**DL 2504 0705**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SPECIAL PROVISIONS – CALIFORNIA

**NOTICE**

Throughout this policy, the term spouse includes an individual registered under California law as a domestic partner with the "named insured" shown in the Declarations.

© ISO Properties, Inc., 2004

Exhibit D - page 20

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PERSONAL INJURY COVERAGE
# (AGGREGATE LIMIT OF LIABILITY)

## DEFINITIONS

For an additional premium, under **Coverage L – Personal Liability**, the definition of bodily injury is amended to include personal injury.

"Personal injury" means injury arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment;

2. Malicious prosecution;

3. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

4. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

5. Oral or written publication, in any manner, of material that violates a person's right of privacy.

"Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

However, this does not include any fungi that are, are on, or are contained in, a good or product intended for consumption.

## LIABILITY COVERAGES

**A. Coverage L – PERSONAL LIABILITY**

The following is added **to COVERAGE L – PERSONAL LIABILITY:**

**Personal Injury Coverage**

If a claim is made or suit is brought against an "insured" for damages resulting from an offense, defined under "personal injury", to which this coverage applies, we will:

1. Pay for the damages for which an "insured" is legally liable, subject to the Aggregate Limit Of Liability, as shown in the Declarations and described in **CONDITIONS B. Aggregate Limit Of Liability** below. Damages include prejudgment interest awarded against an "insured"; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the Aggregate Limit Of Liability shown in the Schedule has been exhausted by payment of a judgment or settlement.

## EXCLUSIONS

With respect to the coverage provided by this endorsement, **EXCLUSIONS** is replaced by the following:

This insurance does not apply to:

1. "Personal injury":

   a. Caused by or at the direction of an "insured" with the knowledge that the act would violate the rights of another and would inflict "personal injury";

Contains copyrighted material from
Insurance Services Office, Inc., 2010, used with permission

**b.** Arising out of oral or written publication of material, if done by or at the direction of an "insured" with knowledge of its falsity;

**c.** Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

**d.** Arising out of a criminal act committed by or at the direction of an "insured";

**e.** Arising out of liability assumed by an "insured" under any contract or agreement except any indemnity obligation assumed by an "insured" under a written contract directly relating to the ownership, maintenance or use of the premises;

**f.** Sustained by any person as a result of an offense directly or indirectly related to the employment of this person by an "insured";

**g.** Arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured". This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

This exclusion does not apply to:

**(1)** The rental or holding for rental of an "insured location";

    **(a)** On an occasional basis if used only as a residence;

    **(b)** In part for use only as a residence, unless a single-family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

    **(c)** In part, as an office, school, studio or private garage; and

**(2)** An "insured" under the age of 21 years involved in a part-time or occasional, self-employed "business" with no employees;

**h.** Arising out of civic or public activities performed for pay by an "insured";

**i.** To you or an "insured" as defined under Definitions;

This exclusion also applies to any claim made or suit brought against you or an "insured" to:

**(1)** Repay; or

**(2)** Share damages with;

another person who may be obligated to pay damages because of "personal injury" to an "insured";

**j.** Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed; or

**k.** Arising directly or indirectly, in whole or in part, out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi", wet or dry rot, or bacteria.

**2.** Any loss, cost or expense arising out of any:

**a.** Request, demand or order that an "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants, "fungi", wet or dry rot, or bacteria; or

**b.** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, clean up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, pollutants, "fungi", wet or dry rot, or bacteria.

Contains copyrighted material from
Insurance Services Office, Inc., 2010, used with permission

**ADDITIONAL COVERAGES**

With respect to the coverage provided by this endorsement, the following **ADDITIONAL COVERAGE** is added:

**Loss Assessment**

We will pay up to $1,000 for your share of loss assessment charged against you, as an owner or tenant of the "residence premises", in an annual policy period by a corporation or association of property owners, when the assessment is made as a result of "personal injury" not excluded under this endorsement.

We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

Regardless of the number of assessments, the limit of $1,000 is the most we will pay in an annual policy period for loss arising out of "personal injury".

**CONDITIONS**

With respect to the coverage provided by this endorsement, **CONDITIONS A. Policy Period** does not apply and **CONDITIONS B. Insurable Interest and Limit Of Liability** and **D. Duties After Loss** are replaced by the following:

**B.  Aggregate Limit Of Liability**

Our total liability in an annual policy period under Personal Injury Coverage for all damages resulting from the total of all offenses during the policy period will not be more than the Aggregate Limit Of Liability shown in the Declarations. This is the most we will pay regardless of the number of:

**a.**  "Insureds";

**b.**  Offenses;

**c.**  Claims made; or

**d.**  Suits brought.

This insurance applies separately to each "insured" except with respect to the Aggregate Limit of Liability. Therefore, this condition will not increase the Annual Aggregate Limit of Liability for this coverage.

**D.  Duties After Offense**

In the event of a covered offense, you or another "insured" will perform the following duties that apply. We have no duty to provide coverage under this policy if your failure to comply with the following duties is prejudicial to us. You will help us by seeing that these duties are performed:

**a.**  Give written notice to us or our agent as soon as is practical, which sets forth:

**(1)**  The identity of the policy and "named insured";

**(2)**  Reasonably available information on the time, place and circumstances of the offense; and

**(3)**  Names and addresses of any claimants and witnesses;

**b.**  Cooperate with us in the investigation, settlement or defense of any claim or suit;

**c.**  Promptly forward to us every notice, demand, summons or other process relating to the offense;

**d.**  At our request, help us:

**(1)**  To make settlement;

**(2)**  To enforce any right of contribution or indemnity against any person or organization who may be liable to an "insured";

**(3)**  With the conduct of suits and attend hearings and trials; and

**(4)**  To secure and give evidence and obtain the attendance of witnesses;

**e.**  No "insured" shall, except at such "insured's" own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the "personal injury".

All other provisions of this policy apply.

**DL 2482G 0713**           Contains copyrighted material from           **Page 3 of 3**
Insurance Services Office, Inc., 2010, used with permission

Exhibit D - page 23

**PERSONAL LIABILITY**
**DL 9063G 0713**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PERSONAL LIABILITY EXCLUSION –
# "FUNGI", WET OR DRY ROT OR BACTERIA

The following is added to **DEFINITIONS** in Form **DL 2401G:**

"Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

This definition does not include any fungi that are, are part of, or become part of, a good or product intended for consumption.

The following is added to **EXCLUSIONS** in Form **DL 2401G**:

Coverage **L** and **M** do not apply to "bodily injury", "personal injury" or "property damage arising directly, indirectly, in whole or in part, out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi", wet or dry rot, or bacteria.

All other policy provisions apply.

**DWELLING**
**DP 0003G 0713**

# DWELLING PROPERTY 3 – SPECIAL FORM

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We," "us" and "our" refer to the Company providing this insurance.

## DEDUCTIBLE

Unless otherwise noted in this policy, the following deductible provision applies:

Subject to the policy limits that apply, we will pay only that part of the total of all loss payable that exceeds the deductible amount shown in the Declarations.

## COVERAGES

This insurance applies to the Described Location, Coverages for which a Limit of Liability is shown and Perils Insured Against for which a Premium is stated.

**A. Coverage A – Dwelling**

1. We cover:

   a. The dwelling on the Described Location shown in the Declarations, used principally for dwelling purposes, including structures attached to the dwelling;

   b. Materials and supplies located on or next to the Described Location used to construct, alter or repair the dwelling or other structures on the Described Location; and

   c. If not otherwise covered in this policy, building equipment and outdoor equipment used for the service of and located on the Described Location.

2. We do not cover land, including land on which the dwelling is located.

**B. Coverage B – Other Structures**

1. We cover other structures on the Described Location, set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line or similar connection.

2. **We do not cover:**

   a. Land, including land on which the other structures are located;

   b. Other structures rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage;

   c. Other structures used in whole or in part for commercial, manufacturing or farming purposes. However, we do cover a structure that contains commercial, manufacturing or farming property solely owned by you or a tenant of the dwelling provided that such property does not include gaseous or liquid fuel, other than fuel in a permanently installed fuel tank of a vehicle or craft parked or stored in the structure; or

   d. Grave markers, including mausoleums.

### C.  Coverage C – Personal Property

#### 1.  Covered Property

We cover personal property, usual to the occupancy as a dwelling and owned or used by you or members of your family residing with you while it is on the Described Location. After a loss and at your request, we will cover personal property owned by a guest or servant while the property is on the Described Location.

#### 2.  Property Not Covered

We do not cover:

**a.** Accounts, bank notes, bills, bullion, coins, currency, deeds, evidences of debt, gold other than goldware, letters of credit, manuscripts, medals, money, notes other than bank notes, passports, personal records, platinum other than platinumware, securities, silver other than silverware, tickets, stamps, scrip, stored value cards and smart cards;

**b.** Animals, birds or fish;

**c.** Aircraft meaning any contrivance used or designed for flight including any parts whether or not attached to the aircraft.

We do cover model or hobby aircraft not used or designed to carry people or cargo;

**d.** Hovercraft and parts. Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles;

**e.** Motor vehicles or all other motorized land conveyances.

  **(1)** This includes:

    **(a)** Their accessories, equipment and parts; or

    **(b)** Any device or instrument for the transmitting, recording, receiving or reproduction of sound or pictures which is operated by power from the electrical system of motor vehicles and all other motorized land conveyances, and its accessories. Accessories include antennas, tapes, wires, records, discs or other media that can be used with any device or instrument described above.

    The exclusion of property described in **(a)** and **(b)** above applies only while such property is in or up-on the vehicle or conveyance.

  **(2)** We do cover motor vehicles or other motorized land conveyances not required to be registered for use on public roads or property which are:

    **(a)** Used solely to service the Described Location; or

    **(b)** Designed to assist the handicapped;

**f.** Watercraft of all types, other than rowboats and canoes;

**g.** Data, including data stored in:

  **(1)** Books of account, drawings or other paper records; or

  **(2)** Computers and related equipment;

We do cover the cost of blank recording or storage media, and of prerecorded computer programs available on the retail market;

**h.** Credit cards, electronic fund transfer cards or access devices used solely for deposit, withdrawal or transfer of funds;

**i.** Water or steam; or

**j.** Grave markers, including mausoleums.

#### 3.  Property Removed To A Newly Acquired Principle Residence

If you remove personal property from the Described Location to a newly acquired principal residence, the Coverage **C** limit of liability will apply at each residence for the 30 days immediately after you begin to move the property there. This time period will not extend beyond the termination of this policy. Our liability is lim-ited to the proportion of the limit of liability that the value at each residence bears to the total value of all personal property covered by this policy.

Includes copyrighted material from
ISO Properties, Inc., 2002, used with permission

**D. Coverage D – Fair Rental Value**

**1.** If a loss to property described in Coverage **A, B** or **C** by a Peril Insured Against under this policy makes that part of the Described Location rented to others or held for rental by you unfit for its normal use, we cover the fair rental value of that part of the Described Location rented to others or held for rental by you less any expenses that do not continue while that part of the Described Location rented or held for rental is not fit to live in.

Payment will be for the shortest time required to repair or replace that part of the Described Location rented or held for rental.

**2.** If a civil authority prohibits you from use of the Described Location as a result of direct damage to a neighboring location by a Peril Insured Against in this policy, we cover the Fair Rental Value loss for no more than two weeks.

**3.** The periods of time referenced above are not limited by the expiration of this policy.

**4.** We do not cover loss or expense due to cancellation of a lease or agreement.

**E. Coverage E – Additional Living Expense**

**1.** If a loss to property described in Coverage **A, B** or **C** by a Peril Insured Against under this policy makes the Described Location unfit for its normal use, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

Payment will be for the shortest time required to repair or replace the Described Location or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

**2.** If a civil authority prohibits you from use of the Described Location as a result of direct damage to a neighboring location by a Peril Insured Against in this policy, we cover the Additional Living Expense loss for no more than two weeks.

**3.** The periods of time referenced above are not limited by the expiration of this policy.

**4.** We do not cover loss or expense due to cancellation of a lease or agreement.

**F. Other Coverages**

**1. Other Structures**

You may use up to 10% of the Coverage **A** limit of liability for loss by a Peril Insured Against to other structures described in Coverage **B.**

This coverage is additional insurance.

**2. Debris Removal**

We will pay your reasonable expense for the removal of:

**a.** Debris of covered property if a Peril Insured Against causes the loss; or

**b.** Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

This expense is included in the limit of liability that applies to the damaged property.

**3. Improvements, Alterations And Additions**

If you are a tenant of the Described Location, you may use up to 10% of the Coverage **C** limit of liability for loss by a Peril Insured Against to improvements, alterations and additions, made or acquired at your expense, to that part of the Described Location used only by you.

This coverage is additional insurance.

**4. World-Wide Coverage**

You may use up to 10% of the Coverage **C** limit of liability for loss by a Peril Insured Against to property covered under Coverage **C** except rowboats and canoes, while anywhere in the world.

Use of this coverage reduces the Coverage **C** limit of liability for the same loss.

5. **Rental Value And Additional Living Expense**

You may use up to 20% of the Coverage **A** limit of liability for loss of both fair rental value as described in Coverage **D** and additional living expense as described in Coverage **E.** Payment will be for the shortest time required to repair or replace that part of the Described Location occupied, rented or held for rental, or 12 months, whichever occurs first.

This coverage is additional insurance.

6. **Reasonable Repairs**

   **a.** In the event that covered property is damaged by a Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage.

   **b.** If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by a Peril Insured Against. This coverage does not:

   **(1)** Increase the limit of liability that applies to the covered property; or

   **(2)** Relieve you of your duties, in case of a loss to covered property, as set forth in Condition **D.2.**

7. **Property Removed**

We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed.

This coverage does not change the limit of liability that applies to the property being removed.

8. **Trees, Shrubs And Other Plants**

We cover trees, shrubs, plants or lawns, on the Described Location for loss caused by the following Perils Insured Against:

   **a.** Fire or lightning;

   **b.** Explosion;

   **c.** Riot or civil commotion;

   **d.** Aircraft;

   **e.** Vehicles not owned or operated by you or a resident of the Described Location; or

   **f.** Vandalism or malicious mischief, including damage during a burglary or attempted burglary, but not theft of property.

The limit of liability for this coverage will not be more than 5% of the Coverage **A** limit of liability, or more than $500 for any one tree, shrub or plant. We do not cover property grown for commercial purposes.

This coverage is additional insurance.

9. **Fire Department Service Charge**

We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance. No deductible applies to this coverage.

10. **Collapse**

   **a.** With respect to this Other Coverage:

   **(1)** Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

   **(2)** A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

   **(3)** A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

**(4)** A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**b.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:

**(1)** The Perils Insured Against named under Coverage **C;**

**(2)** Decay that is hidden from view, unless the presence of such decay is known to you prior to collapse;

**(3)** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to you prior to collapse;

**(4)** Weight of contents, equipment, animals or people;

**(5)** Weight of rain which collects on a roof; or

**(6)** Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

**c.** Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under **b.(2)** through **(6)** above unless the loss is a direct result of the collapse of a building or any part of a building.

This coverage does not increase the limit of liability that applies to the damaged covered property.

**11. Glass Or Safety Glazing Material**

**a.** We cover:

**(1)** The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window;

**(2)** The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window when caused directly by earth movement; and

**(3)** The direct physical loss to covered property caused solely by the pieces, fragments or splinters of broken glass or safety glazing material which is part of a building, storm door or storm window.

**b.** This coverage does not include loss:

**(1)** To covered property which results because the glass or safety glazing material has been broken, except as provided in **a.(3)** above; or

**(2)** On the Described Location if the dwelling has been vacant for more than 60 consecutive days immediately before the loss, except when the breakage results directly from earth movement as provided for in **a.(2)** above. A dwelling being constructed is not considered vacant.

**c.** This coverage does not increase the limit of liability that applies to the damaged property.

**12. Ordinance Or Law**

**a.** The Ordinance Or Law limit of liability determined in **b.** or **c.** below will apply with respect to the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:

**(1)** The construction, demolition, remodeling, renovation or repair of that part of a covered building or other structure damaged by a Peril Insured Against;

**(2)** The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a Peril Insured Against to another part of that covered building or other structure; or

**(3)** The remodeling, removal or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a Peril Insured Against.

**b.** If you are an owner of a Described Location, and that location:

**(1)** Is insured for Coverage **A** or Unit-Owners Building Items, you may use up to 10% of the limit of liability that applies to Coverage **A** or Unit-Owners Building Items at each Described Location; or

**(2)** Is not insured for Coverage **A** or Unit-Owners Building Items, you may use up to 10% of the total limit of liability that applies to Coverage **B** at each Described Location.

**c.** If you are a tenant of a Described Location, you may use up to 10% of the limit of liability that applies to Improvements, Alterations And Additions at each Described Location. Also, the words "covered building" used throughout this Other Coverage **12.** Ordinance Or Law, refer to property at such a Described Location covered under Other Coverage **3.** Improvements, Alterations And Additions.

**d.** You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in **a.** above.

**e.** We do not cover:

**(1)** The loss in value to any covered building or other structure due to the requirements of any ordinance or law; or

**(2)** The costs to comply with any ordinance or law which requires you or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants in or on any covered building or other structure.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This coverage is additional insurance.

---

## PERILS INSURED AGAINST

**A. Coverage A – Dwelling And Coverage B – Other Structures**

**1.** We insure against risk of direct physical loss to property described in Coverages **A** and **B**.

**2.** We do not insure, however, for loss:

**a.** Excluded under General Exclusions;

**b.** Involving collapse, except as provided in Other Coverage **10.** Collapse; or

**c.** Caused by:

**(1)** Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This provision does not apply if you have used reasonable care to:

**(a)** Maintain heat in the building; or

**(b)** Shut off the water supply and drain all systems and appliances of water;

However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

For purposes of this provision a plumbing system or household appliance does not include a sump, sump pump or related equipment a roof drain, gutter, downspout or similar fixtures or equipment.

**(2)** Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

**(a)** Fence, pavement, patio or swimming pool;

**(b)** Footing, foundation, bulkhead, wall, or any other structure or device, that supports all or part of a building or other structure;

**(c)** Retaining wall or bulkhead that does not support all or part of a building or other structure; or

**(d)** Pier, wharf or dock;

**(3)** Theft of property not part of a covered building or structure;

**(4)** Theft in or to a dwelling or structure under construction;

**(5)** Wind, hail, ice, snow or sleet to:

**(a)** Outdoor radio and television antennas and aerials including their lead-in wiring, masts or towers; or

**(b)** Trees, shrubs, plants or lawns;

---

Includes copyrighted material from
ISO Properties, Inc., 2002, used with permission

**(6)** Vandalism and malicious mischief, theft or attempted theft, and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, theft or attempted theft, if the dwelling has been vacant for more than 60 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

**(7)** Constant or repeated seepage or leakage of water or steam over a period of time from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

**(8)** Any of the following:

    **(a)** Wear and tear, marring, deterioration;

    **(b)** Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

    **(c)** Smog, rust or other corrosion, mold, wet or dry rot;

    **(d)** Smoke from agricultural smudging or industrial operations;

    **(e)** Discharge, dispersal, seepage, migration release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage **C.**

    Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

    **(f)** Settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings; or

    **(g)** Birds, vermin, rodents, insects or domestic animals.

**Exception To c.(8)**

Unless the loss is otherwise excluded, we cover loss to property covered under Coverage **A** or **B** resulting from a sudden and accidental discharge or overflow of water or steam from within a:

**(i)** Storm drain, or water, steam or sewer pipe, off the Described Location; or

**(ii)** Plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the Described Location. This includes the cost to tear out and replace any part of a building, or other structure, on the Described Location, but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the Described Location.

We do not cover loss to the system or appliance from which this water or steam escaped.

For the purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or roof drain, gutter, down spout or similar fixtures or equipment.

General Exclusion **A.3.** Water Damage, Paragraphs **a.** and **c.** that apply to surface water and water below the surface of ground do not apply to loss by water covered under **c.(8)** above.

Under **2.b.** and **c.** above, any ensuing loss to property described in Coverages **A** and **B** not excluded or excepted in this policy is covered.

**B. Coverage C – Personal Property**

We insure for direct physical loss to the property described in Coverage **C** caused by a peril listed below unless the loss is excluded in the General Exclusions.

**1. Fire Or Lightning**

**2. Windstorm Or Hail**

This peril does not include loss to:

**a.** Property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening;

Includes copyrighted material from
ISO Properties, Inc., 2002, used with permission

**b.** Canoes and rowboats; or

**c.** Trees, shrubs or plants.

3. **Explosion**

4. **Riot Or Civil Commotion**

5. **Aircraft**

This peril includes self-propelled missiles and spacecraft.

6. **Vehicles**

7. **Smoke**

This peril means sudden and accidental damage from smoke, including the emission or puffback of smoke, soot, fumes or vapors from a boiler, furnace or related equipment.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. **Vandalism Or Malicious Mischief**

This peril does not include loss by pilferage, theft, burglary or larceny.

9. **Damage By Burglars**

**a.** This peril means damage to covered property caused by burglars.

**b.** This peril does not include:

**(1)** Theft of property; or

**(2)** Damage caused by burglars to property on the Described Location if the dwelling has been vacant for more than 60 consecutive days immediately before the damage occurs. A dwelling being constructed is not considered vacant.

10. **Falling Objects**

This peril does not include loss to property contained in the building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not covered.

11. **Weight Of Ice, Snow Or Sleet**

This peril means weight of ice, snow or sleet which causes damage to property contained in the building.

12. **Sudden and Accidental Discharge Or Overflow Of Water Or Steam**

**a.** This peril means sudden and accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

**b.** This peril does not include loss:

**(1)** To the system or appliance from which the water or steam escaped;

**(2)** Caused by or resulting from freezing except as provided in Peril Insured Against **14.** Freezing; or

**(3)** On the Described Location caused by accidental discharge or overflow which occurs off the Described Location.

**c.** In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment; or a roof drain, gutter, downspout or similar fixtures or equipment.

**d.** General Exclusion **A.3.** Water Damage, Paragraphs **a.** and **c.** that apply to surface water and water below the surface of the ground do not apply to loss by water covered under this peril.

13. **Sudden And Accidental Tearing Apart, Cracking, Burning Or Bulging**

This peril means sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover:

**a.** Loss caused by or resulting from freezing except as provided in the peril of freezing below; or

**b.** Loss resulting from continuous or repeated seepage or leakage of water or steam which occurs over a period of time and results in deterioration, rust, fungi, dry or wet rot or bacteria.

**14. Freezing**

**a.** This peril means freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance but only if you have used reasonable care to:

**(1)** Maintain heat in the building; or

**(2)** Shut off the water supply and drain all systems and appliances of water.

However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

**b.** In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment; or a roof drain, gutter, downspout or similar fixtures or equipment.

**15. Sudden And Accidental Damage From Artificially Generated Electrical Current**

This peril does not include loss to tubes, transistors, electronic components or circuitry that are a part of appliances, fixtures, computers, home entertainment units or other types of electronic apparatus.

**16. Volcanic Eruption**

This peril does not include loss caused by earthquake, land shock waves or tremors.

---

## GENERAL EXCLUSIONS

**A.** We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

**1. Ordinance Or Law**

Ordinance Or Law means any ordinance or law:

**a.** Requiring or regulating the construction, demolition, remodeling, renovation or repair of property, including removal of any resulting debris. This Exclusion **A.1.a.** does not apply to the amount of coverage that may be provided under Other Coverage **12.** Ordinance Or Law;

**b.** The requirements of which result in a loss in value to property; or

**c.** Requiring you or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This Exclusion **A.1.** applies whether or not the property has been physically damaged.

**2. Earth Movement**

Earth Movement means:

**a.** Earthquake, including land shock waves or tremors before, during or after a volcanic eruption or along geologic faults;

**b.** Landslide, lahar, mudslide or mudflow;

**c.** Subsidence or sinkhole; or

**d.** Any other earth movement including earth sinking, rising or shifting;

caused by or resulting from human or animal forces or any act of nature unless direct loss by fire or explosion ensues and then we will pay only for the ensuing loss.

**3. Water,** meaning:

**a.** Flood, surface water, waves, including tidal wave and tsunami, tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind, including storm surge;

---

**b.** Water below the surface of the ground, including water which exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure;

**c.** Water which:

    **(1)** Backs up through sewers or drains; or

    **(2)** Overflows or is otherwise discharged from a sump, sump pump or related equipment;

**d.** Waterborne material carried or otherwise moved by any of the water referred to in **3.a.** through **c.** of this exclusion; or

**e.** Continuous or repeated seepage or leaking of water or steam or condensation from a:

    **(1)** Heating, air conditioning or automatic fire protective sprinkler system; or

    **(2)** Household appliance; or

    **(3)** Plumbing system, including from, within or around any shower stall, shower bath, tub installation, or other plumbing fixture, including their walls, ceilings or floors.

This Exclusion **3.** applies if any of the above, in **3.a.** through **e.:**

    **(1)** Occurs independently;

    **(2)** Is caused by an act of nature;

    **(3)** Is caused by an act or omission of humans or animals; or

    **(4)** Is attributable to the failure, in whole or in part, of a dam, levee, seawall or other boundary or containment system.

However, direct loss by fire or explosion resulting from any of the above, in **3.a.** through **e.**, is covered.

**4. Power Failure**

Power Failure means the failure of power or other utility service if the failure takes place off the Described Location. But if the failure of power or other utility service results in a loss, from a Peril Insured Against on the Described Location, we will pay for the loss caused by that Peril Insured Against.

**5. Neglect**

Neglect means your neglect to use all reasonable means to save and preserve property at and after the time of a loss.

**6. War**

War includes the following and any consequence of any of the following:

**a.** Undeclared war, civil war, insurrection, rebellion or revolution;

**b.** Warlike act by a military force or military personnel;

**c.** Destruction or seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

**7. Nuclear Hazard**

This Exclusion **A.7.** pertains to Nuclear Hazard to the extent set forth in the Nuclear Hazard Clause of the Conditions.

**8. Intentional Loss**

Intentional Loss means any loss or criminal act arising out of any act you or any person or organization named as an additional insured commits or conspires to commit with the intent to cause a loss whether or not the result of the loss was the same as what was originally intended.

In the event of such loss, neither you nor any such person or organization is entitled to coverage, even those who did not commit or conspire to commit the act causing the loss.

**9. Governmental Action**

Governmental Action means the destruction, confiscation or seizure of property described in **A, B** or **C** by order of any governmental or public authority.

Includes copyrighted material from
ISO Properties, Inc., 2002, used with permission

This exclusion does not apply to such acts ordered by any governmental or public authority that are taken at the time of a fire to prevent its spread, if the loss caused by fire would be covered under this policy.

**B.** We do not insure for loss to property described in Coverages **A** and **B** caused by any of the following. However, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.

    **1.** Weather conditions. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in **A.** above to produce the loss.

    **2.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

    **3.** Faulty, inadequate or defective:

        **a.** Planning, zoning, development, surveying, siting;

        **b.** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

        **c.** Materials used in repair, construction, renovation or remodeling; or

        **d.** Maintenance;

    of part or all of any property whether on or off the Described Location.

---

## CONDITIONS

**A. Policy Period**

This policy applies only to loss which occurs during the policy period.

**B. Insurable Interest And Limit Of Liability**

Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

    **1.** For an amount greater than the interest of a person insured under this policy at the time of loss; or

    **2.** For more than the applicable limit of liability.

**C. Concealment Or Fraud**

We provide coverage to no persons insured under this policy if, whether before or after a loss, one or more persons insured under this policy have:

    **1.** Intentionally concealed or misrepresented any material fact or circumstance;

    **2.** Engaged in fraudulent conduct; or

    **3.** Made false statements;

relating to this insurance.

**D. Duties After Loss**

In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you or your representative:

    **1.** Give prompt notice to us or our agent;

    **2.** Protect the property from further damage. If repairs to the property are required, you must:

        **a.** Make reasonable and necessary repairs to protect the property; and

        **b.** Keep an accurate record of repair expenses;

    **3.** Cooperate with us in the investigation of a claim;

    **4.** Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

    **5.** As often as we reasonably require:

        **a.** Show the damaged property;

**b.** Provide us with records, books, ledgers, checks, correspondence and memoranda, books of accounts and other relevant financial records and documents we request and permit us to make copies; and

**c.** Anyone making the claim or any person assisting in making the claim, must submit to an examination under oath, including a recorded video examination and while not in the presence of any other person making the claim or person having an insurable interest in the claim. The person or assistant's answers to this examination must be signed.

**6.** Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth to the best of your knowledge and belief:

**a.** The time and cause of loss;

**b.** Your interest and that of all others in the property involved and all liens on the property;

**c.** Other insurance which may cover the loss;

**d.** Changes in title or occupancy of the property during the term of the policy;

**e.** Specifications of damaged buildings and detailed repair estimates;

**f.** The inventory of damaged personal property described in **D.3.**;

**g.** Receipts for additional living expenses incurred and records that support the fair rental value loss.

**E. Loss Settlement**

In this Condition **E.**, the terms "cost to repair or replace" and "replacement cost" do not include the increased costs incurred to comply with the enforcement of any ordinance or law except to the extent that coverage for these increased costs is provided in Other Coverage **F.12.** Ordinance Or Law. Covered property losses are settled as follows:

**1.** Property of the following types:

**a.** Personal property;

**b.** Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and

**c.** Structures that are not buildings;

at actual cash value at the time of loss but not more than the amount required to repair or replace.

**2.** Buildings under Coverage **A** or **B** at replacement cost without deduction for depreciation, subject to the following:

**a.** If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:

**(1)** The limit of liability under this policy that applies to the building;

**(2)** The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

**(3)** The necessary amount actually spent to repair or replace the damaged building.

If the building is rebuilt at a new premises, the cost described in **(2)** above is limited to the cost which would have been incurred if the building had been built at the original premises.

**b.** If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

**(1)** The actual cash value of that part of the building damaged; or

**(2)** That proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

**c.** To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

   **(1)** Excavations, footings, foundations, piers or any other structures or devices that support all or part of the building, which are below the undersurface of the lowest basement floor;

   **(2)** Those supports in **(1)** above which are below the surface of the ground inside the foundation walls, if there is no basement; and

   **(3)** Underground flues, pipes, wiring and drains.

  **d.** We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss as noted in **2.a.** and **b.** above.

  However, if the cost to repair or replace the damage is both:

   **(1)** Less than 5% of the amount of insurance in this policy on the building; and

   **(2)** Less than $2,500;

  we will settle the loss as noted in **2.a.** and **b.** above whether or not actual repair or replacement is complete.

  **e.** You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis. You may then make claim for any additional liability according to the provisions of this Condition **E.** Loss Settlement, provided you notify us of your intent to do so within 180 days after the date of loss.

**F. Loss To A Pair Or Set**

In case of loss to a pair or set we may elect to:

**1.** Repair or replace any part to restore the pair or set to its value before the loss; or

**2.** Pay the difference between actual cash value of the property before and after the loss.

**G. Appraisal**

If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the Described Location is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

**1.** Pay its own appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

**H. Other Insurance And Service Agreement**

If property covered by this policy is also covered by:

**1.** Other fire insurance, we will pay only the proportion of a loss caused by any peril insured against under this policy that the limit of liability applying under this policy bears to the total amount of fire insurance covering the property; or

**2.** A service agreement, this insurance is excess over any amounts payable under any such agreement. Service agreement means a service plan, property restoration plan, home warranty or other similar service warranty agreement, even if it is characterized as insurance.

**I. Subrogation**

You may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, the person insured must sign and deliver all related papers and cooperate with us.

**J. Suit Against Us**

No action can be brought against us unless there has been full compliance with all of the terms under this policy and the action is started within one year after the date of loss.

**K. Our Option**

If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with material or property of like kind and quality.

**L. Loss Payment**

We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

**1.** Reach an agreement with you;

**2.** There is an entry of a final judgment; or

**3.** There is a filing of an appraisal award with us.

**M. Abandonment Of Property**

We need not accept any property abandoned by you.

**N. Mortgage Clause**

**1.** If a mortgagee is named in this policy, any loss payable under Coverage **A** or **B** will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

**2.** If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

    **a.** Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

    **b.** Pays any premium due under this policy on demand if you have neglected to pay the premium; and

    **c.** Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Paragraphs **G.** Appraisal, **J.** Suit Against Us and **L.** Loss Payment also apply to the mortgagee.

**3.** If we decide to cancel or not to renew this policy, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

**4.** If we pay the mortgagee for any loss and deny payment to you:

    **a.** We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

    **b.** At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

**5.** Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

**O. No Benefit To Bailee**

We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

**P. Cancellation**

**1.** You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

**2.** We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations. Proof of mailing will be sufficient proof of notice.

    **a.** When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

    **b.** When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

    **c.** When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

(1)  If there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

(2)  If the risk has changed substantially since the policy was issued.

This can be done by letting you know at least 30 days before the date cancellation takes effect.

**d.**  When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 30 days before the date cancellation takes effect.

**3.**  When this policy is canceled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

**4.**  If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

**Q. Nonrenewal**

We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

**R. Liberalization Clause**

If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

This Liberalization Clause does not apply to changes implemented with a general program revision that includes both broadenings and restrictions in coverage, whether that general program revision is implemented through introduction of:

**1.**  A subsequent edition of this policy; or

**2.**  An amendatory endorsement.

**S. Waiver Or Change Of Policy Provisions**

A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

**T. Assignment**

Assignment of this policy will not be valid unless we give our written consent.

**U. Death**

If you die, we insure:

**1.**  Your legal representatives but only with respect to the property of the deceased covered under the policy at the time of death;

**2.**  With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

**V. Nuclear Hazard Clause**

**1.**  "Nuclear Hazard" means any nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

**2.**  Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against.

**3.**  This policy does not apply to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

**W. Recovered Property**

If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

**X. Volcanic Eruption Period**

One or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

**Y. Loss Payable Clause**

If the Declarations show a loss payee for certain listed insured personal property, that person is considered an insured in this policy with respect to that property.

If we decide to cancel or not renew this policy, that loss payee will be notified in writing.

**Z. Joint Obligations**

The terms of this policy impose joint obligations on each and every insured person. This means that the re-sponsibilities, actions and failures to act by any insured person are binding on all insured persons.

DWELLING PROPERTY
DP 0104G CA 0719

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SPECIAL PROVISIONS – CALIFORNIA

**NOTICES**

Throughout this Policy:

The term spouse includes an individual registered under California Law as a domestic partner with the "named insured" shown in the Declarations.

The following is added to any provision which uses the term actual cash value:

Actual cash value for a partial loss to a building or structure covered under Coverage **A** or **B**, or a total or partial loss to contents covered under Coverage **C**, is calculated as the lesser of the policy limit or the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for depreciation.

In the event of a total loss to a building or structure covered under Coverage **A** or **B**, actual cash value is calculated as the lesser of the following:

   **1.** The policy limit applicable to that building or structure; or

   **2.** The fair market value of the building or structure.

**COVERAGES**

**A. Coverage A – Dwelling**

   The following is added:

   If a state of emergency under California Law is declared, you may combine the policy limits for Coverage **A** and Coverage **B**, for any of the covered expenses reasonably necessary to rebuild or replace the damaged or destroyed dwelling, if the Coverage **A** policy limits to rebuild or replace the dwelling are insufficient. This provision does not increase the limit of liability that applies to Coverage **B**. Claims payments for other structures in excess of the amount applied towards the necessary cost to rebuild or replace the damaged or destroyed dwelling shall be paid according to the terms of the Policy.

**E. Coverage E – Additional Living Expense**

   In Forms **DP 0002G** and **DP 0003G**, the following paragraph is added:

   **5.** However, if a state of emergency under California Law is declared, payment will be for a period no less than:

     **a.** The time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere; or

     **b.** 24 months from the date of loss;

     whichever is shorter.

     If you, acting in good faith and with reasonable diligence, encounter a delay or delays in approval for, or reconstruction of, the home or residence that are beyond your control, we shall provide an additional extension of 12 months. Circumstances beyond your control include, but are not limited to:

     **a.** Unavoidable construction permit delays;

     **b.** The lack of necessary construction materials; or

     **c.** The unavailability of contractors to perform the necessary work.

     We shall provide one or more additional extensions of six months for good cause.

**DP 0104G CA 0719**    Includes copyrighted material from    **Page 1 of 6**
Insurance Services Office, Inc., 2018, used with permission

Exhibit D - page 41

**F. Other Coverages**

    **12. Ordinance Or Law**

    In Forms **DP 0002G** and **DP 0003G**, the following is added to Paragraph **a.**:

    If a total loss has occurred and:

        **(1)** The dwelling or other structure is rebuilt at a new premises; or

        **(2)** You purchase an existing dwelling or other structure at a new premises;

        we will pay the increased costs, subject to the limit in **a.** above, you would have incurred due to the enforcement of any ordinance or law had you repaired, rebuilt or replaced the dwelling or other structure at the original premises.

**GENERAL EXCLUSIONS**

    **8. Intentional Loss**

    The following paragraphs are added:

    This exclusion does not apply, with respect to loss to covered property caused by fire, to you or any person or organization named as an additional insured who does not commit or conspire to commit any act that results in loss by fire. We cover such person or organization only to the extent of that person's or organization's legal interest, but not exceeding the applicable limit of liability.

    We may apply reasonable standards of proof to claims for such loss.

    (This is Exclusion **A.8.** in Forms **DP 0001G** and **DP 0003G**.)

**CONDITIONS**

Paragraph **C. Concealment Or Fraud** is replaced by the following:

**C. Concealment Or Fraud**

    **1.** With respect to loss caused by fire, we provide coverage to no person insured under this Policy who has:

        **a.** Intentionally concealed or misrepresented any material fact or circumstance;

        **b.** Engaged in fraudulent conduct; or

        **c.** Made false statements;

    relating to this insurance.

    **2.** With respect to loss caused by a peril other than fire, we provide coverage to no persons insured under this Policy, if, whether before or after a loss, one or more persons insured under this Policy have:

        **a.** Intentionally concealed or misrepresented any material fact or circumstance;

        **b.** Engaged in fraudulent conduct; or

        **c.** Made false statements;

    relating to this insurance.

If Endorsement **DP 04 72** or **DP 04 73** is attached to the Policy, Paragraph **D. Conditions** in both endorsements is replaced by the following:

**D. Conditions**

    **1.** Under Condition **D. Duties After Loss,** the following paragraph is added:

        **7.** Notify the police in case of loss by theft.

    **2.** Condition **H. Other Insurance And Service Agreement,** with respect to the coverage provided by this endorsement, is replaced by the following:

        **I. Other Insurance And Service Agreement**

        If a loss covered by this endorsement is also covered by:

        **1.** Other insurance, we will pay only the proportion of the loss that the limits of liability that applies under this endorsement bears to the total amount of insurance covering the loss; or

**DP 0104G CA 0719**      Includes copyrighted material from      **Page 2 of 6**
Insurance Services Office, Inc., 2018, used with permission

Exhibit D - page 42

**2.** A service agreement, this insurance is excess over any amounts payable under any such agreement. Service agreement means a:

    **a.** Service Plan

    **b.** Property restoration plan;

    **c.** Home warranty: or

    **d.** Other similar service warranty agreement;

    Even if it is characterized as insurance.

(This is Condition I. in Form **DP 00 01**.)

## E. Loss Settlement

In Forms **DP 0002G** and **DP 0003G**, Paragraph **2.a.** is replaced by the following:

**a.** If, at the time of loss, the amount of insurance in this Policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, without deduction for depreciation, but not more than the least of the following amounts:

    **(1)** The limit of liability under this Policy that applies to the building;

    **(2)** The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

    **(3)** The necessary amount actually spent to repair or replace the damaged building.

If the building is rebuilt at a new premises, the cost described in **(2)** above is limited to the cost which would have been incurred, including any increased costs you would have incurred due to the enforcement of any ordinance or law, if the building had been built at the original premises.

In Forms **DP 0002G** and **DP 0003G**, Paragraph **2.e.** is replaced by the following:

**e.** We must be notified that you intend to repair or replace the damaged property within:

    **(1)** 36 months after our payment for actual cash value if the loss or damage relates to a state of emergency under California law; or

    **(2)** 12 months after our payment for actual cash value in all other cases;

If you, acting in good faith and with reasonable diligence, encounter a delay or delays in approval for, or reconstruction of, the home or residence that are beyond your control, we shall provide one or more additional extensions of six months for good cause. Circumstances beyond your control include, but are not limited to:

    **(1)** Unavoidable construction permit delays;

    **(2)** The lack of necessary construction materials; or

    **(3)** The unavailability of contractors to perform the necessary work.

Paragraph **G. Appraisal** is replaced by the following:

## G. Appraisal

If you and we fail to agree on the amount of loss, then either party may make a written request for an appraisal. However, both parties must agree to the appraisal. In this event, each party will select a competent and impartial appraiser. Each party shall notify the other of the appraiser selected within 20 days of the request. Where the request is accepted, the two appraisers will select a competent and impartial umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the described location is located. The appraisers will appraise the loss, stating separately the loss to each item. If they fail to agree, they will submit their differences to the umpire. An award in writing, agreed to by any two, will set the amount of loss.

Each party will:

**1.** Pay its own appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

(This is Condition **H.** in Form **DP 0001G.**)

**DP 0104G CA 0719**    Includes copyrighted material from    **Page 3 of 6**
Insurance Services Office, Inc., 2018, used with permission

Exhibit D - page 43

Paragraph **L. Loss Payment** is replaced by the following:

**L. Loss Payment**

We will adjust all losses with you. We will pay you unless some other person is named in the Policy or is legally entitled to receive payment. Loss will be payable 30 days after we receive your proof of loss and:

**1.** Reach agreement with you;

**2.** There is an entry of a final judgment; or

**3.** There is a filing of an appraisal award with us.

(This is Condition **M.** in Form **DP 0001G.**)

**P. Cancellation**

Under **P. Cancellation**, Paragraphs **2., 3.,** and **4.** are replaced by the following:

**2.** If a state of emergency is declared and the dwelling or other structure is located in any ZIP Code within or adjacent to the fire perimeter, as determined by California Law, we may not cancel this Policy for one year, beginning from the date the state of emergency is declared, solely because the dwelling or other structure is located in an area in which a wildfire has occurred.

However, we may cancel:

**a.** When you have not paid the premium, at any time by letting you know at least 10 days before the date cancellation takes effect.

**b.** If willful or grossly negligent acts or omissions by the named insured, or his or her representatives, are discovered that materially increase any of the risks insured against.

**(1)** When this Policy has been in effect for less than 60 days and is not a renewal with us, we will notify you at least 20 days before the date cancellation takes effect.

**(2)** When this Policy has been in effect for more than 60 days, we will notify you at least 30 days before the date cancellation takes effect.

**c.** If there are physical changes in the property insured against, beyond the catastrophe damaged condition of the structures and surface landscape, which result in the property becoming uninsurable.

**(1)** When this Policy has been in effect for less than 60 days and is not a renewal with us, we will notify you at least 20 days before the date cancellation takes effect.

**(2)** When this Policy has been in effect for more than 60 days, we will notify you at least 30 days before the date cancellation takes effect.

**3.** If the conditions described in Paragraph **P.2.** do not apply, we may cancel this Policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations. Proof of mailing will be sufficient proof of notice.

**a.** When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

**b.** When this Policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason, except as provided below, by letting you know at least 20 days before the date cancellation takes effect.

We may not cancel this Policy solely because:

**(1)** You accepted an offer of earthquake coverage;

**(2)** Corrosive soil conditions exist on the Described Location. This Provision **(2)** applies only if this Policy includes one or more of the following, which exclude loss caused by corrosive soil conditions:

**(a)** Dwelling Property 3 Special Form; or

**(b)** Special Coverage Endorsement; or

**(3)** You cancelled or did not renew an earthquake policy issued by the California Earthquake Authority (CEA) that included an earthquake policy premium surcharge.

**DP 0104G CA 0719**         Includes copyrighted material from         **Page 4 of 6**
Insurance Services Office, Inc., 2018, used with permission

Exhibit D - page 44

However, we may cancel this Policy if you have accepted a new or renewal policy issued by the CEA that included an earthquake policy premium surcharge, but you failed to pay the earthquake policy premium surcharge authorized by the CEA.

However, in the event of a total loss to the dwelling, we will not cancel while any structure at the Described Location is being rebuilt except for the reasons stated in Paragraphs **2.a.** and **2.c.** of this Condition **P.** Cancellation.

**c.** When this Policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may only cancel if there has been:

   **(1)** Conviction of a crime having as one of its necessary elements an act increasing the hazard insured against;

   **(2)** Discovery of fraud or material misrepresentation by:

      **(a)** You or your representative in obtaining this insurance; or

      **(b)** You or your representative in pursuing a claim under this Policy;

   **(3)** Discovery of grossly negligent acts or omissions substantially increasing any of the hazards insured against;

   **(4)** Physical changes in the property insured against which result in the property becoming uninsurable.

   However, we may not cancel this Policy solely because:

      **(a)** Physical changes occur due to a total loss; or

      **(b)** Corrosive soil conditions exist on the Described Location if this Policy includes one or more of the following, which exclude loss caused by corrosive soil conditions:

         **(i)** Dwelling Property 3 Special Form; or

         **(ii)** Special Coverage Endorsement; or

   **(5)** Acceptance of a new or renewal policy, issued by the CEA that included an earthquake policy premium surcharge, but you failed to pay the earthquake policy premium surcharge authorized by the CEA.

   This can be done by notifying you at least 30 days before the date cancellation takes effect.

   **d.** When this Policy is written for a period longer than one year, we may cancel for any reason at anniversary by notifying you at least 45 days before the date cancellation takes effect.

**4.** When this Policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata. However, the refund may be less than pro rata if we made a loan to you for the purpose of payment of premiums for this Policy.

**5.** If, when we cancel this Policy, the return premium is not refunded with the notice of cancellation, we will refund it within 25 business days after we send the cancellation notice to you. If, when you cancel this Policy, the return premium is not refunded when this Policy is returned to us, we will refund it within 25 business days of the date when we receive your notice of cancellation.

(This is Condition **Q.** in Form **DP 0001G.**)

Paragraph **Q. Nonrenewal** is replaced by the following:

**Q. Nonrenewal**

**1.** We may elect not to renew this Policy, subject to the provisions of Paragraph **2.** below. We may do so by delivering to you, at your mailing address shown in the Declarations, written notice at least 45 days before the expiration date of this Policy. Proof of mailing will be sufficient proof of notice.

**2.** We will not refuse to renew this Policy:

   **a.** Solely because you accepted an offer of earthquake coverage.

   However, the following applies only to insurers who are associate participating insurers as established by Cal. Ins. Code Section 10089.16. We may elect not to renew this Policy after you have accepted an offer of earthquake coverage if one or more of the following reasons apply:

**DP 0104G CA 0719**         Includes copyrighted material from         **Page 5 of 6**
Insurance Services Office, Inc., 2018, used with permission

Exhibit D - page 45

    **(1)** The nonrenewal is based on sound underwriting principles that relate to the coverages provided by this Policy and that are consistent with the approved rating plan and related documents filed with the Department of Insurance as required by existing law;

    **(2)** The Commissioner of Insurance finds that the exposure to potential losses will threaten our solvency or place us in a hazardous condition. A hazardous condition includes, but is not limited to, a condition in which we make claims payments for losses resulting from an earthquake that occurred within the preceding two years and that required a reduction in policyholder surplus of at least 25% for payment of those claims; or

    **(3)** We have:

        **(a)** Lost or experienced a substantial reduction in the availability or scope of reinsurance coverage; or

        **(b)** Experienced a substantial increase in the premium charged for reinsurance coverage of our residential property insurance policies; and

    the Commissioner has approved a plan for the nonrenewals that is fair and equitable, and that is responsive to the changes in our reinsurance position;

**b.** Solely because you cancelled or did not renew an earthquake policy, issued by the California Earthquake Authority, that included an earthquake policy premium surcharge;

**c.** Solely because corrosive soil conditions exist on the Described Location. This Provision **(c.)** applies only if this Policy includes one or more of the following, which exclude loss caused by corrosive soil conditions:

    **(1)** Dwelling Property 3 Special Form; or

    **(2)** Special Coverage Endorsement; or

**d.** Solely on the grounds that a claim is pending under the Policy unless such claim is made under coverage for loss caused by an earthquake;

**3.** If this Policy is written for a period of less than one year, we agree not to refuse to renew except at the end of an annual period commencing with the original or renewal effective date.

**4.** If a state of emergency under California Law is declared and the dwelling or other structure is located in any ZIP Code within or adjacent to the fire perimeter, as determined by California Law, we may not nonrenew this Policy for one year, beginning from the date the state of emergency is declared, solely because the dwelling or other structure is located in an area in which a wildfire has occurred.

However, we may nonrenew.

**a.** If willful or grossly negligent acts or omissions by the named insured, or his or her representatives, are discovered that materially increase any of the risks insured against;

**b.** If losses unrelated to the post-disaster loss condition of the property have occurred that would collectively render the risk ineligible for renewal; or

**c.** If there are physical changes in the property insured against, beyond the catastrophe damaged condition of the structures and surface landscape, which result in the property becoming uninsurable.

(This is Condition **R.** in Form **DP 0001G.**)

All other provisions of this Policy apply.

**DP 0104G CA 0719**      Includes copyrighted material from      **Page 6 of 6**
Insurance Services Office, Inc., 2018, used with permission

Exhibit D - page 46

**DWELLING**
**DP 0422G 0515**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LIMITED FUNGI, WET OR DRY ROT, OR BACTERIA
### FOR USE WITH ALL FORMS

With respect to the coverage and exclusion provided under this endorsement, "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**COVERAGES**

The following Coverage is added to Paragraph **F. Other Coverage** (Paragraph **E.** in **DP 0001G**):

**13. "Fungi", Wet Or Dry Rot, Or Bacteria**

    **a.** We will pay up to $5,000 for:

        **(1)** The total of all loss payable caused by "fungi", wet or dry rot, or bacteria;

        **(2)** The cost to remove "fungi", wet or dry rot, or bacteria from covered property;

        **(3)** The cost to tear out and replace any part of the building or other covered property as needed to gain access to the "fungi", wet or dry rot, or bacteria; and

        **(4)** The cost of testing of air or property to confirm the absence, presence or level of "fungi", wet or dry rot, or bacteria whether performed prior to, during or after removal, repair, restoration or replacement. The cost of such testing will be provided only to the extent that there is reason to believe that there is a presence of "fungi", wet or dry rot, or bacteria.

    **b.** The coverage described in **13.a.** only applies when such loss or costs are a result of a Peril Insured Against that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at and after the time the Peril Insured Against occurred.

    **c.** The amount shown in the Schedule for this coverage is the most we will pay for the total of all loss or costs payable under this Other Coverage regardless of the:

        **(1)** Number of locations insured under this endorsement; or

        **(2)** Number of claims made.

    **d.** If there is covered loss or damage to covered property, not caused, in whole or in part, by "fungi", wet or dry rot, or bacteria, loss payment will not be limited by the terms of this Other Coverage, except to the extent that "fungi", wet or dry rot, or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Other Coverage.

    This Coverage does not increase the limit of liability applying to the damaged covered property.

    (This is Other Coverage **9.** in Form **DP 0001G.**)

**PERILS INSURED AGAINST**

In Form **DP 0003G**, Paragraph **A.2.c.(8)(c)** is deleted and replaced by the following:

        **(c)** Smog, rust or other corrosion;

**GENERAL EXCLUSIONS**

The following exclusion is added:

**10. "Fungi", Wet Or Dry Rot, Or Bacteria**

    "Fungi", wet or dry rot, or bacteria meaning, the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot, or bacteria.

         Includes copyrighted material from<br>ISO Properties, Inc., 2002, used with permission         

Exhibit D - page 47

This Exclusion does not apply to the extent coverage is given under **COVERAGES**, above, provided such loss results from the sudden and accidental discharge or overflow of water or steam from within:

**a.** A plumbing, heating, air conditioning or automatic fire protective sprinkler system, or a household appliance at the dwellings on the Described Location shown in the Declarations; or

**b.** A storm drain or water, steam or sewer pipes off the Described Location shown in the Declarations.

For the purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment, or a roof drain, gutter, downspout or similar fixtures or equipment.

(This is General Exclusion **A.10.** in Forms **DP 0001G** and **DP 0003G.**)

**CONDITIONS**

**A. Policy Period** is deleted and replaced by the following:

**A. Policy Period**

This policy applies only to loss or costs which occur during the policy period.

All other provisions of this policy apply.

PERSONAL LIABILITY
DL 2411G 0713

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PREMISES LIABILITY

### (NON-OWNER OCCUPIED DWELLING)

**DEFINITIONS**

Definition **6.** "Insured location" is extended to include any non-owner occupied dwelling as described in the Declarations.

**LIABILITY COVERAGES**

Coverage **L** – Personal Liability and Coverage **M** – Medical Payments To Others are restricted to apply only with respect to "bodily injury" and "property damage" arising out of the ownership, maintenance, occupancy or use of any non-owner occupied dwelling as described in the Declarations.

**EXCLUSIONS**

Exclusion **E.2.** does not apply to any non-owner occupied dwelling as described in the Declarations.

All other provisions of this policy apply.

Exhibit D - page 49

POLICY NUMBER:                                                              **DWELLING**
                                                                           **DP 0471G 0713**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ORDINANCE OR LAW COVERAGE
# INCREASED AMOUNT OF COVERAGE
### FORMS DP 0002G AND DP 0003G ONLY

**SCHEDULE\***

| |
|---|
| **New Total Percentage Amount:** |

\*Entry may be left blank if shown elsewhere in this policy for this coverage.

**COVERAGES**

**F.  Other Coverages**

   **12.  Ordinance Or Law**

   The total limit of liability that applies,:

   **a.**  If you are an owner of a Described Location, to:

      **1.**  Coverage **A**

      **2.**  Coverage **B;** or

      **3.**  Unit-Owners Building Items; or

   **b.**  If you are a tenant of a Described Location, to Improvements, Alterations and Additions;

   is increased from 10% to the percentage amount shown in the Schedule above.

All other provisions of this policy apply.

**DP 0471G 0713**          Includes copyrighted material from          **Page 1 of 1**
                    Insurance Services Office, Inc., 2002, used with permission

Exhibit D - page 50

DWELLING PROPERTY
DP 0495G 0713

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WATER BACK-UP AND
# SUMP DISCHARGE OR OVERFLOW

**A. Coverage**

We insure, up to $5,000, for direct physical loss, not caused by your negligence, or that of any person insured under this policy, to covered property caused by water, or waterborne material, which:

**1.** Backs up through sewers or drains; or

**2.** Overflows or is discharged from a:

   **a.** Sump, sump pump; or

   **b.** Related equipment;

even if such overflow or discharge results from mechanical breakdown. This coverage does not apply to direct physical loss of the sump pump, or related equipment, which is caused by mechanical breakdown.

This coverage does not increase the limits of liability for Coverages **A, B, C, D** or, if covered, Coverage **E** stated in the Declarations.

**B. Perils Insured Against**

With respect to the coverage described in **A.** above, Paragraph:

**A.2.c.(8)(b)** in Form **DP 0003G;**

is replaced by the following:

Latent defect, inherent vice or any quality in property that causes it to damage or destroy itself;

**C. Special Deductible**

The following replaces any other deductible provision in this policy with respect to loss covered under this endorsement.

We will pay only that part of the total of all loss payable that exceeds $250. No other deductible applies to this coverage. This deductible does not apply with respect to Coverage **D** – Fair Rental Value and, if covered, Coverage **E** – Additional Living Expense.

**D. General Exclusion**

The **Water Damage** Exclusion is replaced by the following:

**Water**

This means:

**1.** Flood, surface water, waves, including tidal wave and tsunami, tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind, including storm surge;

**2.** Water which:

   **a.** Backs up through sewers or drains; or

   **b.** Overflows or is otherwise discharged from a sump, sump pump or related equipment;

   as a direct or indirect result of flood;

**3.** Water below the surface of the ground, including water which exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure; or

Includes copyrighted material from
Insurance Services Office, Inc., 2008, used with permission

Exhibit D - page 51

**4.** Waterborne material carried or otherwise moved by any of the water referred to in **D.1.** through **D.3.** of this Exclusion.

This Exclusion applies regardless of whether any of the above, in **D.1.** through **D.4.,** is caused by an act of nature or is otherwise caused.

This Exclusion applies to, but is not limited to, escape, overflow or discharge, for any reason, of water or waterborne material from a dam, levee, seawall or any other boundary or containment system.

However, direct loss by fire or explosion resulting from any of the above, in **D.1.** through **D.4.,** is covered.

All other provisions of this policy apply.

**DP 0495G 0713**          Includes copyrighted material from          **Page 2 of 2**
Insurance Services Office, Inc., 2008, used with permission

Exhibit D - page 52

POLICY NUMBER:                                        **PERSONAL LIABILITY**
                                                        **DL 2410 1202**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED

### SCHEDULE*

| Name And Address Of Person Or Organization |
|---|
| |
| Interest |
| |
| Location |
| |
| *Entries may be left blank if shown elsewhere in this policy for this coverage. |

## DEFINITIONS

Definition **5.** which defines "insured" is extended to include the person or organization named in the Schedule above, but only with respect to the "insured location shown in the Schedule, and only with respect to Coverage **L** – Personal Liability and Coverage **M** – Medical Payments to Others for "bodily injury" or "property damage" arising out of the ownership, maintenance or use of the "residence premises".

## EXCLUSIONS

This coverage does not apply to "bodily injury" to an "employee", "residence employee" or a temporary employee furnished to the "insured" to substitute for a permanent "residence employee" arising out of or in the course of the employee's employment by the person or organization.

## CANCELLATION AND NONRENEWAL NOTIFICATION

If we decide to cancel or not to renew this policy, the person or organization named in the Schedule will be notified in writing.

All other provisions of this policy apply.

POLICY NUMBER:                                                                    **DWELLING**
**DP 0441 1202**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED
### DESCRIBED LOCATION

**SCHEDULE\***

| |
|---|
| Name And Address Of Person Or Organization<br><br><br><br><br><br>Interest<br><br><br><br><br> |
| Described Location<br>(Number, Street, Apartment, Town or City, County, State, ZIP Code)<br><br><br> |
| \*Entries may be left blank if shown elsewhere in this policy for this coverage. |

The person or organization named in the Schedule above is considered an insured in this policy with respect to Coverage **A** – Dwelling and Coverage **B** – Other Structures at the Described Location listed above.

If we decide to cancel or not to renew this policy, the party named in the Schedule will be notified in writing.

All other provisions of this policy apply.

**HOMEOWNERS**
**HO 9003G 0509**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# MORTGAGE CLAUSE

If a mortgagee is named in this policy, any loss payable under Coverage **A** or **B** will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

    **a.** Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

    **b.** Pays any premium due under this policy on demand if you have neglected to pay the premium; and

    **c.** Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

If we decide to cancel or not to renew this policy, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

If we pay the mortgagee for any loss and deny payment to you:

    **a.** We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

    **b.** At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

Includes copyrighted material from
Insurance Services Office, Inc., used with permission

Exhibit D - page 55

# EXHIBIT E

# EXHIBIT E

GRANGE INSURANCE ASSOCIATION
200 CEDAR ST
SEATTLE WA 98121

# NOTICE OF CANCELLATION OF INSURANCE

Named Insured & Mailing Address:

JED D'ABRAVANEL
YANYI MAO
1132 PACIFIC AVE
SAN FRANCISCO CA 94133

Producer: 80400

CALIFORNIA MERIDIAN INSURANCE SERVICES INC
9700 EL CAMINO REAL
ATASCADERO CA 93422

| | |
|---|---|
| Policy No.: | 5302220006342 |
| Type of Policy: | DWELLING FIRE |
| Date of Cancellation: | 10/12/2020; 12:01 A.M. Local Time at the mailing address of the Named Insured. |

We are cancelling this policy.  Your insurance will cease on the Date of Cancellation shown above.

The reason for cancellation is  our guidelines require the construction of a dwelling not be on a property with a slope of 30 degrees or more.

This policy provides fire and extended coverage insurance on your property.  You should contact your agent concerning coverage through another insurer, or your eligibility for coverage through the California Fair Plan, P.O. Box 76924, Los Angeles, CA 90076, Phone: (800) 339-4099 or www.cfpnet.com.

The excess premium will be refunded upon demand.

If you believe this policy has been wrongfully canceled, you may have the cancellation reviewed by the Insurance Department. You may contact the Department on the internet at www.insurance.ca.gov, by telephone at 1-800-927-HELP(4357), or by mail at Consumer Services Division, 300 South Spring Street, Los Angeles, CA 90013.

You have a right to know the specific reasons for this action, the source of any information we used in reaching this decision, and the right to see and obtain copies of documents relating to this action.  If we receive a written request from you to correct, amend or delete any recorded personal information in our files, and we refuse to do so, you have the right to provide us with a concise statement of what you believe is correct.  We will put your statement in our files.  If you desire additional information concerning this action, you must submit a written request within 90 business days of the date of mailing of this notice.  Please send your written request to us at the address shown at the top of this notice.

Named Insured

JED D'ABRAVANEL
YANYI MAO
1132 PACIFIC AVE
SAN FRANCISCO CA 94133

Date Mailed:
11th day of September, 2020

*Brian J Allen*

NEW SIGNATURE

CAPC58NONE APP
09102020MYNY
Page 1 of 1

FORM# PC969701032895CA32020
ODEN 3.0.20.08a

Copy for Named Insured

Exhibit E - page 1

# EXHIBIT F

# EXHIBIT F



May 13, 2021

Via Email (jedandyanyi@gmail.com) and US Mail

Mr. Jed D'Abravanel
1132 Pacific Avenue
San Francisco, CA 94133

Re   **RESERVATION OF RIGHTS AND NOTICE OF RESCISSION**
     *Mark Griffin v. Jed D'Abravanel, et al.*
     Marin County Superior Court, Case No. CIV2100821
     Claim No. 530222000634250

Dear Mr. D'Abravanel:

I am the claims representative for Grange Insurance Association ("Grange") with respect to your tender for defense and indemnity in the above referenced matter *Mark Griffin v. Jed D'Abravanel, et al.,* Marin County Superior Court Case No. CIV2100821 (the "*Griffin* Action).

<u>SUMMARY OF COVERAGE DETERMINATION</u>

We have completed our review of the Complaint in the *Griffin* Action, and have reviewed the Policy and the information provided to Grange, including information and documentation provided by you.

In summary form, Grange maintains that there is no coverage for the *Griffin* Action, and that the Policy should be rescinded in light of material misrepresentations made in the Application for insurance to obtain the Grange Policy.  Specifically, the answer "no" to the question of whether the property had any "unrepaired damage" was false, in that the information you provided confirms that you were aware of a rodent infestation, a broken heating system with a carbon monoxide leak issue, and repairs needed to the stairs and foundation at the time the Application was submitted.  Grange relied on the information in the Application to issue the Policy, and would not have issued the Policy had it been made aware of any of these issues with the property.  Accordingly, the Policy is subject to rescission, and Grange maintains there is no coverage for the *Griffin* Action.  Grange is serving you with a Complaint for Declaratory Relief regarding the duty to defend and for Rescission concurrently with this communication.

While Grange awaits a court determination on Rescission and/or the duty to defend, Grange will provide a defense to you in the *Griffin* Action **without conceding coverage**, and subject to a complete reservation of rights.  The reservation of rights includes the right to withdraw its defense upon a court finding of no coverage and/or rescission, and the right to seek reimbursement of fees and costs expended in your defense in the *Griffin* Action.

Grange Insurance Association | 200 Cedar Street | Seattle, Washington 98121
Claims 800 826 3197 | Fax 888 769 7602 | www.grange.com

Exhibit F - page 1

May 13, 2021
Page 2 of 19

Given the significant allegations of intentional conduct in the *Griffin* Action, Grange also reserves rights under the Knowing Violation of Rights exclusion.  As explained further below, although Grange is appointing counsel to defend you, you have the right to independent counsel to also defend you against the claims being asserted by plaintiff because of the nature of the rights being reserved.  Again, all of this is dependent upon a coverage obligation owed to you, which Grange specifically disputes.  However, while Grange awaits a court confirmation of lack of coverage, Grange will agree to provide you with defense counsel and offer you independent counsel as well.

Grange has appointed Tim Sullivan of McCormick Barstow, LLP to defend you under said reservation of rights as set forth below.  His contact information is as follows:

Tim Sullivan, Esq.
McCormick Barstow LLP
7647 N. Fresno Street
Fresno, CA 93720
559-433-1300

Please provide your appointed defense counsel with your full cooperation in order to assure that the most effective defense effort is provided.

**FACTUAL BACKGROUND**

Plaintiff Mark Griffin is the father of two boys (age 10 and 12) and he filed the *Griffin* Action involving a lengthy period of alleged substandard living conditions at 27 Acacia Road, Fairfax, California (the "Property"), which he rented with his sons.  We understand that you bought the Rental Premises while Mr. Griffin was already a tenant and after these habitability issues had long been complained of.  Mr. Griffin alleges that when he insisted on correction of these substandard and illegal conditions, both the prior landlord and then you delayed making repairs, forcing Mr. Griffin and his children to vacate on unsafe home during the COVID-19 crisis.  Below is a summary of the facts known to Grange, many of which we understand are disputed.

A.      **Issues When Prior Owner Owned the Property**

Mr. Griffin moved into the Rental Premises in August 2019, when it was owned by Christopher and Claire Prio.  After living at the Property for some months, Mr. Griffin and his sons noticed some defective conditions. Chief among these defects were an extensive rat infestation and a defective furnace. There was also a problem with rotting exterior stairs and railings. He provided notice to Mr. Piro, but no steps were apparently taken to remediate.

May 13, 2021
Page 3 of 19

**B.      Sale of the Property to D'Abravanels and Timeline of Habitability Issues at that Time**

In late August 2020, we understand that you performed housing inspections at the Property as a precursor to buying it. It is alleged that one inspector informed Mr. Griffin that the furnace was cracked and leaking carbon monoxide.  A written timeline that you provided to Grange substantiates that a structural and HVAC inspection took place on August 20, 2020, during which the inspector "found a crack in the heater that he suggested could potentially cause a carbon monoxide leak."  Mr. Griffin alleges this condition had no doubt been in existence throughout the tenancy, exposing Mr. Griffin and his boys to carbon monoxide gas poisoning. The inspector shut off the HVAC and instructed Mr. Griffin not to turn it on because it posed a health hazard.

Mr. Griffin alleges that on August 24, 2020, you came to the Property and he told you about the rodent infestation, lack of heat, and rotting stairs and railings that he had been trying to get Mr. Piro to fix since September 2019.  The written timeline you provided to Grange indicates that this meeting took place, and that you told Mr. Griffin that you were considering repairing the stairs and "possible foundation work upon purchase."  Mr. Griffin alleges that during this conversation you also admitted that the property was at risk of sliding down the hill.  Mr. Griffin alleges that he reiterated his request for immediate abatement of the rodent infestation and repair of the furnace, but that you replied that you did not intend to pay for repairs until such time as you would be moving into the Property yourself.

**C.      Application for Insurance is Submitted September 2, 2020**

On September 2, 2020, you submitted an Application for Dwelling Fire Insurance (the "Application").  The Application answered "No" as to whether the Property had any "Unrepaired Damage."  The question was specifically as follows:  "Does the dwelling have any of the following characteristics: cantilevered design, post or pillar construction, unrepaired damage, structural defects or built on fill or silt?"

The Application also answered "no" as to whether the Property was built on a slope of 20 degrees or more.  Based on the answers in the Application, Grange issued Dwelling Policy No. 5302220006342, effective September 2, 2020 through September 2, 2021, to Jed and Yanyi D'Abravanel (the "Policy").  Grange soon determined that the slope was in fact 30 degrees and sent a Notice of Cancellation of Insurance on September 11, 2020, effective October 12, 2020, because Grange guidelines require the construction of a dwelling not be on a property with a slope of 30 degrees or more.

The Policy was therefore only in place for approximately a month.

Exhibit F - page 3

**D.      Habitability Issues During the Month the Policy was in Effect (Sept 2, 2020 through Oct 12, 2020)**

On September 7, 2020, the sale of the Property closed.  The Policy incepted on September 2, 2020.

It is alleged that, starting on September 13, 2020, you and Mr. Griffin communicated repeatedly about the rodent infestation and the furnace issue, and that you stated you were "looking into" it and would be having the Premises evaluated for fire hazards.  On September 28, 2020, Mr. Griffin asked for an update and was allegedly advised that you had ordered a replacement furnace and were waiting for the company to schedule an installation date, and that you had ordered rodent traps.  Mr. Griffin protested these traps, stating they had not worked in the past and the infestation was too large for traps to fix.

Mr. Griffin states he then took action to abate the rat infestation himself.  Apparently, several extermination companies came to inspect and each stated the infestation was the worst they had ever seen.  Hundreds of rats were nesting in the insulation materials, walls, and HVAC ducts.  He was advised that the air ducts needed to be sanitized for safety before the furnace could be turned back on.  Each company also emphasized that this rat infestation constituted a major health hazard that should be remediated right away.

Mr. Griffin states that he communicated all of this information to you, and that you apparently stated you preferred to wait to hear from your own contractor, who was scheduled for October 19, 2020.

On October 2, 2020, the new furnace was installed.  Mr. Griffin had been instructed by the extermination companies he had contacted not to turn on the heat until the old ductwork had been sterilized.  When he communicated this information to the company that installed the new furnace, they elected not to turn on the new furnace.  Mr. Griffin was later informed by the health inspector from the Town of Fairfax that it was important that the heater was not turned on until the old ducts had been sterilized.  Therefore, although there was a new furnace, Mr. Griffin and his family were still without heat.

Mr. Griffin alleges that on October 4, 2020, you came to the Premises to see for yourself whether there was rat excrement in the heater ducts.  He alleges that you looked in the ducts using your phone for light, then told Mr. Griffin that you did not see any.  Your written timeline confirms your inspection of the ducts, and your opinion that no excrement was found.  Mr. Griffin states that he provided you with a photograph showing the excrement in the ducts, but you allegedly indicated that you preferred to wait and rely on an inspection of the ducts by your own HVAC contractor later on.

On October 7, 2020, you scheduled an HVAC inspection performed by a contractor which Mr. Griffin alleges had never performed any cleaning or sanitization work on heating ducts, and was not certified to do so.  After the inspection, Mr. Griffin claims he was told you would not pay for sanitization of the heating ducts because your HVAC inspection had found no proof of excrement.

E.      **Post-Policy Habitability Issues**

On October 14, 2020, Mr. Griffin claims he contacted two companies with the plan to pay out of his own pocket for the duct sterilization or abatement.  The companies would not contract with a tenant for this work.

On October 15, 2020, Mr. Griffin emailed the health inspector for the Town of Fairfax to report the rodent infestation and request an inspection.

Your timeline indicates that the HVAC cleaning took place on October 17, 2020.

On October 19, 2020, the Fairfax health inspector come to the Property for an inspection.  The inspector said he found health and safety violations and would be issuing a Notice of Violation to you.  He also suggested that Mr. Griffin phone Marin County Vector Control for advice on how to protect himself and his family in the short term.  Mr. Griffin phoned Vector Control the next day and scheduled a County rodent inspection for October 26, 2020.

Mr. Griffin alleges that by October 21, 2020, he still had not received any word from you as to when the rodent infestation would be abated or when the furnace ·would be made functional.  He sent on email to you that day again asking for abatement of his rent because substandard conditions at the Property posed a significant health risk.  In the email, Mr. Griffin allegedly stated his intent to vacate the Property as soon as possible for health and safety reasons.  Your timeline supports the allegation that this email was sent.

On October 22, 2020, you emailed Mr. Griffin taking the position that he was not entitled to any rent abatement.  Your timeline indicates that you sent this email "on advice of counsel."

On October 23, 2020, the Town of Fairfax issued a Notice of Violation stating the presence of rodents at the Property constituted a violation of the 2013 International Property Maintenance Code§ 309.1, and the Fairfax Municipal Code§ 1.1 2.045. The Notice advised defective conditions "must be addressed immediately, and we must receive a letter from the extermination company stating that the infestation hos been eliminated."

Your timeline indicates that you promptly responded to the Notice of Violation and provided the Building Inspector with information that you had just purchased the home a month prior, were working on rodent exterminators and forwarding a written proposed work plan for the exclusion work.  You indicate that the inspector was satisfied with your update.

On October 27, 2020, Mr. Griffin claims he emailed you stating that the new HVAC system was not operating properly, and that rodents had rendered the hot tub unusable.

May 13, 2021
Page 6 of 19

On October 30, 2020, rodent cleanup began.  Mr. Griffin alleges that you advised him that his family would need to leave the house for the second day of their work.  The exterminator confirmed that the infestation was major and that they would have trouble sealing the affected areas for fogging due to the overall dilapidated condition of the Property.

Mr. Griffin was able to secure a lease for himself and his boys at another residence. Because of the tightness of the rental market, and the need to stay within the school district for his children, Mr. Griffin alleges he was only able to find a smaller residence at higher rent.  The Property at 27 Acacia Road comprised 3 Bedrooms, with 2.5 Baths, in 1,615 square feet at a rent of $4,250. The new residence was a 2-Bedroom, 1 Bath place with only 1,225 square feet at a rent of $4,500.  Mr. Griffin sent you a letter regarding his need to move his family from the Property.

On November 9, 2020, Mr. Griffin moved out of the Property, leaving it in what he describes as "broom-clean condition."

On November 30, 2020, Mr. Griffin claims to have received an email from your attorney regarding the security deposit. Of the $6,375 deposit, $4,250 was withheld, which apparently allocates rent for one month for alleged insufficient notice of termination of tenancy.  Another $1,275 was deducted as rent for the first week of November.  Only $850 was refunded to Mr. Griffin.

F.    **The *Griffin* Action is Filed**

On March 12, 2021, Mr. Griffin filed suit against Jed and Yanyi D'Abravanel, and the prior owners, Chris and Claire Piro, for causes of action for negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of Civil Code 1941 and 1941.1, 1942.4, 1942.5, 1950.5, and Unfair Business Practices in Violation of Bus. & Prof. Code 17200, 17203.  Plaintiff alleges that he suffered special and general damages, including property damage and "bodily injuries" in an amount to be proven at trial, including at least $60,775 for rent paid, $1,000 for property damage, $20,000 for bodily injury, and $2,000 for moving costs.

Plaintiff also claims significant intentional conduct, including:

"Defendants have failed to make repairs at the Property with the malicious intent to retaliate against Plaintiff for requesting repairs, and for reporting defective conditions to the Town of Fairfax. Plaintiff further alleges that Defendants were motivated to cause harm to Plaintiff, with the goal of forcing Plaintiff to abandon his tenancy prior to the termination of the term of his Rental Agreement, so that Defendants might gain possession of the Property for themselves without having to undertake the expense and difficulty of complying with applicable owner move-in laws and regulations."

(Complaint ¶ 64, 109.)

May 13, 2021
Page 7 of 19

## COVERAGE ISSUES

As discussed above, Grange issued Dwelling Policy No. 5302220006342, effective September 2, 2020 through September 2, 2021, to Jed and Yanyi D'Abravanel, based on the information contained in the Application.  However, a Notice of Cancellation of Insurance was issued to you on September 11, 2020, effective October 12, 2020, because it was determined the Property had a slope of 30 degrees or more.  Accordingly, the Policy was only in place for approximately a month.   On September 14, 2020 and September 23, 2020, Grange refunded you $851.00 (Eight Hundred Fifty One Dollars) of the total $952 (Nine Hundred Fifty Two Dollars) premium you paid for the Policy.  Grange only retained $101 (One Hundred and One Dollars) in premium to account for the month that coverage was in place before cancellation.  Those checks were both cashed on September 29, 2020.  Enclosed with this letter, and in compliance with CA Civil Code § 1691(b), Grange hereby issues you a reimbursement of the $101 (One Hundred and One Dollars) premium. All premiums have now been refunded.

**A.**      **Rescission of the Policy is Warranted Because Answering "No" on the Application as to Whether "Unrepaired Damage" Existed at the Property Was a Material Misrepresentation**

Misstatements or concealment of any material facts in an application for insurance, even if unintentional, entitle the insurer to rescind the insurance policy.  (See *LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.* (2007) 156 CA4th 1259, 1267, 67 CR3d 917, 922—policyholders responsible for misrepresentations in broker-prepared application; CA Insurance Code § 331—concealment, whether intentional or unintentional, entitles the injured party to rescind.)

As stated above, the Application stated "no" as to whether there were any unrepaired damages at the Property.  This was submitted on September 2, 2020, after you confirm you were made aware of the broken heater and carbon monoxide issue, rodent infestation, and acknowledged to Mr. Griffin that you were considering repairs to the stairs and foundation.  All of these items qualify as "unrepaired damage."  The Policy would not have been issued if any of those defects were disclosed to Grange, making the misrepresentations material.

Concurrent with this letter, Grange will serve you with the Complaint for Rescission and Declaratory Relief, seeking a Court determination that there is no duty to defend you in the *Griffin* Action and that rescission of the Policy is proper.  Enclosed with this letter, and in compliance with CA Civil Code § 1691(b), Grange hereby issues you a reimbursement of the $101 (One Hundred and One Dollars) premium.  As of this date, all premium amounts have been returned.

**Your initial appearance in Federal Court is due 21 days after service of the complaint.**

Pursuant to the terms of California Insurance Code § 331, the Policy would be rescinded *ab initio,* meaning it would extinguish the Policy from the date it was issued as though it never was in place.

May 13, 2021
Page 8 of 19

 

 

B.       **Until a Court Determination is Made Regarding Rescission and/or Grange's Duty to Defend, Grange Will Provide You With a Defense to the Underlying Action Subject to a Reservation of  Rights Without Conceding Coverage**

Without conceding coverage, and while specifically maintaining that Grange is entitled to Rescission of the Policy and therefore does not have a duty to defend you in the *Griffin* Action, Grange will agree to provide you a defense in the Underlying Action subject to a full reservation of rights, including the right to withdraw defense and seek reimbursement of fees and costs expended in your defense upon obtaining a Court order that Grange of Rescission and/or a Court order that there is no duty to defend you in the *Griffin* Action.

1.       **There is No Coverage Under Coverage L, As There is No Alleged Occurrence**

The Policy was only in effect for approximately one month before it was cancelled.  The Policy provides Personal Liability pursuant to Form DL 2401G 073, as follows:

"A.       Coverage L – Personal Liability

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

   1.       Pay up to our limit of liability for the damages for which an "insured" is legally liable. Damages include prejudgment interest awarded against an "insured"; and

   2.       Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent.

We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of liability for the "occurrence" has been exhausted by payment of a judgment or settlement."

The Policy contains the following relevant definitions:

"DEFINITIONS

        ...

3.       "Business" means:

   a.       A trade, profession or occupation engaged in on a full-time, part-time or occasional basis; or

May 13, 2021
Page 9 of 19

b.      Any other activity engaged in for money or other compensation, except the following:

(1) One or more activities, not described in (2) through (4) below, for which no "insured" receives more than $2,000 in total compensation for the 12 months before the beginning of the policy period;

(2) Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

(3) Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or

(4) The rendering of home day care services to a relative of an "insured".

…

8.      "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

a. "Bodily injury"; or

b. "Property damage".

9. "Property damage" means physical injury to, destruction of, or loss of use of tangible property."

The Policy is subject to a number of exclusions, including:

"E.      Coverage L – Personal Liability and Coverage M – Medical Payments to Others

Coverages L and M do not apply to the following: …

2.      "Business"

a.      "Bodily injury" or "property damage" arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured".

This Exclusion E.2. applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

b.      This Exclusion E.2. does not apply to:

May 13, 2021
Page 10 of 19

       (1)     The rental or holding for rental of an "insured location";

          (a)     On an occasional basis if used only as a residence;

          (b)     In part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

          (c)     In part, as an office, school, studio or private garage; and

       (2)     An "insured" under the age of 21 years involved in a part-time or occasional, self-employed "business" with no employees;

…

F.      Coverage L – Personal Liability

Coverage L does not apply to:

1.      Liability:

       a.     For any loss assessment charged against you as a member of an association, corporation or community of property owners;

       b.     Under any contract or agreement entered into by an "insured". However, this exclusion does not apply to written contracts:

          (1)     That directly relate to the ownership, maintenance or use of an "insured location"; or

          (2) Where the liability of others is assumed by you prior to an "occurrence";

unless excluded in a. above or elsewhere in this policy;

2.     "Property damage" to property owned by an "insured". This includes costs or expenses incurred by an "insured" or others to repair, replace, enhance, restore or maintain such property to prevent injury to a person or damage to property of others, whether on or away from an "insured location";

3.     "Property damage" to property rented to, occupied or used by or in the care of an "insured". This exclusion does not apply to "property damage" caused by fire, smoke or explosion…"

The Policy also contains a Premises Liability Endorsement on Form DL 2411G 07 13, which removes the "Business Pursuits" exclusion for non-owner occupied dwellings.  The Endorsement states:

"**PREMISES LIABILITY**

LIABILITY COVERAGES

Coverage L – Personal Liability and Coverage M – Medical Payments To Others are restricted to apply only with respect to "bodily injury" and "property damage" arising out of the ownership, maintenance, occupancy or use of any non-owner occupied dwelling as described in the Declarations.

EXCLUSIONS

Exclusion E.2. does not apply to any non-owner occupied dwelling as described in the Declarations."

Plaintiff alleges that he suffered special and general damages, including property damage and "bodily injuries."  However, no "occurrence" or "accident" is alleged.  Plaintiff alleges that you fell below the standard of care by failing to remedy the habitability issues at the Property despite having notice thereof.

While there is a cause of action for negligence, there is no allegation of accidental conduct alleged.  In fact, the Negligence cause of action incorporates by reference all paragraphs before it, including Paragraph 64, which alleges that you acted with intent and malice to retaliate against Plaintiff for requesting repairs, and for reporting defective conditions to the Town of Fairfax.  Plaintiff further alleges that Defendants were motivated to cause harm to Plaintiff, with the goal of forcing Plaintiff to abandon his tenancy prior to the termination of the term of his Rental Agreement, so that Defendants might gain possession of the Property for themselves without having to undertake the expense and difficulty of complying with applicable owner move-in laws and regulations.  As such, there is no accidental conduct or "occurrence" alleged, and coverage Under Coverage L is denied.

2.     **Coverage for the Habitability Issues Would Fall Under the Personal Injury Coverage Endorsement, However, Grange Maintains Rescission is Warranted**

The Policy contains Personal Injury Coverage (Aggregate Limit of Liability) Endorsement on Form DL 2482G 07 13, which expands the definition of "bodily injury" to include enumerated "offenses" as follows:

"DEFINITIONS

For an additional premium, under Coverage L – Personal Liability, the definition of bodily injury is amended to include personal injury.

"Personal injury" means injury arising out of one or more of the following offenses:

1.      False arrest, detention or imprisonment;

2.      Malicious prosecution;

3.      The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

4.      Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

5.      Oral or written publication, in any manner, of material that violates a person's right of privacy.

"Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or byproducts produced or released by fungi.

However, this does not include any fungi that are, are on, or are contained in, a good or product intended for consumption.

LIABILITY COVERAGES

A.      Coverage L – PERSONAL LIABILITY

The following is added to COVERAGE L – PERSONAL LIABILITY:

Personal Injury Coverage

If a claim is made or suit is brought against an "insured" for damages resulting from an offense, defined under "personal injury", to which this coverage applies, we will:

1.      Pay for the damages for which an "insured" is legally liable, subject to the Aggregate Limit Of Liability, as shown in the Declarations and described in CONDITIONS B. Aggregate Limit Of Liability below.

Damages include prejudgment interest awarded against an "insured"; and

2.      Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the Aggregate Limit Of

May 13, 2021
Page 13 of 19

Liability shown in the Schedule has been exhausted by payment of a judgment or settlement.

EXCLUSIONS

With respect to the coverage provided by this endorsement, EXCLUSIONS is replaced by the following:

This insurance does not apply to:

1.   "Personal injury":

a.   Caused by or at the direction of an "insured" with the knowledge that the act would violate the rights of another and would inflict "personal injury";

…

g.   Arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured". This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

This exclusion does not apply to:

(1)   The rental or holding for rental of an "insured location";

(a)   On an occasional basis if used only as a residence;

(b)   In part for use only as a residence, unless a single-family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

(c)   In part, as an office, school, studio or private garage; and

(2)   An "insured" under the age of 21 years involved in a part-time or occasional, self-employed "business" with no employees;

…

j.   Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

May 13, 2021
Page 14 of 19

> Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed; or
>
> k.        Arising directly or indirectly, in whole or in part, out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi", wet or dry rot, or bacteria.

2.        Any loss, cost or expense arising out of any:

> a.        Request, demand or order that an "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants, "fungi", wet or dry rot, or bacteria…"

The enumerated covered personal injury "offenses" include wrongful eviction from, wrongful entry to, or invasion of the right of private occupancy of a dwelling, etc.  Here, Griffin alleges that your failure to remedy the habitability issues at the Property resulted in his having to vacate the Property.  While Mr. Griffin vacated the Property after the Policy was cancelled, some of the conduct giving rise to his feeling the need to vacate are alleged to have occurred in part during the month that the Policy was in effect.

### 3.        No Coverage for Personal Injury Caused With Knowledge it Would Violate Griffin's Rights

The Personal Injury Endorsement contains an exclusion for personal injury caused by or at the direction of an "insured" with the knowledge that the act would violate the rights of another.  It is alleged that the reason behind your alleged refusal to fix the habitability issues was to retaliate against plaintiff for requesting the repairs and reporting you to the Town of Fairfax.  It is also alleged that you intended to force Plaintiff to abandon his tenancy prior to the termination of the term of his Rental Agreement, so that you could regain possession of the Property without having to deal with an owner move-in procedure.  While we understand you dispute these allegations, please be advised that this exclusion precludes coverage for any personal injury caused by you with knowledge that it would violate Mr. Griffin's rights or inflict personal injury.

### 4.        No Coverage for Willful Acts or Punitive Damages

Under California law, Grange is precluded from indemnifying willful acts or a punitive damage award.  California Insurance Code, section 533; and California Civil Code section 1668.  There are allegations of intentional and willful conduct against you as well as a request for punitive damages.  Accordingly, please be advised that there is no coverage for willful acts or any award of punitive damages entered against you.

May 13, 2021
Page 15 of 19

**5.**   **No Coverage for Pollution**

The pollution Exclusion 2.a precludes coverage for the allegations of carbon monoxide escaping from the broken heater.  Carbon monoxide certainly qualifies as a gaseous irritant or contaminant such that the exclusion applies.  Further, Exclusion 2.a. similarly applies for the allegations arising out of the insured's failure to test or monitor for the carbon monoxide.

**6.**   **No Coverage for Attorneys' Fees Arising out of Uncovered Conduct**

The Policy contain the following language regarding claim expenses:

"A.   Claim Expenses

We pay:

1.      Expenses we incur and costs taxed against an "insured" in any suit we defend;

2**.**      Premiums on bonds required in a suit we defend, but not for bond amounts more than the Coverage **L** limit of liability. We need not apply for or furnish any bond;

3.      Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) up to $250 per day, for assisting us in the investigation or defense of a claim or suit;

and

4.      Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or…"

Again, Grange maintains there is no coverage for the *Griffin* Action and no duty to defend because Rescission of the Policy is warranted.  However, please be advised that even if there were coverage, there is no coverage for any attorneys' fees that arise out of uncovered conduct.

**7.**   **Duty to Cooperate**

Your cooperation is an obligation imposed under Policy.  It is found in the CONDITIONS section, and states:

**"C.   Duties After "Occurrence"**

In case of an "occurrence", you or another "insured" will perform the following duties that apply.

We have no duty to provide coverage under this policy if your failure to comply with the following duties is prejudicial to us.

May 13, 2021
Page 16 of 19

You will help us by seeing that these duties are performed:

1.      Give written notice to us or our agent as soon as is practical, which sets forth:

      a.      The identity of the policy and the "named insured" shown in the Declarations;

      b.      Reasonably available information on the time, place and circumstances of the "occurrence"; and

      c.      Names and addresses of any claimants and witnesses;

2.      Cooperate with us in the investigation, settlement or defense of any claim or suit;

3.      Promptly forward to us every notice, demand, summons or other process relating to the "occurrence";

4.      At our request, help us:

      a.      To make settlement;

      b.      To enforce any right of contribution or indemnity against any person or organization who may be liable to an "insured";

      c.      With the conduct of suits and attend hearings and trials; and

      d.      To secure and give evidence and obtain the attendance of witnesses;"

As noted above, the obligation to cooperate in the investigation, settlement and defense of the action prosecuted by Plaintiff is a continuing one.

### GRANGE'S APPOINTMENT OF COUNSEL; AND YOUR ENTITLEMENT TO INDEPENDENT COUNSEL PURSUANT TO CALIFORNIA CIVIL CODE §2860

While Grange maintains there is no coverage for the *Griffin* Action, and Rescission is proper, Grange will agree to provide you with a defense to the *Griffin* Action while awaiting a court order in the Coverage Action.

Under California law, where a potential conflict exists due to the assertion of particular reservations of rights by an insurance carrier, according to statute an insured is entitled to independent counsel of its own choosing to represent it.  Such counsel must meet certain requirements and is subject to the rates Grange typically pays in similar litigation, discussed in more detail below, but such counsel, chosen by you, is then paid by Grange.  This right has been codified in California Civil Code Section 2860.

In this instance, Grange has reserved its rights on the Knowing Violation of Rights exclusion for allegations of intentional and retaliatory conduct, which are uncovered.  In light of that reservation of rights, and California's public policy against indemnification of willful or criminal acts, Grange

May 13, 2021
Page 17 of 19

acknowledges that if there is coverage for you for the *Griffin* Action, you are also entitled to independent counsel.

Under the statute, you have two options.  You can choose to exercise this right and choose your own counsel, who must meet the statutory requirements outlined further herein.  The other option is that you can waive your right to independent counsel.  Should you waive your right, Tim Sullivan of McCormick Barstow, LLP will defend you at Grange's expense, pursuant to the reservation of rights set forth in this letter.

**Please be advised that Grange is reserving its right to seek reimbursement of *all* fees and costs expended in your defense in the event that the court grants an Order of Rescission and/or an Order that there is no duty to defend you.  This would include the right to reimbursement of all fees and costs that Grange pays to independent counsel.**

I strongly urge you to consult with an outside attorney and/or a coverage attorney in making this decision.

I do ask that you advise me at your earliest convenience if you wish to exercise the right to Independent Counsel under California Civil Code Section 2860.

If you wish to waive the right, the statute requires that you sign and acknowledge the following statement:

**I have been advised and informed of my right to select independent counsel at this time.  I authorize my insurer to select a defense attorney to represent me in this lawsuit.**

Date:

By: _____

Jed D'Abravanel

A.      **Independent Counsel Statutory Requirements and Obligations to Cooperate; and Reservation of Grange's Right to Maintain Defense Counsel**

Should you exercise the right to independent counsel, I wish to advise you of the following provisions of the statute.  It is Grange's right, under Civil Code Section 2860, subsection (c), to:

"require that the counsel selected by the insured possess certain minimum qualifications which may include that the selected counsel have: (1) at least five years of civil litigation practice which includes substantial defense experience in the subject at issue in the litigation, and (2) errors and omissions coverage.  The insurer's obligation to pay fees to the independent counsel selected by the insured is limited to the rates which are actually paid by the insurer to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended."

Subsection (d) of the statute further states, in part, as follows:

"When independent counsel has been selected by the insured, it shall be the duty of that counsel and the insured to disclose to the insurer all information concerning the action except privileged materials relevant to coverage disputes, and timely to inform and consult with the insurer on all matters relating to the action."

Finally, if you choose to select independent counsel, Grange reserves all rights to continue to retain appointed defense counsel to participate in the defense of plaintiff's complaint on your behalf. Subsection (f) of the statute provides this right to Grange and also requires cooperation from the independent counsel selected by you, as well as the continued cooperation of each of you with Grange as provided in the terms of the insurance policies.

Grange will pay independent counsel fees at a rate of $185 per hour for attorneys.

## RECAPITULATION

Nothing contained in this correspondence is intended to waive, or should be construed as a waiver of, any rights of Grange under any of the provisions, conditions, terms or exclusions of the Grange policies, whether specifically identified herein or not, as may be applicable to this claim. Additional bases for disclaimer of coverage may also exist based on the facts of this claim and Grange reserves the right to specify any such applicable provisions in the future.

Grange specifically reserves all of its rights and remedies under the policies and under the statutes, and common law. No action taken by Grange in this matter should be construed as a waiver by or estoppel of these rights and remedies or any of the terms, conditions, exclusions, or limitations of the policies.

Grange reserves all rights to amend this Reservation of Rights or assert additional defenses under the policy and applicable law(s) which may become relevant at a later date.

We urge you not to discuss this matter with anyone other than a representative of Grange or the attorney's office listed above. Should you have any additional information you would like us to consider, please forward such documentation to our attention so we may receive it in a timely and prompt manner.

If you disagree with any of the positions set forth herein, you may have the matter reviewed by the California Department of Insurance, which can be contacted at the following address:

California Department of Insurance
Claims Services Bureau
300 South Spring Street, 11th Floor
Los Angeles, CA  90013
(800) 927-4357
(213) 897-8921

May 13, 2021
Page 19 of 19


       To the extent you believe there are facts that are either unknown to Grange or that Grange has failed to consider, I invite you to provide such additional information to me at your very earliest opportunity so that it may be investigated and given proper consideration.

Sincerely,

*Germaine Klemmer*

Germaine Klemmer
**GRANGE INSURANCE ASSOCIATION**
Claim Representative III
Ext. 2297


Enclosures:
Check No. 0356571
Draft Rescission Complaint, w/o exhibits

cc:

Jim Sciaroni

Berry Kaiman

1  Brandt L. Wolkin, Esq. SBN 112220
   Catharine M. Tolson, Esq. SBN 271223
2  WOLKIN · CURRAN, LLP
   111 Maiden Lane, Sixth Floor
3  San Francisco, California 94108
   Telephone:    (415) 982-9390
4  Facsimile:    (415) 982-4328
   bwolkin@wolkincurran.com
5  ctolson@wolkincurran.com

6  Attorneys for plaintiff
   GRANGE INSURANCE ASSOCIATION          **DRAFT**
7

8

9                  UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11  GRANGE INSURANCE ASSOCIATION, a       Case No.
    Washington corporation,
12                                        **GRANGE INSURANCE
                   Plaintiffs,            ASSOCIATION COMPLAINT FOR
13                                        RESCISSION AND DECLARATORY
            v.                            RELIEF**
14
    JED D'ABRAVANEL, an individual,
15  YANYI D'ABRAVANEL, an individual,
    AND DOES 1-10,
16
                   Defendants.
17

18

19

20         COMES NOW, GRANGE INSURANCE ASSOCIATION ("Grange" and/or

21  "Plaintiff"), and alleges as follows:

22                              **PARTIES**

23         1.      Plaintiff Grange is now, and at all times mentioned in the Complaint was, an

24  insurance company organized and existing under the laws of the State of Washington with

25  its principal place of business located at 200 Cedar Street, Seattle, Washington.  Grange is

26  licensed to do business in the State of California by the California Secretary of State and

27  Department of Insurance.

28  ///

                                   1
    COMPLAINT FOR RESCISSION AND DECLARATORY RELIEF              CASE NO.

2.      Grange is informed and believes, and thereon alleges, that defendants Jed and Yanyi D'Abravanel (hereinafter "Defendants") are individuals who reside and are domiciled in San Francisco, California.

## ACTION

3.      This is an action for rescission and declaratory judgment brought under 28 U.S.C. §2201 and Rule 57 of the Federal Rules of Civil Procedure for the purpose of determining actual controversies among the parties as hereinafter more fully set forth.

## JURISDICTION

4.      The controversy for which Grange requests a declaratory judgment involves parties who are subject to the diversity jurisdiction of this court and the amount in controversy exceeds the jurisdictional limitations set forth in 28 U.S.C. §1332.

## VENUE

5.      Venue is proper in the Northern District of California in that the Defendants are subject to personal jurisdiction in this district at the time this action is commenced (28 U.S.C. §1391(c)) and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL RECITALS AND INSURANCE POLICIES

6.      Grange issued a policy of homeowners insurance to Defendants commencing at the time they purchased a rental property located at 27 Acacia Road, Fairfax, California (the "Property") in September 2020.  Defendants purchased the Property with an existing tenant residing therein, Mark Griffin.  Escrow closed on the sale of the Property on September 7, 2020.  The Policy incepted on September 2, 2020.

### History of Habitability Issues at the Property

7.      The Property's tenant, Mark Griffin, filed suit on March 12, 2021 in an action styled *Griffin v. D'Abravanel,* Marin County Superior Court, Case No. CIV2100821 (the "Griffin Action").  The below factual recitals are based on information contained in the Complaint filed in the Griffin Action, attached hereto as Exhibit A.

///

COMPLAINT FOR RESCISSION AND DECLARATORY RELIEF         CASE NO.

Exhibit F - page 21

1        8.     Mr. Griffin allegedly moved into the Property in August 2019, when it was

2 owned by Christopher and Claire Prio.  After living at the Property for some months, Mr.

3 Griffin alleges that he and his sons noticed some defective conditions.  Chief among these

4 defects were an alleged extensive rat infestation and a defective furnace.  He alleges there

5 was also a problem with rotting exterior stairs and railings.  He alleges he provided notice to

6 Mr. Piro, but no steps were taken to remediate.

7 **Pre-Purchase Inspections Conducted by Defendants**

8        9.     Grange is informed and believes and based thereon alleges that, in late

9 August 2020, Defendants performed housing inspections at the Property as a precursor to

10 buying the Property.  One of their inspectors is alleged to have informed Mr. Griffin that the

11 furnace was cracked and leaking carbon monoxide.  Mr. Griffin alleges this condition had

12 no doubt been in existence throughout the tenancy, exposing Mr. Griffin and his boys to

13 carbon monoxide gas poisoning.  The inspector shut off the HVAC and instructed Mr.

14 Griffin not to turn it on because it posed a health hazard.

15       10.    Grange is informed, believes, and thereon alleges that Defendants do not

16 dispute that an HVAC inspection took place on August 20, 2020 during which the inspector

17 "found a crack in the heater that he suggested could potentially cause a carbon monoxide

18 leak."  (Attached hereto as Exhibit B is a true and correct copy of a written timeline drafted

19 by Defendant(s) and submitted to Grange on March 18, 2021.)

20       11.    Mr. Griffin alleges that, on August 24, 2020, Defendant(s) came to the

21 Property and he again advised about the rodent infestation, lack of heat, and rotting stairs

22 and railings that he had been trying to get Mr. Piro to fix since September 2019. Defendants

23 have provided written information to Grange which confirms this meeting took place, and

24 that Defendant(s) told Mr. Griffin that they were considering repairing the stairs and

25 "possible foundation work upon purchase."  (Exhibit B.)  Mr. Griffin alleges during this

26 conversation that Defendant(s) also admitted that the Property was at risk of sliding down

27 the hill.  Mr. Griffin alleges that he reiterated his request for immediate abatement of the

28 rodent infestation and repair of the furnace but that Defendant(s) replied that they did not

3

COMPLAINT FOR RESCISSION AND DECLARATORY RELIEF         CASE NO.

1   intend to pay for repairs until such time as they would be moving into the Property

2   themselves.

3   **Defendants Apply for Insurance With Grange Before Escrow Closes**

4   12.     In order to obtain insurance with Grange to insure the Property upon

5   purchase, Defendants submitted a signed Application for Insurance on September 2, 2020

6   ("Application").   (Exhibit C.)   One of the questions on the Application was "Does the

7   dwelling have any of the following characteristics: cantilevered design, post or pillar

8   construction, unrepaired damage, structural defects or built on fill or silt?"   Defendants

9   answered "no" to that question, despite awareness of rat infestation, broken heater with

10  carbon monoxide issue, and failing stairs and railings that Grange is informed and believes

11  and based thereon alleges that they had learned of during the pre-purchase inspections.

12  They also answered "no" to whether the Property was built on a slope of 20 degrees or

13  more.   Based on the answers in the Application, Grange issued Dwelling Policy No.

14  5302220006342, effective September 2, 2020 through September 2, 2021 to Jed and Yanyi

15  D'Abravanel (the "Policy", attached hereto as Exhibit D).   One of the Conditions on the

16  Policy includes "Concealment or Fraud," which provides:

17  "**K.     Concealment Or Fraud**

18  We do not provide **coverage** to an "insured" who, whether before or after a

19  loss, has:

20          1.     Intentionally concealed or misrepresented any material fact or
          circumstance;

21          2. Engaged in fraudulent conduct; or

22          3. Made false statements;

23  relating to this insurance."

24  13.     Thereafter, Grange determined that the slope was in fact 30 degrees, despite

25  the Application representing otherwise.   Grange guidelines require the construction of a

26  dwelling not be on a property with a slope of 30 degrees or more.   Accordingly, Grange sent

27  a Notice of Cancellation of Insurance on September 11, 2020, effective October 12, 2020.

28  The Policy was therefore only in place for approximately a month.   (Exhibit E.)   On

4

1   September 14, 2020 and September 23, 2020, Grange refunded Defendants $851.00 (Eight

2   Hundred Fifty One Dollars) of the total $952 (Nine Hundred Fifty Two Dollars) premium

3   paid for the Policy.  Grange only retained $101 (One Hundred and One Dollars) in premium

4   to account for month that coverage was in place before cancellation.  Those checks were

5   both cashed on September 29, 2020

6         14.     On September 7, 2020, the sale of the Property closed and Defendants

7   became the new owners of the Property.

8                      **Habitability Issues During the Month of Coverage**

9         15.     Griffin alleges that, starting on September 13, 2020, Defendant(s) and Mr.

10  Griffin communicated repeatedly about the rodent infestation and the furnace issue, and that

11  Defendant(s) stated they were "looking into" it and would be having the Property evaluated

12  for fire hazards.

13        16.     It is alleged that, on September 28, 2020, Mr. Griffin asked for an update and

14  was allegedly advised that Defendant(s) had ordered a replacement furnace and were

15  waiting for the company to schedule an installation date, and that rodent traps had been

16  purchased.  Mr. Griffin protested these traps, stating they had not worked in the past and the

17  infestation was too large for traps to fix.

18        17.     Mr. Griffin alleges he then took action to abate the rat infestation himself.

19  He alleges that several extermination companies came to inspect and each stated the

20  infestation was the worst they had ever seen.  Hundreds of rats were allegedly nesting in the

21  insulation materials, walls, and HVAC ducts.  He alleges that he was advised that the air

22  ducts needed to be sanitized for safety before the furnace could be turned back on. Each

23  company also allegedly emphasized that this rat infestation constituted a major health hazard

24  that should be remediated right away.  Mr. Griffin alleges that he communicated all of this

25  information to Defendant(s), and that Defendant(s) apparently stated they preferred to wait

26  to hear from their own contractor, who was scheduled for October 19, 2020.

27        18.     Grange is informed and believes and based thereon alleges that, on October

28  2, 2020, the new furnace was installed.  Mr. Griffin alleges he had been instructed by the

COMPLAINT FOR RESCISSION AND DECLARATORY RELIEF                    CASE NO.

1   extermination companies he had contacted not to turn on the heat until the old ductwork had

2   been sterilized.  When he communicated this information to the company that installed the

3   new furnace, they allegedly elected not to turn on the new furnace.  Mr. Griffin was later

4   allegedly informed by the health inspector from the Town of Fairfax that it was important

5   that the heater was not turned on until the old ducts had been sterilized.  Therefore, although

6   there was a new furnace, Mr. Griffin and his family were still without heat.

7          19.     Mr. Griffin alleges that, on October 4, 2020, Defendant(s) came to the

8   Property to see whether there was rat excrement in the heater ducts.  He alleges that

9   Defendant(s) denied finding any, and Defendants have provided Grange with written

10  information to confirm they did not find any excrement during their investigation that day.

11         20.     Grange is informed and believes and based thereon alleges that on October 7,

12  2020, Defendant(s) scheduled an HVAC inspection, but Mr. Griffin alleges the chosen

13  company had never performed any cleaning or sanitization work on heating ducts, and was

14  not certified to do so.  After the inspection, Mr. Griffin claims he was told Defendant(s)

15  would not pay for sanitization of the heating ducts because their HVAC inspection had

16  found no proof of excrement.

17         21.     Grange is informed and believes and based thereon alleges that, during the

18  time period after the Policy was cancelled on October 12, 2021, Defendants and Mr. Griffin

19  continued a dialogue regarding Mr. Griffin's habitability claims.  Mr. Griffin also claimed

20  entitlement to rent abatement due to the habitability issues he claimed, which Defendants

21  denied.

22         22.     Grange is informed and believes and based thereon alleges that the County of

23  Fairfax issued a Notice of Violation for the Property which noted the presence of rodents at

24  the Property, which constituted a violation of the 2013 International Property Maintenance

25  Code§ 309.1, and the Fairfax Municipal Code§ 1.1 2.045. The Notice advised the

26  D'Abravanels that the defective conditions "must be addressed immediately, and we must

27  receive a letter from the extermination company stating that the infestation has been

28  eliminated."

6

COMPLAINT FOR RESCISSION AND DECLARATORY RELIEF          CASE NO.

1     23.    Ultimately, Mr. Griffin alleges that he moved out of the Property on

2  November 9, 2020, citing that the Property was uninhabitable.

3     24.    Mr. Griffin filed the Griffin Action on March 12, 2021.  (Exhibit A.)

4  Defendants tendered their defense in the Griffin Action to Grange under the Policy.  During

5  its investigation into coverage, Grange had discussions with Defendant Jed D'Abravanel

6  regarding facts known to him at the time the Application for insurance was submitted and

7  obtained written documentation from him, including a timeline of events he drafted.

8  (Exhibit B.)  That timeline confirms the allegations in the Complaint that Defendants' pre-

9  purchase inspections of the Property revealed rat infestation, a broken heater with carbon

10  monoxide issue, and dilapidated stairs and railings needing repair.  Accordingly, at the time

11  the Application was submitted on September 2, 2020, wherein Defendants answered "no" as

12  to whether there was any "unrepaired damage" at the Property, Grange is informed and

13  believes and based thereon alleges that Defendants were in fact of aware of several items of

14  unrepaired damage.

15     25.    The Policy was issued in reliance upon the false information contained in the

16  Application.  Had Grange been made aware of the unrepaired damage, it would not have

17  issued the Policy.  Accordingly, the misrepresentations were material, and Grange is entitled

18  to rescission *ab initio.*

19     26.    Grange first determined the grounds for rescission during its investigation

20  into coverage for the Griffin Action.  Grange issued written correspondence to Defendants

21  on XXXX providing notice of Grange's intent to rescind the Policy, and including a draft

22  copy of this Complaint for Rescission and Declaratory Relief.  (Exhibit F.)  That notice also

23  included that, in compliance with CA Civil Code § 1691(b), Grange enclosed a check in the

24  amount of $101 (One Hundred and One Dollars) to refund the previously retained premium

25  for the month that coverage was in place before cancellation.  All premiums have now been

26  refunded.   Additionally, without conceding coverage or waiving any of its coverage

27  defenses or right to rescission, Grange offered to provide a defense to Defendant in the

28  Griffin Action until such time as the Court in this action issues an order of Rescission and/or

COMPLAINT FOR RESCISSION AND DECLARATORY RELIEF                    CASE NO.

1   Declaratory Relief regarding the Duty to Defend.  That offer included an offer for
2   independent counsel pursuant to Civil Code section 2860 given the allegations of intentional
3   conduct in the Griffin Action.  Grange's communication was clear that it was not waiving its
4   no-coverage position or any other coverage defenses or rescission rights, and that Grange
5   reserved the right to seek reimbursement of all fees and costs expended in Defendants'
6   defense in the Griffin Action upon a court determination of Rescission and/or Declaratory
7   Relief regarding the duty to defend.  (Exhibit F.)

8                                    **FIRST CAUSE OF ACTION**

9                                    (Rescission of the Grange Policy)

10          27.     Grange re-alleges, and incorporates by reference as though set forth in full,
11   each and every allegation contained in Paragraphs 1 through 26 of the Complaint.

12          28.     Grange is informed and believes, and therefore alleges, that on or about
13   September 2, 2020, Defendants made material false representations in their Application for
14   Insurance.  Specifically, to the question "Does the dwelling have any of the following
15   characteristics: cantilevered design, post or pillar construction, unrepaired damage,
16   structural defects or built on fill or silt," Defendants answered "no."  Grange is informed and
17   believes and based thereon alleges that at that time, Defendants were aware of a rat
18   infestation, broken heater with carbon monoxide issue, and failing stairs and railings that
19   they learned of during the pre-purchase inspections.

20          28.     The representations made by Defendants were in fact false.

21          29.     At the time the representations were made, and at the time Grange issued the
22   Policy, Grange did not know the representations made were false.  Grange believed the
23   representations to be true and reasonably relied on them.  If Grange had known the true
24   facts, it would not have issued the Policy to Defendants.

25          30.     Grange will suffer substantial harm and injury if the 2020 Grange Policy is
26   not rescinded.  Defendant's misrepresentations as to the Property not having unrepaired
27   damage caused the risk accepted by Grange to be greatly expanded beyond what it was
28   willing to insure and deprived Grange of its bargain.

                                                  8

31.      Grange provided notice of rescission both pursuant to this Summons and Complaint and by way of XXXX correspondence, which included an enclosed check for the remaining premiums.  Thus, all consideration furnished by Defendants in exchange for the issuance of the Policy have been refunded.

32.       As a result of issuing the Policy, Grange has incurred expenses in addition to those alleged above.  Additional expenses include, without limitation, attorneys' fees and costs to file the instant action, and attorneys' fees and costs expended in defense of Jed D'Abravanel in the Griffin Action.  Grange will continue to incur expenses in an amount unknown at this time.  Grange prays leave of this court to amend this Complaint to insert the true amount of those expenses when they have been ascertained.

## SECOND CAUSE OF ACTION

(Declaratory Relief)

33.      Grange re-alleges, and incorporates by reference as though set forth in full, each and every allegation contained in Paragraphs 1 through 32 of the Complaint.

34.      Should Grange not be granted rescission as prayed for in the First Cause of Action, then Grange also seeks a declaration that it is not obligated to provide coverage to Defendants for the claims being made in the Griffin Action.

35.      Regardless of whether the relief requested in the First Cause of Action is granted, Grange seeks a declaration that it is not obligated to provide coverage to Defendants for the claims being asserted in the Griffin Action.

36.      An actual and present controversy now exists between Grange and others in that, for the reasons described above, Grange contends it is not obligated to provide coverage for the Griffin Action in light of Condition K. Concealment or Fraud on the Policy, which states that Grange does not provide coverage to an "insured" who, whether before or after a loss, has:

"1.      Intentionally concealed or misrepresented any material fact or circumstance;

2.      Engaged in fraudulent conduct; or

3.      Made false statements;

9

COMPLAINT FOR RESCISSION AND DECLARATORY RELIEF                    CASE NO.

1   relating to this insurance."

2       Grange is informed and believes, and thereon alleges, that Defendants

3   misrepresented a material fact or circumstance relating to the condition of the Property when

4   it applied for coverage from Grange.  Grange is informed and believes, and based thereon

5   alleges that Defendants dispute this contention and contends that Grange is obligated to

6   provide coverage for the Griffin Action.

7       37.    Grange desires a judicial determination and declaration of the parties'

8   respective rights and duties under the Policy issued to Defendants.  Specifically, Grange

9   desires a judicial determination and declaration that it is not obligated to provide coverage to

10  Defendants in connection with Griffin Action because Defendants have not complied with

11  the Conditions of the Policy and/or Grange is entitled to rescission of the Policy.

12      38.    Should the Court find that Grange is not entitled to rescission of the Policy,

13  Grange seeks a declaration from this Court that there is no coverage for the Griffin Action

14  because Defendants did not comply with Condition K. Concealment or Fraud in that they

15  misrepresented the condition of the Property by failing to disclose known unrepaired

16  damage in the Application for Insurance.

17      WHEREFORE, Grange prays for judgment as set forth below.

18  1.    For rescission of the Policy *ab initio*;

19  2.    For a declaration of all rights, duties and obligations of the parties under the

20        Policy;

21  3.    That a judgment be entered against Defendants determining that Grange has

22        no obligation to provide coverage for the Griffin Action;

23  4.    For reimbursement of reasonable attorneys' fees and other litigation expenses

24        according to proof;

25  5.    For costs of suit incurred herein;

26  6.    For pre-judgment and post-judgment interest at the legal rate; and,

27  7.    For such other further relief as this Court deems just and proper.

28  ///

10

COMPLAINT FOR RESCISSION AND DECLARATORY RELIEF                    CASE NO.

1         Respectfully submitted,

2    Dated:                               WOLKIN CURRAN, LLP

3

4                                      **DRAFT**

5                       By: _____

6                             Brandt L. Wolkin, Esq.
                              Catharine M. Tolson, Esq.

7                             Counsel for plaintiff
                              GRANGE INSURANCE

8                             ASSOCIATION

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

COMPLAINT FOR RESCISSION AND DECLARATORY RELIEF               CASE NO.